AP-77,047
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/19/2015 3:07:54 PM
Accepted 6/22/2015 3:35:12 PM
ABEL ACOSTA
CLERK

**NO. AP-77,047**

**IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS**

_____

**KENNETH WAYNE THOMAS
Appellant**

**VS.**

**THE STATE OF TEXAS
Appellee**

_____

**APPEALING THE TRIAL COURT'S CAPITAL JUDGMENT
ASSESSING THE DEATH SENTENCE BASED ON JURY VERDICT
OF GUILTY AND ANSWERS TO SPECIAL ISSUES
IN CAUSE NUMBER F86-85539-M FROM THE 194TH JUDICIAL
DISTRICT COURT OF DALLAS COUNTY, TEXAS
THE HONORABLE ERNEST B. WHITE, III, JUDGE PRESIDING**

_____

**BRIEF FOR APPELLANT**

_____

**JOHN TATUM
990 SOUTH SHERMAN STREET
RICHARDSON, TEXAS 75081
(972) 705-9200
BAR NO. 19672500
ATTORNEY FOR APPELLANT ON APPEAL ONLY**

**ORAL ARGUMENT IS REQUESTED**

## IDENTITIES OF PARTIES AND COUNSEL

HONORABLE ERNEST B. WHITE, III      JUDGE PRESIDING
     133 N. Riverfront Blvd      194TH JUDICIAL
     Frank Crowely Courts Bldg.      DISTRICT COURT
     Dallas, Texas 75207      OF DALLAS COUNTY, TEXAS

KENNETH WAYNE THOMAS      APPELLANT
     TDC#00000869
     Polunsky Unit
     3872 FM 350 South
     Livingston, Texas 77351

HONORABLE JOHN C. "JUAN" SANCHEZ      ATTORNEY FOR APPELLANT
     703 McKinney Ave, Suite 418
     Dallas, Texas 75202-1014
     SBOT#00791599

HONORABLE BROOK A BUSBEE      ATTORNEY FOR APPELLANT
     703 McKinney Ave, Suite 312
     Dallas, Texas 75202-6012
     SBOT# 034880000

HONORABLE JOHN TATUM      ATTORNEY FOR APPELLANT
     990 S. Sherman St.
     Richardson, Texas 75081
     SBOT# 19672500

HONORABLE CRAIG WATKINS      DISTRICT ATTORNEY
     133 N. Riverfront Blvd      DALLAS COUNTY, TEXAS
     Frank Crowely Courts Bldg.
     Dallas, Texas 75207
     at time of trial

HONORABLE BRANDON BIRMINGHAM     ASSISTANT DISTRICT ATTORNEY
    133 N. Riverfront Blvd.     DALLAS COUNTY, TEXAS
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207
    SBOT# 24034330

HONORABLE DEWEYMITCHELL     ASSISTANT DISTRICT ATTORNEY
    133 N. Riverfront Blvd.     DALLAS COUNTY, TEXAS
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207

HONORABLE JERRY VARNEY     ASSISTANT DISTRICT ATTORNEY
    133 N. Riverfront Blvd.     DALLAS COUNTY, TEXAS
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207

HONORABLE MARCIA TAYLOR     ASSISTANT DISTRICT ATTORNEY
    133 N. Riverfront Blvd.     DALLAS COUNTY, TEXAS
    Frank Crowely Courts Bldg.
    Dallas, Texas 75207

# TABLE OF CONTENTS

PAGE

IDENTITIES OF PARTIES AND COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-ii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-vi

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii-xxiii

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xviii-xix

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxvi-xlii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-31

    A.    Competency Trial
        The Defense on Competency Trial

        1) Testimony of Antoinette McGarrahan, Ph.D.. . . . 1-2
        2) Testimony of Cynthia Short. . . . . . . . . . . . . . . . . 2-3

        The State on Competency Trial
        3) Testimony of Kristi Compton, Ph.D. . . . . . . . . . . 3-4

    B.    Trial on Punishment

        The State on Punishment
        1) Testimony of James Gallagher. . . . . . . . . . . . . . . 4-6
        2) Testimony of Joseph Schreck.. . . . . . . . . . . . . . . 6
        3) Testimony of Joseph Maberry. . . . . . . . . . . . . . . 7
        4) Testimony of Carolyn Vanwinkle. . . . . . . . . . . . 7-8
        5) Testimony of Edward T. McDonough, M.D... . . . 8
        6) Testimony of James R. Smith.. . . . . . . . . . . . . . . 8
        7) Testimony of Aubrey Basse. . . . . . . . . . . . . . . . . 9
        8) Testimony of Angela Fitzwater. . . . . . . . . . . . . . 9
        9) Testimony of Margaret Ann "Peggy" Crain. . . . . . 9
        10) Testimony of Pansy Lee Lewis. . . . . . . . . . . . . . 9
        11) Testimony of Bernard H. Blackmon. . . . . . . . . . 10

12) Testimony of Delores Easter. . . . . . . . . . . . . . . .  10
13) Testimony of Thomas Penagraph.. . . . . . . . . . . .  10-11
14) Testimony of Lonnie Thomas. . . . . . . . . . . . . . .  10-12
15) Testimony of Billy Ray Thomas. . . . . . . . . . . . .  12-13
16) Testimony of Lonnie Burrell. . . . . . . . . . . . . . .  13
17) Testimony of Philip E. Jones. . . . . . . . . . . . . . .  13-14
18) Testimony of Marvin Lindwood. . . . . . . . . . . . .  14
19) Testimony of Joyce Brown.. . . . . . . . . . . . . . . .  14-15
20) Testimony of Billy Ray Thomas. . . . . . . . . . . . .  15
21) Testimony of Michael Ferguson. . . . . . . . . . . . .  15
22) Testimony of Steven Dewayne McCarroll.. . . . . .  16
23) Testimony of Larry Dean Turner. . . . . . . . . . . . .  16
24) Testimony of Linda White. . . . . . . . . . . . . . . . .  16

The Defense on Punishment
25) Testimony of Anthony Penagraph. . . . . . . . . . . .  16-17
26) Testimony of Jim Hom, Ph.D.. . . . . . . . . . . . . .  17-18
27) Testimony of Antoinette McGarrahan, Ph.D.. . . .  18-20
28) Testimony of Carolyn Henrietta Roy.. . . . . . . . .  20
29) Testimony of Bobby Charles Roy. . . . . . . . . . . .  20-21
30) Testimony of Rodney Turner.. . . . . . . . . . . . . . .  21
31) Testimony of Cynthia Ann Rice.. . . . . . . . . . . . .  21
32) Testimony of Jaye W. Crowder, M.D.. . . . . . . . .  21-22
33) Testimony of Marilyn Calhoun. . . . . . . . . . . . . .  22-23
34) Testimony of Curfey Henderson. . . . . . . . . . . . .  23
35) Testimony of Van Similine. . . . . . . . . . . . . . . . .  23
36) Testimony of George Abraham. . . . . . . . . . . . . .  23-24
37) Testimony of James Evans Aiken. . . . . . . . . . . .  24-25
38) Testimony of Stephen Phillips.. . . . . . . . . . . . . .  25
39) Testimony of Raymond Moore. . . . . . . . . . . . . .  25-26
40) Testimony of David Weeks. . . . . . . . . . . . . . . . .  26-27
41) Testimony of Anthony Graves.. . . . . . . . . . . . . .  27

The State on Rebuttal
42) Testimony of Melodye Nelson.. . . . . . . . . . . . . .  27-28
43) Testimony of Richard Hughes, Ph.D.. . . . . . . . . .  28
44) Testimony of James C. Belt, Jr.. . . . . . . . . . . . . .  29
45) Testimony of Randy Price, Ph.D.. . . . . . . . . . . . .  29-30

Defense on Rebuttal

46) Testimony of Antoinette McGarrahan, Ph.D.. . . . 30

**SUMMARY OF ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-34

**ISSUES ON VOIR DIRE**

ISSUE NO. 1        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34-35
ISSUE NO. 2        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36
ISSUE NO. 3        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-37
ISSUE NO. 4        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-38
ISSUE NO. 5        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
ISSUE NO. 6        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-40
ISSUE NO. 7        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-41
ISSUE NO. 8        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
ARGUMENT ON ISSUES 1-8.. . . . . . . . . . . . . . . . . . . . . . 41-50
ISSUE NO. 9        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50-54
ISSUE NO. 10       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54-56
ISSUE NO. 11       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56-57
ISSUE NO. 12       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58-59
ISSUE NO. 13       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60-61
ISSUE NO. 14       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62-63
ISSUE NO. 15       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63-65
ISSUE NO. 16       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65-66
ISSUE NO. 17       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67-68
ISSUE NO. 18       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68-70
ISSUE NO. 19       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70-72
ISSUE NO. 20       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72-74
ISSUE NO. 21       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74-75
ISSUE NO. 22       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75-76
ISSUE NO. 23       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77-79
ISSUE NO. 24       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79-80
ISSUE NO. 25       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80-81
ISSUE NO. 26       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
ISSUE NO. 27       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
ISSUE NO. 28       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84-85
ISSUE NO. 29       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85-86

ISSUE NO. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86-87
ISSUE NO. 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87-101
ISSUE NO. 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101-104
ISSUE NO. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101-104
ISSUE NO. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102-104
ISSUE NO. 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
ISSUE NO. 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105-107

**PRETRIAL ISSUES**
ISSUE NO. 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107-108

**COMPETENCY TRIAL ISSUES**
ISSUE NO. 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109-112
ISSUE NO. 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113-114
ISSUE NO. 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114-119
ISSUE NO. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114-120

**PUNISHMENT TRIAL ISSUES**
ISSUE NO. 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120-121
ISSUE NO. 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
ISSUE NO. 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122-123
ISSUE NO. 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123-126
ISSUE NO. 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127-128
ISSUE NO. 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129-131
ISSUE NO. 48 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129-131
ISSUE NO. 49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131-142
ISSUE NO. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142-143
ISSUE NO. 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
ISSUE NO. 52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144-145
ISSUE NO. 53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
ISSUE NO. 54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145-148

**SPECIAL REQUESTED ISSUE ON APPEAL**
ISSUE NO. 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149-150

**FEDERAL ISSUES**
ISSUE NO. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
ISSUE NO. 57 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152-153
ISSUE NO. 58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153
ISSUE NO. 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
ISSUE NO. 60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
ISSUE NO. 61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

ISSUE NO. 62 .................................. 156
ISSUE NO. 63 .................................. 156
ISSUE NO. 64 .................................. 157
ISSUE NO. 65 .................................. 157-158
ISSUE NO. 66 .................................. 158-159
PRAYER ..................................... 160
CERTIFICATE OF SERVICE. ....................... 161
CERTIFICATE OF SERVICE. ....................... 161
CERTIFICATE OF WORD COUNT. .................. 162

**INDEX OF AUTHORITIES**

**FEDERAL CASES**

*Apprendi v. New Jersey*
530 U.S. 466 (2000), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

*Atkins v. Virginia*
536 U.S. at 321). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89-91,95,97,100,101

*Batson v. Kentucky*
476 U. S. 79, 106 S. C. 1712, 90 L. Ed. 2d 69 (1988).. . . . . . . . . . . . . . . . . . . 34-42,47

*Bush v. Gore*
531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).. . . . . . . . . . . . . . . . . . . . . 160

*Chester v. Thaler*
666 F.3d 340, 346 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91,96

*Drope v. Missouri*
420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975).. . . . . . . . . . . . . . . . 115

*Eddings v. Oklahoma*
455 U.S. 104, 112, 102 S. Ct. 869, 71 L.Ed.2d 1 (1982). . . . . . . . . . . . . . . . . . . . 52

*Furman v. Georgia*
408 U.S. 238 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*Gilmore v. Taylor*
508 U.S. 333, 113 S.Ct. 2112, 124 L. Ed.2d 306 (1993). . . . . . . . . . . . . . . . . . . . 159

*Gregg v. Georgia*
428 U.S. 153, 189 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*Hall v. Florida*
134 S.Ct. 1986 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . 88-90,92,97-98,100-104

*Hayes v. Thaler*
361, Fed App. 563 (C.A.5 (Tex.)) 2010 WL 183395 . . . . . . . . . . . . . . . . . . . . . . . 49

***In Re Windship***
397 U.S. 358 (1970).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

***Jurek v. Texas***
428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).. . . . . . . . . . . . . . . . . . . . . 132

***Lockett v. Ohio***
438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 ( 1978). . . . . . . . . . . . . . . . . . . . . . 54

***Lowenfield v. Phelps***
484 U.S. at 240-41, 108 S.Ct. at 522, 98 L.Ed.2d.. . . . . . . . . . . . . . . . . . . . . . . 154

***Miller-El v. Cockrell***
537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47,49

***Miller-El v. Drekte***
545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

***Mills v. Maryland***
486 U.S. 367, 383, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988) . . . . . . . . . . . . . 154

***Moore v. Quarterman***
342 F. App'x 65, 72 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

***Morgan v. Illinois***
504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52,54

***Payne v. Tennessee***
501 U.S. 808 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

***Reed v. Quaterman***
555 F3d 304 (45th Cir.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

***Ross v. Oklahoma***
4897 U.S. 81 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

***Snyder v. Louisiana***
128 S.Ct. 1203 (2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

***Spaziano v. Florida***
468 U.S. 447-64 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  156

***Tennard v. Dreke***
124 S.Ct. 2562 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

***Wainwright v. Witt***
469 U.S. 412 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54,80

***Walton v. Arizona***
497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). . . . . . . . . . . . . . . . . . . . . . .  156

***Woodson v. North Carolina***
428 U.S. 280, 305 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52,160

**STATE CASES**

***Alcott v. State***
51 S.W.3d 596, 599 (Tex.Crim.App.2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  147

***Anderson v. State***
633 S.W.2d 851, 854 (Tex. Crim.App. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . 52,87

***Ardovina v. State***
143 Tex. Crim. 43, 156 S.W.2d 983, 984(1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  150

***Barajas v. State***
93 S.W.3d 36,39 (Tex Crim. App. 2002). . . 51-52,55,57,59,61,63,65-66,68,70,72,74-76

***Barletta v. State***
994 S.W.2d 708, 713 (Tex. App.- Texarkana 1999, pet. ref'd). . . . . . . . . . . . . . . . .  127

***Beltran v. State***
728 S.W.2d 382,388(Tex.Cr.App.1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135,142

***Belyeu v.State***
791 S.W.2d 66, 73 (Tex. Crim. App. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  145

***Berry v. State***
233 S.W.3d 847 (Tex. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132-133

***Blonner v. State***
127 P.3d 1135, 1139 (Okla.Crim.App. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

***Boston  v. State***
965 S.W.2d 546, 550 (Tex. App.-Houston [14[th] Dist.] 1997, no pet.). . . . . . . . . . . . 127

***Brasfield v. State***
600 S.W.2d 288 (Tex. Cr. App. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

***Brooks v. State***
599 S.W.2d 312 (Tex. Cr. App. 1979), cert. den. 453 U.S. 913, 101 S.Ct. 3146, 69
L.Ed.2d 996 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

***Burgan v. State***
259 S.W.3d 219 (Tex. Ct. App.-Beaumont, 2008).. . . . . . . . . . . . . . . . . . . . . . . . 148

***Cantu v. State***
939 S.W. 2d 627, 637 (Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . 127-128

***Carter v. State***
717 S.W.2d 60 (Tex. Cri. App. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

***Casey v. State***
924 S.W.2d 946, 949 (Tex.Crim.App.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

***Clark v. State***
717 S.W.2d 910, 916-17 (Tex. Crim. App. 1986). . . . . . . . . . . . . . . . . . . . . . . . . 52

***Coe v. State***
683 S.W.2d 431, 438 (Tex.Crim.App.1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

***Commonwealth v. Miller***
888 A.2d 624 (Pa. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

***Cordova v. State***
733 S.W.2d 175, 182 (Tex. Cr. App. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

***Criswell v. State***. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
278 S.W.3d 455, 458 (Tex.App.-Houston [14th Dist.] 2009, no pet.).

***Cruz v. State***
629 S.W.2d 852 (Tex. Ct. App. Corpus Christi, 1982). . . . . . . . . . . . . . . . . . . . . . 150

***Cumbo v. State***
760 S.W.2d 251 (Tex. Crim. App. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

***Eidson v. Edwards***
793 S.W.2d 1 (Tex. Crim. App. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

***Esteves v. State***
859 S. W. 2d 613 (Tex. App. – Houston [1ˢᵗ Dist.] 1993, pet. ref'd). . . . . . . . . . . . . . 42

***Everson v. State***
851 S. W. 2d 269 (Tex. Crim. App. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

***Ex Parte Briseno***
135 S.W.3d 1 (Tex. Crim. App. 2009) . . . . . . . . . . . . . 87,90-92,94-95,97,100-102,144

***Ex Parte Cathay***
451 S.W.3d 1 (Tex. Crim.App. 2014). . . . . . . . . . . . . . . . . . . . . . . . 87-90,95,104,129

***Ex parte Hagens***
558 S.W.2d 457, 461 (Tex. Crim. App. 1977). . . . . . . . . . . . . . . . . . . . . . . . . 111,112

***Ex parte Hearn***
310 S.W.3d 424, 428–29 (Tex.Crim.App.2010). . . . . . . . . . . . . . . . . . . . . . . . . 88,91

***Ex Parte Ladd***
2013 WL 593927 S.W. 3d (Tex. Crim. App. 2015). . . . . . . . . . . . . . . . . . . . . . . . 88,92

***Ex parte LaHood***
401 S.W. 3d 45,53 (Tex. Crim. App.  2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

***Ex Parte Lizcano***
WR-68,348-03 (Tex. Crim.App. April 15, 2015) . . . . . . . . . . . . . . . . . . . . . . . . .  88

***Ex parte Sosa***
364 S.W.3d 889, 891 (Tex. Crim. App. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 91,97

***Ex Parte Van Alstine***
239 S.W. 3d 815(Tex. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  131

***Ex parte Weathers***
No. WR-64,302-02, 2014 WL 1758977, at *6 (Tex. Crim. App. Apr. 30, 2014). . . . .  91

***Faulder v. State***
745 S.W.2d 327 (Tex. Cr. App.. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  87

***Fierro***
706 S.W.2d 310,319 (Tex. Crim. App. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . 135,142

***Fuller v. State***
363 S.W.3rd 583 (Tex. Crim. App. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  147

***Gallo v. State***
239 S.W.3d 757 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  131

***Garcia v. State***
626 S.W.2d 46 (Tex. Cr. App. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  136

***Gigliobianco v. State***
2310 S.W.3d 637, 641-42 (Tex. Crim.App. 2006). . . . . . . . . . . . . . . . . . . . . . . . .  114

***Green v. State***
682 S.W.2d 271 (Tex. Crim. App. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  145

***Greer v. State***
No. 05-08-00146 (Tex. App.-Dallas June 9, 2009). . . . . . . . . . . . . . . . . . . . . . . . .  49

***Harris v. State***
790 S.W.2d 568, 581 (Tex. Crim. App. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

***Harris v. Texas Dep't of Crim. Justice***
806 F. Supp. 627, 636 (S.D. Tex. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

***Hernandez v. State***
757 S.W.2d 744 (Tex. Crim. App. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

***Hovila v. State***
562 S.W.2d 243 (Tex. Cr. App. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

***Huffman v. State***
746 S.W.2d 212 (Tex. Crim. App. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

***Hughes v. State***
892 So.2d 203, 216 (Miss. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

***In RE: Tyrone Allen***
realtor, WR-82,265-01 and WR-82,265-02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

***Johnson v. State***
673 S.W.2d 190, 197 (Tex. Crim. App.1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

***Jones v. State***
982 S.W.2d 386 (Tex. Crim. App. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 106-107

***Jurek v. State***
522 S.W.2d 934 (Tex. Cr. App. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

***Keeton v. State***
724 S. W. 2d 58, 65 n. 5 (Tex. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . 47,133,134

***Kelly v. State***
824 S.W.2d 568 (Tex. Crim. App. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

***Kostura v. State***
292 S.W.3d 744, 749 (Tex.App.-Houston [14th Dist.] 2009, no pet.). . . . . . . . . . . . . 147

***Ladd v. State***
3 S.W.3d 547, 567 (Tex. Crim. App. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

***Lallo v. State***
239 S.W.3d 757 (Tex. Rim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

***Lindsay v. State***
102 S.W.3d 223, 228 n. 1 (Tex. App.-Houston [14th Dist.], 2003, pet. filed). . . . . . . 128

***Linscomb v. State***
829 S. W. 2d 164, 166 (Tex. Crim. App. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . 47,48

***Lizcano v. State***
No. AP-75879, 2010 WL 181772, *35 (Tex. Crim. App. May 5, 2010) . . . . . . . . . . . 96

***Lopez v. State***
940 S. W. 2d 388 (Tex. App.-Austin, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

***Marguez v. State***
725 S.W.2d 217 (Tex.Crim. App. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

***Mays v. State***
726 S.W.2d 937, 950 (Tex. Cr. App. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

***Mertz v. State***
785 S.W.2d 146 (Tex. Crim. App. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

***McFarlane v. State***
254 S.W.2d 136 (Tex. Cr. App. 1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

***Middleton v. State***
239 S.W.45 ( Tex. Crim. App. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

***Mitchell v. State***
650 S.W.2d 801 (Tex. Cr. App. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

***Montgomery v. State***
810 S.W.2d 372, 376 (Tex. Crim. App.1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . 113

***Morris***
301 S.W.3d (Tex. Crim. App. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

***Mosely v. State***
983 S.W.2d (Tex. Crim. App. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

***Musick v. State***
862 S.W. 2d 794 (Tex. App. – El Paso 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

***Nenno v. State***
970 S.W.2d 549 (Tex. Crim. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

***Nunez v. State***
742 S.W.2d 57 (Tex. Ct. App.-Corpus Christi 1997, no pet.). . . . . . . . . . . . . . . . . . 120

***O'Bryan v. State***
591 S.W.2s 464, 480 (Tex. Cr. Ap. 1979).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

***People v. Lavalle***
783 N.Y.S.2d 485 (N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

***Perkins v. State***
32 Tex. 109, 112(1869).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

***Ramirez v. State***
862 S. W. 2d 648 (Tex. App. – Dallas 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42,49

***Reeves v. State***
806 S.W.2d 540, 543 (Tex. Crim.App.1990), cert. denied, –U.S.–, 111 S.Ct. 641,
113 L.Ed.2d 736 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

***Renteria v. State***
206 S.W.3d 689 (Tex. Crim. App. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

***Robinson v. State***
548 S.W.2d 63, 64 (Tex. Cr. App. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

***Rodriguez v. State***
324 S.W.3d 74 (Tex. Crim. App. -Hou [14[th] Dist.] 2010) . . . . . . . . . . . . . . . . . . . . 145

***Rojas v. State***
986 S.W.2d 241, 249 (Tex. Crim. App.1998).. . . . . . . . . . . . . . . . . . . . . . . 112,126

***Roney v. State***
 632 S.W.2d 598,603 (Tex. Cr. App. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . 132,136

***Salazar v. State***
562 S.W.2d 480, 482 (Tex. Crim. App. 1978).. . . . . . . . . . . . . . . . . . . . . . . 51,124

***Saldano v. State***
*232 S.W.3d 77 (Tex. Crim.App. 2007)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

***Santana v. State***
714S.W.2d 1, 8 (Tex. Cr. App. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

***Santellan v. State***
 939 S.W.2d 155 (Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 126

***Seghelmeble v. State***
390 S.W.3d 576 (Tex. Ct. App.-Dallas, 2012) . . . . . . . . . . . . . . . . . . . . . . . . 115

***Shaver v. State***
280 S.W.2d 740, 742 (Tex. Crim.App. 1955). . . . . . . . . . . . . . . . . . . . . . . . 51

***Smith v. State***
919 S.W.2d 96 (Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

***State v. Jimenez***
880 A.2d 468 (N.J. Super. Ct. App. Div. 2005). . . . . . . . . . . . . . . . . . . . . . . 99

***State v. Jimenez***
908 A.2d 181 (N.J. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

***State v. Lott***
779 N.E.2d 1011 (Ohio 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

***Townsend v. State***
427 S.W.2d 55, 63 (Tex. Crim. App. 1968). . . . . . . . . . . . . . . . . . . . . . . . . 112

***Turner v. State***
422 S.W.3d 676, 688 (Tex. Crim. App. 2013)... . . . . . . . . . . . . . . . . . . . . . . . . . . 114

***Wallace v. State***
618 S.W.2d 67 (Tex. Cr. App. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

***Warren v. State***
562 S.W.2d 474 (Tex. Cr. App. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

***Whitsey v. State***
796 S. W. 2d 707, 713 (Tex. Crim. App. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . 48

***Williams v. State***
68 S.W.2d 692 (Tex. CR. App. 1983)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

***Williams v. State***
270 S.W.3d 112 (Tex. Crim. App. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

***Williams v. State***
692 S.W.2d 671, 676 (Tex.Crim.App.1984). . . . . . . . . . . . . . . . . . . . . . . . . . . 149

***Wyatt v. State***
23 S.W.3d 18, 29 (Tex. Crim. App.2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

***Young v. State***
826 S. W. 2d 141, 145 (Tex. Crim. App. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . 48

***Zamosa v. State***
41 S.W.3d 504 (Tex. Crim. App. 2013)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

**STATE STATUTES**:

Tex. Code Crim. P. Ann. Art. 35.16(c)(2)
(Vernon Supp. 1992). . . . . . . . . . . . . . . . 51,52.55,57,59,61,63,64,66,68,70,71,73,74,76

Tex. Code Crim. P. Ann. Art. 35.16(a)(9)
(Vernon Supp. 1992). . . . . . . . . . . . . . . . . . . 55,57,59,61,63,64,66,68,70,71,73,74,76

TEX. CODE CRIM. PROC. ANN. art. 37.071, §3(b)(1), (b)(2), (e) (Vernon Supp. 1999)............................................................ 52,155

TEX.CODE CRIM. PROC. ANN. art. 37.071 § 2(e)(1)
(Vernon Supp. 1999). ........................................ 153

TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3)
& (c)(2) (West 2006)...................... 55,57,59,61,63,64,66,68,70,72,74-76

Rule. 44.2.(b) C.C.P.................................................. 126

Tex. Const. Art. I, §§ 13 & 19.................................. 112

Tex. Const. Art. I, § 10................................. 51,105

TEX.R.EVID. 403................................. 113,122,123,125

TEX.CODE.CRIM.PROC.ANN, art. 46B.003(a) (Vernon 2006). ............ 115

TEX CODE CRIM. PRO. ANN. Art 46B.024 (West 2006)... ................. 119

TEX.R.CRIM.EVID 401................................................ 128

Art. 44.251 (a). ..................................................... 132

Article 37.0711§3(a)(1) C.C.P. ............................ 133,135

Article 38.14 C.C.P... ............................................ 145

TEX.CODE CRIM. PROC. ANN. Art 38.03 (Vernon Supp. 1991)... ............ 149

ALA. CODE § 15-24-2(3) (2012)..................................... 99

ARIZ. REV. STAT. ANN. § 13-753(K)(1)-(K)(3) (2012)................... 99

ARK. CODE ANN. § 5-4-618(a)(1) (2011). .......................... 99

CAL. PENAL CODE § 1376(a) (2011). .............................. 99

COLO. REV. STAT. § 18-1.3-1101(2) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

DEL. CODE ANN. tit. 11 § 4209(d)(3)d (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

FLA. STAT. ANN. § 921.137(1) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

GA. CODE ANN. § 17-7-131(a)(3) (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

IDAHO CODE ANN. § 19-2515A(1)(a) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

IND. CODE ANN. 35-36-9-2 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

KAN. STAT. ANN. §§ 21-6622(h), 76-12b01 (2011). . . . . . . . . . . . . . . . . . . . . . . . . 99

KY. REV. STAT. ANN. § 532.130(2) (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

LA. CODE CRIM. PROC. ANN. art. 905.5.1(H)(1) (2011). . . . . . . . . . . . . . . . . . . . . 99

MO. ANN. STAT. § 565.030(6) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

NEB. REV. STAT. § 28-105.01(3) (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

NEV. REV. STAT. ANN. § 174.098(7) (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

N.C. GEN. STAT. ANN. § 15A-2005(a)(1)(a) (2011). . . . . . . . . . . . . . . . . . . . . . . . . 99

S.C. CODE ANN. § 16-3-20(C)(b)(10) (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

TENN. CODE ANN. § 39-13-203(a) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

UTAH CODE ANN. § 77-15a-102 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

VA. CODE ANN. § 19.2-264.3:1.1(A) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

WASH. REV. CODE ANN. § 10.95.030(2)(a) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . 99

OKLA. STAT. ANN. tit. 21 § 701.10bA(1) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

S.D. CODIFIED LAWS § 23A-27A-26.2 (2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . 99

CONN. GEN. STAT. § 1-1g(a) (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

725 ILL. COMP. STAT. 5/114-15(d) (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

MD. CODE ANN., CRIM. LAW § 2-202(b)(1) (2012) . . . . . . . . . . . . . . . . . . . . . 99

N.M. STAT. ANN. § 31-20A-2.1(A) (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

N.Y. CRIM. PROC. LAW § 400.27(e) (2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . 99

DSMIV.DEL. CODE tit. 11g § 4209(d)(3)d.1 (2012). . . . . . . . . . . . . . . . . . . . . 99

IDAHO CODE ANN. § 19-2515A(1)(a) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 99

725 ILL. COMP. STAT. 5/114-15(d) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

MO. ANN. STAT. § 565.030(6) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

N.C. GEN.STAT. ANN. § 15A-2005(a)(1)(b) (2012). . . . . . . . . . . . . . . . . . . . . 99

VA. CODE ANN. § 19.2-264.3:1.1(A) (2102).. . . . . . . . . . . . . . . . . . . . . . . . . . . 99

TENN. CODE ANN. § 33-1-101(17) (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

ARIZ. REV. STAT. ANN. § 13-753(K) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 99

CONN. GEN. STAT. § 1-1g(b) (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

FLA. STAT. ANN. § 921.137(1) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

KAN. STAT. ANN. § 76-12b01(a) (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

LA. CODE CRIM. PROC. Ann. art. 905.5.1(H)(1) (2011). . . . . . . . . . . . . . . . . . 99

UTAH CODE ANN. §77-15a-102 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

WASH. REV. CODE ANN. § 10.95.030(2)(d) (2012). .. . . . . . . . . . . . . . . . . . . . . .  99

**OTHER**:

John Blume et al., *A Tale of Two (and possible three) Atkins:*
*Intellectual Disability and Capital Punishment Twelve Years*
*After the Supreme Court's Creation of a Categorical Bar*,
23 WM. & MARY BILL RTS. J. 393, 414 (2015). . . . . . . . . . . . . . . . . . . . . . . . . 93,97

American Psychiatric Association, *Diagnostic*
*and Statistical Manual of Mental Disorders*, 39 (4th ed. Text Revision 2007) . . . .  93,94

J. Gregory Olley, *Knowledge and Experience*
*Required for Experts in Atkins Cases*, 16 J. Applied Psych. 135, 137 (2009) . . . . . . .  94

George W. Woods et al, *Intellectual Disability*
*and Comorbid Disorders*, in DEATH PENALTY AND
INTELLECTUAL DISABILITY 279, 286. .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94

Stephen Greenspan, *The Briseño Factors* in
DEATH PENALTY AND INTELLECTUAL DISABILITY 219. .. . . . . . . . . . . . . . . . . . . . 95-97

John Blume et al., *Of Atkins and Men: Deviations from*
*Clinical Definitions of Mental Retardation*
*in Death Penalty Cases,* 18 CORNELL J. LAW & PUB. POLICY 689, 710-17 (2009). . . .  96

Peggy M. Tobolowsky, *A Different Path Taken:*
*Texas Capital Offenders' Post-Atkins Claims of Mental Retardation*,
39 HASTINGS CONST. L.Q. 1, 149-66, 173-74 (2011). . . . . . . . . . . . . . . . . . . . . . . . 96,07

Stephen Greenspan & Harvey N. Switzky,
*Lessons from the Atkins Decision for the Next AAMR Manual*,
in AAMR, WHAT IS MENTAL RETARDATION?
IDEAS FOR AN EVOLVING DISABILITY IN THE 21ST CENTURY 291 (2006). . . . . . . . . . . .  96

Peggy M. Toblowsky, *Excluding Intellectually Disabled Offenders from Execution: The Continuing Journey to Implement Atkins*, 211 (Carolina Academic Press 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Lee Kovarsky, *Death Ineligibility and Habeas Corpus*, 95 CORNELL L. REV. 329, 352-53 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

## STATEMENT OF THE CASE

By an indictment filed on the 21st day of March, 1986, Appellant was charged in trial court cause number F86-85539-M with one count of capital murder. (C.R. Vol. 1 p. 2) The indictment alleged that on March 16th, 1986 Appellant intentionally or knowingly caused the death of Mildred Finch by stabbing her with a knife in the course of committing and attempting to commit the offense of burglary of the deceased. On September 22, 2010 the Court of Criminal Appeals granted Habeas Corpus relief in Tr. Ct. No. W86-85539M that resulted in this retrial on the issue of punishment.

On July 7, 2014 a jury was empaneled in the trial on Defendant's mental competency to stand trial. On July 9th, 2014, the jury found that the Defendant was competent to stand trial. (RR: Vol. 59 p. 7) The retrial on punishment began on July 10th, 2014. On July 23, 2014 the jury answered Special Issue No. 1 "Do you find by a preponderance of the evidence that the Defendant, Kenneth Wayne Thomas, is a person with mental retardation?" as "no." The jury answered Special Issue No.2 "Do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant, Kenneth Wayne Thomas, that caused the death of the deceased was committed deliberately and with a reasonable expectation that the death of the deceased or another would result?" as "yes." The jury answered Special Issue No. 3, "Do you find from the

evidence beyond a reasonable doubt that there is a probability that the Defendant, Kenneth Wayne Thomas, would commit criminal acts of violence that would constitute a continuing threat to society?" as "yes."  The jury answered Special Issue No. 4. "Do you find, taking into consideration all the evidence, including the circumstances of the offense, the Defendant's character and background and the personal moral culpability of the Defendant, that there is a sufficient mitigating circumstance or circumstances that warrants that a life sentence of imprisonment rather than a death sentence be imposed?" as "no."  In accordance with the previous verdict of guilty and answers to the special issues, the trial court entered a judgment and assessed Appellant's punishment at death. (Reporter's Record Vol. 70 p. 84-85)

On August 21, 2014, Appellant timely filed a Motion for New Trial that was subsequently denied by the court. (Clerk's Record P. 38).  Notice of appeal was appeal to this Court is automatic.  *See* Tex. Code Crim.Proc.Ann. art. 37.071,§ 2(g)(Vernon Supp. 2001).

## ISSUES PRESENTED

**I.**     **JURY SELECTION ISSUES**

    **A.**     **'BATSON' VOIR DIRE ISSUES 1-8**

**APPELLANT'S ISSUE NO. 1**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 64, NEENA BISWAS IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

**APPELLANT'S ISSUE NO. 2**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 126, LEON R. TILLEY IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

**APPELLANT'S ISSUE NO. 3**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 225, DEBORAH A. MOORE IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

**APPELLANT'S ISSUE NO. 4**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 497, PRONSAK NOHE IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

**APPELLANT'S ISSUE NO. 5**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 755, CASSIE R. FIGURES IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

**APPELLANT'S ISSUE NO. 6**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 955, ARY A. MCGOWAN IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

**APPELLANT'S ISSUE NO. 7**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 1055, ARTHERINE PRIESTON, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

**APPELLANT'S ISSUE NO. 8**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 1095, MARTHA E. BARBOSA IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

**B.     ISSUES ON TRIAL COURT'S DENIAL OF APPELLANT'S CHALLENGES FOR CAUSE**

**APPELLANT'S ISSUE NO. 9**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON MARIE SANDS**

**APPELLANT'S ISSUES NO. 10**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON DORCE L. MOORE**

**APPELLANT'S ISSUE NO. 11**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON DAVID L. DARDEN**

**APPELLANT'S ISSUES NO. 12**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON DELORES SAWYER**

**APPELLANT'S ISSUES NO. 13**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JONATHAN L. HENDERSON**

**APPELLANT'S ISSUES NO. 14**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON ISAAC TSCHEWIK**

**APPELLANT'S ISSUES NO. 15**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON MICHAEL D. DAWSON**

**APPELLANT'S ISSUES NO. 16**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON ANGELA K. THORPE-HARRIS**

**APPELLANT'S ISSUES NO. 17**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON CHRISTOPHER F. WEINZAPFEL**

**APPELLANT'S ISSUES NO. 18**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON PHILLIP D. RAPP**

**APPELLANT'S ISSUES NO. 19**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON NANCY RAMOS**

**APPELLANT'S ISSUES NO. 20**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JAY F. KIRBY**

**APPELLANT'S ISSUES NO. 21**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON NATHAN H. SOSA**

**APPELLANT'S ISSUES NO. 22**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JAMES E. MARTIN**

**APPELLANT'S ISSUES NO. 23**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JENNIFER L. WILDER**

**C. APPELLANT'S ISSUES ON JURORS EXCUSED OVER OBJECTION OF APPELLANT**

**APPELLANT'S ISSUES NO. 24**

**THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON SHERYL R. KINGERY OVER THE OBJECTIONS OF THE DEFENSE**

**APPELLANT'S ISSUES NO. 25**

**THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON KIMBERLY KAY MORRIS OVER THE OBJECTIONS OF THE DEFENSE**

**APPELLANT'S ISSUES NO. 26**

**THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON CONSUELO DAVILA OVER THE OBJECTIONS OF THE DEFENSE**

**APPELLANT'S ISSUES NO. 27**

**THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON GLORIA J. HAWKINS OVER THE OBJECTIONS OF THE DEFENSE**

**APPELLANT'S ISSUES NO. 28**

**THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON JENNA A. KINZIE OVER THE OBJECTIONS OF THE DEFENSE**

**APPELLANT'S ISSUES NO. 29**

**THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON RAUL FLORES OVER THE OBJECTIONS OF THE DEFENSE**

**APPELLANT'S ISSUES NO. 30**

**THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON KELLYE C. HOGAN OVER THE OBJECTIONS OF THE DEFENSE**

**C.  APPELLANT'S ISSUES ON INTELLECTUAL DISABILITY**

**APPELLANT'S ISSUE NO. 31**

**THE APPLICATION OF THE JUDICIAL OPINION IN EX PARTE BRISENO DEFINING INTELLECTUAL DISABILITY (MENTAL RETARDATION) AS A PERSON HAVING AN I.Q. SCORE OF 70 OR BELOW IS UNCONSTITUTIONAL PURSUANT TO THE OPINION RENDERED IN THE CASE OF HALL V. FLORIDA,134 S.CT. 1986(2014)**

**APPELLANT'S ISSUE NO. 32**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO QUASH THE PROSPECTIVE JURY PANEL AFTER RECEIVING THE CASE OF *HALL V. FLORIDA*, Ibid. BECAUSE THE STATE HAD VOIR DIRED THE JURY THAT TEXAS USED AN I.Q. OF 70 OR BELOW TO ESTABLISH INTELLECTUAL DISABILITY**

**APPELLANT'S ISSUE NO. 33**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S COUNSEL'S REQUEST TO REQUESTION THE JURY THAT HAD BEEN ALREADY QUALIFIED AS TO THE ISSUE OF INTELLECTUAL DISABILITY TO PROPERLY EDUCATE THEM AND DETERMINE IF THEY WERE QUALIFIED JURORS AFTER RECEIVING THE CASE OF *HALL V. FLORIDA* Ibid. HANDED DOWN DURING THE VOIR DIRE PROCESS IN THE CASE AT BAR**

**APPELLANT'S ISSUE NO. 34**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION THAT THE STATE SHOULD NOT BE ALLOWED TO CONTINUE TO VOIR DIRE THE PROSPECTIVE JURORS THAT INTELLECTUAL DISABILITY IS MEASURED BY AN I.Q. SCORE OF 70 OR LESS PURSUANT TO THE CASE OF EX PARTE BRISENO, Supra. CONTRARY TO THE CASE OF HALL V. FLORIDA, Supra.**

**APPELLANT'S ISSUES NO. 35**

**THE JURY AS CONSTITUTED WAS BIASED OR PREJUDICE WHICH DEPRIVED APPELLANT OF A FAIR TRIAL**

**APPELLANT'S ISSUE NO. 36**

**THE JURY AS CONSTITUTED HAS DENIED APPELLANT DUE PROCESS OF LAW BECAUSE JURORS CHALLENGEABLE FOR CAUSE WERE ALLOWED ON THE JURY WHICH DEPRIVED APPELLANT OF A FAIR TRIAL**
**(FEDERAL CONSTITUTIONAL ISSUE)**

II.   **TRIAL ISSUES**

A.    **PRETRIAL ISSUES**

**APPELLANT'S ISSUE NO. 37**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO DISQUALIFY THE DALLAS COUNTY DISTRICT ATTORNEY'S OFFICE IN THE PROSECUTION OF THIS CASE**

B.    **COMPETENCY TRIAL ISSUES**

**APPELLANT'S ISSUE NO. 38**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR MISTRIAL DUE TO THE PROSECUTOR'S REMARK THAT THE DEFENDANT'S CASE INVOLVED 'MURDER'**

**APPELLANT'S ISSUE NO. 39**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE PROSECUTOR'S QUESTION TO THE WITNESS THAT APPELLANT'S FIRST TRIAL IN '87 WAS REVERSED ON APPEAL AS NOT RELEVANT**

**APPELLANT'S ISSUE NO.  40**

**THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S VERDICT THAT APPELLANT WAS COMPETENT TO STAND TRIAL**

**APPELLANT'S ISSUE NO. 41**

**THE EVIDENCE WAS FACTUALLY SUFFICIENT TO FIND APPELLANT INCOMPETENT MAKING THE JURY'S VERDICT SO AGAINST THE GREAT WEIGHT AND PREPONDERANCE OF THE EVIDENCE AS TO BE MANIFESTLY UNJUST**

**C.     PUNISHMENT TRIAL ISSUES**

**APPELLANT'S ISSUE NO. 42**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION THAT DR. RANDY PRICE, STATE'S PSYCHOLOGIST, BE ALLOWED TO TESTIFY AS AN EXPERT ON APPELLANT HAVING TRAITS OF SOMEONE WITH ANTI-SOCIAL PERSONALITY DISORDER WHEN HE COULD NOT PURSUANT TO HIS OWN PROFESSIONAL STANDARDS MAKE THAT DIAGNOSIS**

**APPELLANT'S ISSUE NO. 43**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE WITNESS PRICE'S TESTIMONY ABOUT APPELLANT LACKING REMORSE**

**APPELLANT'S ISSUE NO. 44**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION THAT A KNIFE IS PRESENTED IN THE PHOTOGRAPHS (STATE'S EXHIBIT NO. 205) AS SPECULATIVE WHERE NO KNIFE WAS PLACED INTO EVIDENCE**

**APPELLANT'S ISSUE NO. 45**

**THE TRIAL COURT ERRED IN ADMITTING NUMEROUS AUTOPSY PHOTOGRAPHS BY THE MEDICAL EXAMINER'S OFFICE IN VIOLATION OF RULE 403, TEX. R. EVID. WHERE THE PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED ANY PROBATIVE VALUE**

**APPELLANT'S ISSUE NO. 46**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE PROFFERED VICTIM IMPACT EVIDENCE TO BE PRESENTED BY STATE'S WITNESS, MR. JAMES BELT**

**APPELLANT'S ISSUE NO.  47**

**THE JURY'S ANSWER TO SPECIAL ISSUE NO. 1 (INTELLECTUAL DISABILITY ISSUE) IS AGAINST THE GREAT WEIGHT AND PREPONDERANCE OF THE EVIDENCE AS TO MAKE IT UNJUST**

**APPELLANT'S ISSUE NO.  48**

**THE EVIDENCE WAS SUFFICIENT TO SHOW THAT APPELLANT WAS INTELLECTUALLY DISABLED**

**APPELLANT'S ISSUE NO. 49**

**THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S ANSWER TO SPECIAL ISSUE NO. 3 'FUTURE DANGER' IN THE PUNISHMENT STAGE OF THE TRIAL**

**APPELLANT'S ISSUE NO. 50**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUESTED JURY INSTRUCTION THAT DEFINES "SIGNIFICANTLY SUB-AVERAGE GENERAL INTELLECTUAL FUNCTIONING"**

**APPELLANT'S ISSUE NO. 51**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUEST THAT THE DEFENSE DID NOT HAVE TO PROVE MENTAL RETARDATION I.E. INTELLECTUAL DISABILITY BY UNANIMOUS JURY VERDICT OF TEN MEMBERS CONCURRING AS OPPOSED TO TWELVE**

**APPELLANT'S ISSUE NO. 52**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUESTED 'ACCOMPLICE' WITNESS CHARGE IN THIS PUNISHMENT RETRIAL WHERE THE ORIGINAL GUILT/INNOCENCE CHARGE CONTAINED SUCH A CHARGE**

**APPELLANT'S ISSUE NO. 53**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUESTED 'ANTI-PARTIES' CHARGE IN THE JURY CHARGE**

**APPELLANT'S ISSUE NO. 54**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FILED UNDER SEAL BEFORE TRIAL COURT RECEIVED THE JURY'S VERDICT FOR A COMPETENCY HEARING**

**D.     SPECIAL REQUESTED ISSUE ON APPEAL**

**APPELLANT'S ISSUE NO. 55**

**THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE CONVICTION FOR CAPITAL MURDER**

**III.    FEDERAL ISSUES**

**APPELLANT'S ISSUE  NO. 56**

**THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT PROHIBITION OF THE EIGHTH AMENDMENT BECAUSE IT ALLOWS THE JURY TOO MUCH DISCRETION TO DETERMINE WHO SHOULD LIVE AND WHO SHOULD DIE AND BECAUSE IT LACKS THE MINIMAL STANDARDS AND GUIDANCE NECESSARY FOR THE JURY TO AVOID THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY**

**APPELLANT'S ISSUE NO. 57**

**THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH  IS UNCONSTITUTIONAL IN VIOLATION OF THE DUE PROCESS REQUIREMENTS OF THE FOURTEENTH AMENDMENT BECAUSE IT IMPLICITLY PUTS THE BURDEN OF PROVING THE MITIGATION SPECIAL ISSUE ON APPELLANT RATHER THAN REQUIRING A JURY FINDING AGAINST APPELLANT ON THAT ISSUE UNDER THE BEYOND A REASONABLE DOUBT STANDARD**

**APPELLANT'S ISSUE NO. 58**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO HOLD ARTICLE 37.071 Sec. 2(E) AND (F) CONCERNING BURDEN OF PROOF UNCONSTITUTIONAL AS A VIOLATION OF ARTICLE ONE SEC. 10 AND SEC. 13 OF THE TEXAS CONSTITUTION**

**APPELLANT'S ISSUE NO. 59**

**THE TEXAS DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT, CONTRARY TO *APPRENDI* AND ITS PROGENY**

**APPELLANT'S ISSUE NO. 60**

**THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT SPECIAL ISSUES**

**APPELLANT'S ISSUE NO.  61**

**THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT, AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF VAGUE, UNDEFINED TERMS IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF THE TRIAL THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND THE IMPOSITION OF THE DEATH PENALTY.**

**APPELLANT'S ISSUE NO. 62**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO HOLD ART. 37.071 Sec. 2(e) and (f) UNCONSTITUTIONAL BECAUSE SAID STATUTE FAILS TO REQUIRE THE ISSUE OF MITIGATION BE CONSIDERED BY THE JURY**

**APPELLANT'S ISSUE NO. 63**

**THE STATUTORY "PENRY" SPECIAL ISSUE IN TEX. CODE CRIM. PRO. ARTS. 37.071 & 37.0711 IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE**

**APPELLANT'S ISSUE NO. 64**

**THE STATUTORY "<u>PENRY</u>" SPECIAL ISSUE IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT PERMITS THE VERY TYPE OF OPEN-ENDED DISCRETION CONDEMNED BY THE UNITED STATES SUPREME COURT IN <u>FURMAN V. GEORGIA</u>**

**APPELLANT'S ISSUE NO. 65**

**TEXAS' STATUTORY CAPITAL SENTENCING SCHEME IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT DOES NOT PERMIT MEANINGFUL APPELLATE REVIEW**

**APPELLANT'S ISSUE NO. 66**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CONSTITUTIONAL CHALLENGES TO THE TEXAS CAPITAL MURDER DEATH PENALTY LAW**

**APPELLANT'S ISSUE NO. 67**

**THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION**

**STATEMENT OF FACTS**

*This case involves the retrial on punishment of Kenneth Thomas who was found guilty of the 1986 stabbing death of Mildred Finch.*

*TRIAL ON THE MERITS*

*A jury trial was held prior to commencing the punishment hearing retrial to determine the Defendant's competency to stand trial for capital murder. The following is a summary of the testimony given in the competency trial and the retrial of the issue of punishment before the Honorable Ernest B . White, III, Judge presiding of the 194th Judicial District Court of Dallas, County.*

**COMPETENCY TESTIMONY**

*Defense on competency:*

*1)Testimony of Antoinette McGarrahan, Ph.D):* Antoinette McGarrahan, a psychologist specializing in forensic psychology and neuropsychology, testified has evaluated Kenneth Thomas over the last few years. (RR: Vol. 57 p. 167) She gave him extensive neuropsychological tests to look at his intellectual functioning as well as his cognitive functioning to see if there were any brain impairments. (RR: Vol. 57 p. 168) She also performed tests to look at emotional functioning as well as his ability to work with his attorneys. (RR: Vol. 57 p. 168) She reviewed close to 60 documents that related

1

to prior mental health evaluations and transcripts of prior proceedings, including birth and medical records that spanned 28 years.  (RR: Vol. 57 p.170)

Dr. McGarrahan stated that it was her professional opinion that Mr. Thomas was not presently competent to stand trial based on the neuropsychological testing that he performed which showed the Defendant's intellectual capacity to be that of "mild mental retardation." (RR: Vol. 57 p. 172) The Defendant's full scale IQ is 71.  (RR: Vol. 57 p. 172) She stated that he was not able to rationally assist his attorneys.(RR: Vol. 57 p. 172) She found that the Defendant had some brain impairment stemming from his birth and a head injury sustained at age 15.  (RR: Vol. 57 p. 173) She stated that she did not see any evidence that Mr. Thomas was trying in any way to fake mental illness or mental retardation.  (RR: Vol. 57 p. 174) She said Mr. Thomas had a fixed idea that the State could not secure a conviction without a weapon and could not move beyond this idea.  (RR: Vol. 57 p. 177) She said Mr. Thomas thought someone was working against him and his perceptions were not based in reality. (RR: Vol. 57 p. 177) These beliefs were documented as having been present 30 years ago. (RR: Vol. 57 p. 177) She found Mr. Thomas could not rationally consult with his attorneys because his perceptions and his beliefs were not based in reality.(RR: Vol. 57 p. 179)

*2)Testimony of Cynthia Short:* Cynthia Short, an attorney who works with other attorneys in certain types of cases, testified that she was appointed to assist the defense

2

attorneys in preparing the case against Kenneth Thomas by investigating his life.  (RR: Vol. 58 p. 54) She spent in excess of 60 hours with him since November, 2011 and read all his evaluations since 1986.  (RR: Vol. 58 p. 56) She stated that the Defendant closely resembles those people that have been deemed incompetent.  (RR: Vol. 58 p. 58) She found in the Defendant the presence of a "fixed-false belief" about an important matter related to his case and no amount of education, this fixed-false belief could not be undone.  (RR: Vol. 58 p. 59) The Defendant believed that he could not be convicted if there wasn't a weapon introduced into evidence. (RR: Vol. 58 p. 59) She learned that he had this belief as far back as 1980's.  (RR: Vol. 58 p. 59) He also had a fixed false belief about the role of the Judge in the case and that the Judge could dismiss his case.  (RR: Vol. 58 p. 60-61) She did not believe Mr. Thomas could make rational choices about his legal options or legal strategies.  (RR: Vol. 58 p. 63) She said the Defendant thought he didn't have to participate in the State's evaluation when the lack of a murder weapon would lead to his acquittal.  (RR: Vol. 58 p. 64)

***State on competency:***

***3)Testimony of Kristi Compton, Ph. D:*** Kristi Compton, a clinical and forensic psychologist, testified that she was appointed by the trial court to give an opinion about the competency of Mr. Thomas.  (RR: Vol. 58 p. 93) She interviewed and tested Mr. Thomas for three hours, giving him a "Kaufman Brief Intelligence" test, a malingering

test and a competency test. (RR: Vol. 58 p. 97) She reviewed reports that went back to 1986. (RR: Vol. 58 p. 97) She stated that in her opinion, Mr. Thomas was competent to stand trial. (RR: Vol. 58 p. 98) She stated that he functions in the borderline to mental/mild mental retardation. (RR: Vol. 58 p. 114) She said he has beliefs that are firmly fixed, one being that he can't be convicted because there wasn't a weapon. (RR: Vol. 58 p. 115) She said he also believes that there are people that are working within the court system to frame him and keep him incarcerated. (RR: Vol. 58 p. 115) On cross examination the witness stated that she respected the opinion of Antoinette McGarrahan. (RR: Vol. 58 p. 119) <u>She thought he had a mental defect, an intellectual disability</u>. (RR: Vol. 58 p. 127)

***The jury found the Defendant competent to stand trial. (RR: Vol. 59 p. 7)***

## RETRIAL PUNISHMENT TESTIMONY

*1) Testimony of James Gallagher:* James Gallagher, a polygraph examiner and former homicide detective with the Dallas Police Department, testified that he was one of the lead detectives in the Fred and Mildred Finch capital murder case. (RR: Vol. 60 p. 31) He said when it was very obvious that there were multiple stab wounds on the bodies. (RR: Vol. 60 p. 34) He thought someone had gone through a window to burglarize the house. (RR: Vol. 60 p. 37) He entered the house through the kitchen and found a bloody rag lying next to the refrigerator, a copy of a Dallas Times Herald newspaper

4

with bloodstains on it on the kitchen table and blood stains on the handles of the refrigerator. (RR: Vol. 60 p. 38-39) Mrs. Finch's body was laying in the hallway, up against the wall. (RR: Vol. 60 p. 40) He said there was blood on the walls and baseboards. (RR: Vol. 60 p. 40) He found the bedroom door opened and saw Mr. Finch's body on the floor of his bedroom. (RR: Vol. 60 p. 41)

On March 18th, 1986 he was informed by Crime Stoppers that a call had come in from a woman claiming to have knowledge of the offense. (RR: Vol. 60 p. 84-85) He spoke with a woman named "Kathy" who described some of the property taken, including a weapon. (RR: Vol. 60 p. 85) He said Kathy gave him the name of the Defendant and his brother, Lonnie Charles Thomas. (RR: Vol. 60 p. 86) He said Lonnie Thomas gave them information which implicated Kenneth Thomas that was consistent with the scene on Rose Lane. (RR: Vol. 60 p. 89-90) Other detectives collected clothing from the house on Electra Street that was connected with the offense. (RR: Vol. 60 p. 90) After he received information that Lonnie had been involved in disposing of stolen property out of the Finch home he and Lonnie Thomas went to the 4000 block of Hancock where they found some of Fred Finch's property in a makeshift dump on the side of the street. (RR: Vol. 60 p. 91)

He said the phone call by Kathy Johnson to crime stoppers implicated Lonnie Thomas who withheld information when he gave his statement. (RR: Vol. 60 p. 123) He

said Lonnie Thomas was not completely honest and gave them additional information only when he was confronted with the evidence of dumping the stolen property. (RR: Vol. 60 p. 123) He said Lonnie never implicated himself, only his brother. (RR: Vol. 60 p. 124) They never knew what vehicle was used to transport the stolen property. (RR: Vol. 60 p. 124-125) He learned that Kenneth Thomas does not drive and was known to take a bus everywhere. (RR: Vol. 60 p. 125)

*2) Testimony of Joseph Schreck:* The testimony of Joseph Schreck, deceased, from the 1987 trial, was read by State and Defense attorneys. (RR: Vol. 60 p. 139) Joseph Schreck testified that on March 16th, 1986 he worked in the identification section of the Dallas Police Department and went to 3222 Rose Lane where he photographed the scene and gathered evidence. (RR: Vol. 60 p. 143) He photographed a fingerprint on a wooden window sill and on the air conditioner window unit. (RR: Vol. 60 p. 159-160) He photographed palm prints on the front window. (RR: Vol. 60 p. 163) He lifted a fingerprint/palm print from the inside portion of the window. (RR: Vol. 60 p. 168) He photographed a bloody palmprint and corresponding fingerprints by the bathroom door. (RR: Vol. 60 p. 171)

On cross examination the witness testified they searched for the knife, but did not find anything. (RR: Vol. 60 p. 197)

6

*3) Testimony of Joseph Maberry:* Joseph Maberry, a fingerprint examiner, testified that the latent fingerprints recovered from the window sill at Rose Lane belong to Kenneth Thomas. (RR: Vol. 60 p. 215-216) He said the latent prints from the air conditioning unit and the screen also belong to Kenneth Thomas. (RR: Vol. 60 p. 216) He was of the opinion that the bloody fingerprint and palm print depicted in a photograph taken at the house also belonged to the Defendant. (RR: Vol. 60 p. 217) He said he lifted a fingerprint from a hat box that was recovered at 4000 Hancock and found that it belongs to Kenneth Thomas. (RR: Vol. 60 p. 221)

*4) Testimony of Carolyn Vanwinkle:* Carolyn Vanwinkle, a senior forensic DNA analyst, testified that in 1987 she testified in this case about a rape kit she examined. (RR: Vol. 61 p. 17) She also examined a black raincoat, pillow cases, bed sheets and mattress pad in this case. (RR: Vol. 61 p. 19-22) She found human blood on the raincoat that matched the blood types of Mildred and Fred Finch. (RR: Vol. 61 p. 23,26) She found the semen on the anal swabs taken from Fred Finch. (RR: Vol. 61 p. 34) She found blood on the back heels of the black and white shoes that were collected. (RR: Vol. 61 p. 35)

On cross examination the witness testified that the semen found on the pillowcase was consistent with having come from Fred Finch. (RR: Vol. 61 p. 43) She said the

semen on the anal swab was consistent with having come from Fred Finch.  (RR: Vol. 61 p. 43)

*5) Testimony of Edward T. McDonough, M.D.:* Edward T. McDonough, M.D., testified that he performed an autopsy on Mildred Finch in March, 1986 and observed the autopsy of Fred Finch along with Dr. Gilliland and other physicians.  (RR: Vol. 61 p. 47) He said the autopsies were performed at the same time. (RR: Vol. 61 p. 48) He said Mildred Finch had extensive sharp-force trauma over almost all the surfaces of her body and more than 90 wounds.  (RR: Vol. 61 p. 54) He said Fred Finch also had sharp-force injuries consisting of cuts and stabs.  (RR: Vol. 51 p. 55) He thought the wounds were caused by a single edge blade.  (RR: Vol. 61 p. 58)

*6) Testimony of James R. Smith:* James R. Smith, a retired detective with the Dallas Police Department, testified he was a physical evidence collector on this case in 1986. (RR: Vol. 61 p. 96) On March 18th, 1986 he went to the 4000 block of Hancock with Joe Maberry where he collected suitcases, clothing, mens suits, men's hats, hat boxes and a satchel containing a pistol.  (RR: Vol. 61 p. 97)

On cross examination the witness testified that about one-third of the property was recovered at the dumpsite.  (RR: Vol. 61 p. 124) He said that the property recovered at the dumpsite filled up a van, including the front seats.  (RR: Vol. 61 p. 124)

*7) Testimony of Audrey Basse:* Audrey Basse, a forensic biologist, testified that she tested several items of clothing, some bedding, pieces of cardboard, shoes, hats and a lot of hair curlers for DNA. (RR: Vol. 61 p. 132)

*8) Testimony of Angela Fitzwater:* Angela Fitzwater, a DNA analyst at SWIFS, testified that she was able to develop genetic profiles on only a very few items. (RR: Vol. 61 p. 153) All the samples she was able to develop a genetic profile matched to Mildred and Fred Finch. (RR: Vol. 61 p. 153-170)

*9) Testimony of Margaret Ann "Peggy" Crain:* Ms. Crain testified that in 1987 she testified about how the Rolex watches obtained from American Wholesale Jewelry were gifts to for renewing certificates of deposits and matched the serial numbers on the watches with her records. (RR: Vol. 61 p. 176-182)

*10) Testimony of Pansy Lee Lewis:* The previous 1987 testimony of Pansy Lee Lewis, now deceased, was read by attorneys to the jury. Ms. Lewis testified that she went to First City Bank for Ms. Ernestine Gasbar to renew her certificates of deposits and received a man's and ladies Rolex watch through their program. (RR: Vol. 61 p. 185) The watches were given to Fred and Mildred Finch who were good friends and the attorney for Ms. Gasbar. (RR: Vol. 61 p. 185)

**11) Testimony of Bernard H. Blackmon:** The previous 1987 testimony of Bernard H. Blackmon, now deceased, was read by attorneys to the jury. Mr. Blackmon testified that he made tailored suits for Fred Finch. (RR: Vol. 61 p. 193)

**12) Testimony of Delores Easter:** Dolores Easter testified that she had a long term relationship with Lonnie Thomas, brother of the Defendant. (RR: Vol. 62 p. 11) They had a daughter, Corvette, together who was now 26 years old. (RR: Vol. 62 p. 12) The witness testified that on Sunday, March 16th, 1986 at 4:00 a.m. Kenneth Thomas entered the house with a suitcase, pistol, boxes with hats and cloths and a Rolex watch which he put into the living room. (RR: Vol. 62 p. 14) Kenneth told her that he got the property from a rich white girl named Sheila. (RR: Vol. 62 p. 17)

The witness testified she called 911 and after making the call, she left the house and went to a nearby hotel. (RR: Vol. 62 p. 18) She testified that Kenneth told her "Yeah, I did it. And dead folks can't talk." before she and Lonnie left for the hotel. (RR: Vol. 62 p. 21-22)

**13) Testimony of Thomas Penagraph:** Thomas Penagraph, a cousin of the Defendant, testified that he and his girlfriend Brenda Jackson met with Kenneth Thomas on March 17th 1986 at his mother's house on Electra where Kenneth showed him some suits, hats and a watch he was wearing. (RR: Vol. 62 p. 44-45)

10

On cross examination the witness testified that Kenneth was very quiet and was considered the black sheep of the family. (RR: Vol. 62 p. 57) He said Kenneth's mother treated him differently than his brother Lonnie, always favoring Lonnie. (RR: Vol. 62 p. 58) He said the amount of property taken was more than one person could have carried. (RR: Vol. 62 p. 62) He said Kenneth didn't drive and would walk or take a bus everywhere he went. (RR: Vol. 62 p. 62)

*14) Testimony of Lonnie Thomas:* Lonnie Thomas, the younger brother of the Defendant, testified that on Saturday night, March 15th, 1986 he watched television and then went to bed with his girlfriend, Delores Easter. (RR: Vol. 62 p. 74) The next morning he woke up and found Kenneth bringing in some clothing, bags and boxes. (RR: Vol. 62 p. 74) He asked Kenneth where the property came from and was told a lady had given it to him for helping her move something out of her garage. (RR: Vol. 62 p. 76) He said Kenneth told him that he had stabbed a dog that attacked him. (RR: Vol. 62 p. 78)

On March 16th, 1986 he heard about the murders on the radio. (RR: Vol. 62 p. 86) He said he went back to the house on Electra and moved the property to his cousin, Bobby Charles Roy's, house. (RR: Vol. 62 p. 87) He said his brother Billy called him and told him to get rid of the property because the police were looking for him. (RR: Vol. 62 p. 87) He said Kathy Renee Johnson was at Bobby's house and she helped him

11

take the property to Hancock street where he put the property in black trash bags and a sheet and dumped it. (RR: Vol. 62 p.. 90)

He said he was given a court appointed attorney and testified for the State. (RR: Vol. 62 p. 97) He said after his brother's trial, his case was dismissed. (RR: Vol. 62 p. 97)

On cross examination the witness testified that he was going to keep the property at Bobby Charles' house until he found out what was happening. (RR: Vol. 62 p. 101)He said he and Kathy took two cars to move the property. (RR: Vol. 62 p. 102) He stated that he hadn't see his brother in 27 years and had never visited him in prison. (RR: Vol. 62 p. 103)

The witness testified that Kenneth had stabbed Marvin Linwood with a screw driver because Marvin would bully him and after Kenneth was jumped by him, he stood up to him. (RR: Vol. 62 p. 114) He said Kenneth worked as a janitor at Fair Park and was severely beaten in the head by a vendor. (RR: Vol. 62 p. 115)

**15) *Testimony of Billy Ray Thomas:*** The previous 1987 testimony of Billy Ray Thomas, now deceased, was read by attorneys to the jury. (RR: Vol. 62 p. 139) Mr. Thomas testified that on March 16th, 1986 he lived on Rutledge Street and his mother lived on Electra Street. (RR: Vol. 62 p. 140-141) On Sunday, March 16th he went to this mother's house and saw some big boxes in the back room. (RR: Vol. 62 p. 144)

The witness testified that when he returned to the house on Electra, Delores Easter was present and was acting very nervous. (RR: Vol. 62 p. 149) He said they found Kenneth at the house after noticing a window had been broken. (RR: Vol. 62 p. 150)

The witness testified that he heard his mother ask Kenneth if he had killed the people and heard Kenneth answer "yes." (RR: Vol. 62 p. 164) He said Kenneth told him that he was going to kill all of them if they didn't give him his money or his clothes. (RR: Vol. 62 p. 167-168)

*6)Testimony of Lonnie Burrell:* The previous 1987 testimony of Lonnie Burrell, now deceased, was read by attorneys to the jury. (RR: Vol. 62 p. 220) He stated that he had been married to Shirley Baldwin, mother of the Defendant. (RR: Vol. 62 p. 221) On March 18th, 1986 at approximately 5:00 or 6:00 p.m. he learned that his son Lonnie, had been arrested. (RR: Vol. 62 p. 224) He said Kenneth told him that Lonnie didn't know anything and that he wasn't with him during the offense. (RR: Vol. 62 p. 227) He said Shirley asked Kenneth if he had killed the those people and Kenneth told her "Yes, dead people can't talk." (RR: Vol. 62 p. 228)

*17) Testimony of Philip E. Jones:* Former Detective Philip E. Jones testified that he was lead detective in the case involving the murders of Fred and Mildred Finch. (RR: Vol. 63 p. 8) He said the house appeared to be ransacked which was consistent with a burglary. (RR: Vol. 63 p. 12)

13

The witness testified that on March 18th, Detective Hudson received a tip that pertained to Kenneth and Lonnie Thomas. (RR: Vol. 63 p. 20) He and Detective Barnes went to the Electra Street house where they found a black suit, umbrella and some shoes at the house. (RR: Vol. 63 p.22- 23) As they were driving Lonnie Thomas and Thomas Penagraph home, they received information that Lonnie Thomas had been dumping property at the railroad tracks on Hancock street. (RR: Vol. 63 p. 31) They drove the men to Hancock Street where Lonnie Thomas began to cooperate with them, pointing out items. (RR: Vol. 63 p. 32) He said when he arrested Mr. Thomas, he was wearing an expensive watch which was later confirmed as having belonged to Fred Finch. (RR: Vol. 63 p. 36) He said fingerprints at the scene were matched to Kenneth Thomas. (RR: Vol. 63 p. 39)

**18) Testimony of Marvin Lindwood:** Marvin Lindwood testified that he grew up in the Frazier Court projects and knew Kenneth Thomas. (RR: Vol. 63 p. 67) He said on February 18th, 1979 he started fighting with Kenneth and Kenneth eventually ran out of the door. (RR: Vol. 63 p. 70-71) He said he stayed at Vicki's house and Kenneth returned, telling him he wanted to apologize but when he turned to go back into the house, Kenneth stabbed him in the head with a screwdriver. (RR: Vol. 63 p. 72)

**19) Testimony of Joyce Brown:** Joyce Brown testified that she grew up in Frazier Courts project and knew the Defendant by the name of "Clean." (RR: Vol. 63 p. 95) She said he

liked to dress sharp and clean. (RR: Vol. 63 p. 100) On February 18th, 1979 she was in her home when she heard Kenneth talking loud and cursing next door. (RR: Vol. 63 p. 101) She said Kenneth knocked on their door and asked to speak to her grandmother and she told him she was sleeping. (RR: Vol. 63 p. 103) She said he then broke a window and she ran upstairs. (RR: Vol. 63 p. 103) After the police arrived, she heard Kenneth cursing his mother. (RR: Vol. 63 p. 104)

*20) Testimony of Billy Ray Thomas:* The previous 1987 testimony of Billy Ray Thomas, now deceased, was read by attorneys to the jury. (RR: Vol. 63 p. 109) Mr. Thomas testified that in 1979 he was living with his mother, sister, Lonnie and Kenneth and on the night of February 18th, 1979 he argued with Kenneth about some money he had given him. (RR: Vol. 63 p. 112) He said Kenneth cut him on the forehead with what he thought was a knife. (RR: Vol. 63 p. 113) He said Kenneth also cut his friend who was at the house. (RR: Vol. 63 p. 113) He said Kenneth was arrested that night. (RR: Vol. 47 p. 114)

*21) Testimony of Michael Ferguson:* Michael Ferguson testified that in 1983 he shared a cell with Kenneth who read the Bible but once his guard was down, he came on to him in a sexual manner. (RR: Vol. 63 p. 138) He said Kenneth demanded sexual favors and extorted his commissary money. (RR: Vol. 63 p. 139)

**22) Testimony of Steven Dewayne McCarroll:** Mr. McCarroll testified that in 1983 he shared a tank with Kenneth Thomas and saw Kenneth Thomas raping another inmate. (RR: Vol. 63 p. 151- 152) He said the next day Kenneth Thomas hit him, breaking his nose and giving him two black eyes, because he would not give him oral sex. (RR: Vol. 63 p. 153)

**23) Testimony of Larry Dean Turner:** Mr. Turner testified that on August 25th, 1983 he was in the Dallas County Jail and Mr. Thomas wanted him to be his "bitch" and do sexual things with him. (RR: Vol. 63 p. 166-168)

**24) Testimony of Linda White:** The 1987 testimony of Linda White was read to the jury. (RR: Vol. 63 p. 186) Linda White, a parole officer, testified that when Mr. Thomas was released on parole in 1984, he failed to report to her on a monthly basis, failed to secure employment and a hearing was held on a violation, attempting to stab his mother. (RR: Vol. 63 p. 188-189) She said his mother denied she was ever assaulted with a screwdriver by her son. (RR: Vol. 63 p. 196)

**The Defense on Punishment**

**25) Testimony of Anthony Penagraph:** Anthony Penagraph, cousin of Kenneth Thomas, testified that he grew up with Kenneth and went to school with him. (RR: Vol. 65 p. 43) He said that while growing up in the projects, Kenneth would get picked on and he would rescue him. (RR: Vol. 65 p. 47) He said Kenneth wasn't the fighting type and was

16

a little slow. (RR: Vol. 65 p. 49) He said Kenneth's family treated Kenneth very poorly. (RR: Vol. 65 p. 50) The witness testified that Kenneth was hit on the head with an object while working at Fair Park and was never the same person after that injury. (RR: Vol. 65 p. 52) Mr. Penagraph testified that Kenneth didn't fight and he had to push Kenneth to defend himself because he didn't like to fight. (RR: Vol. 65 p. 55-56)

He said that after Kenneth was released from prison, Kenneth lived with him and his family while he worked at the Adel Hunt Furniture Company. (RR: Vol. 65 p. 56) He said Kenneth was making decent money and his mother wanted him to share with the family. (RR: Vol. 65 p. 57)

He said that when he heard about the Finch murders, he couldn't believe Kenneth would be involved. (RR: Vol. 65 p. 64) He said when he heard the family talking about Kenneth committing the murders, he knew they were lying. (RR: Vol. 65 p. 64)

**26) Testimony of Jim Hom, Ph.D:** Dr. Hom, a neuropsychologist, testified that he didn't see how a person could fake a neurological pattern. (RR: Vol. 65 p. 94) He said that if there is a type of damage such as stroke or traumatic brain injury, all damage has a distinctive pattern. (RR: Vol. 65 p. 94) He said his conclusion in 1987 was that the test results were consistent with someone who had a significant head injury. (RR: Vol. 65 p. 97) He said he has reviewed one set of tests of Mr. Thomas and found that they were consistent with his results in 1987. (RR: Vol. 65 p. 98-99;102)

The witness testified that the tests show that Mr. Thomas would have an intelligence range in the low 70's, his academic abilities in the third and fourth grade. (RR: Vol. 65 p. 103) He said Mr. Thomas would have significant problems in reasoning, thinking and putting things together. (RR: Vol. 65 p. 103) Mr. Thomas had problems with his ability to concentrate and stay on task. (RR: Vol. 65 p. 104) Mr. Thomas has problems in understanding simple language and demonstrated problems with verbal memory. (RR: Vol. 65 p. 104) He said Mr. Thomas was in the moderate to severe range of forgetfulness and also exhibited some mild motor and sensory difficulties. (RR: Vol. 65 p. 105-107) He said his results were typical of someone who had a pretty significant head injury at one point in time. (RR: Vol. 65 p. 107) He said his ability to reason things out was in the severe range which was clearly indicative of a person with significant brain impairment. (RR: Vol. 65 p. 109)

27)**Testimony of Antoinette McGarrahan, Ph.D.:** Dr. McGarrahan testified that she specializes in forensic psychology and neuropsychology and was asked in 2012 to perform a neuropsychological evaluation of Mr. Thomas. (RR: Vol. 66 p. 16) She stated that she has approximately 50 sources of information documents and records that she has reviewed. (RR: Vol. 66 p. 16) She also reviewed Dr. Hom's evaluation 27 years ago. (RR: Vol. 66 p. 17)

She learned that Mr. Thomas had grown up very poor in the projects and had difficulty in school but wasn't placed in special education. (RR: Vol. 66 p. 18) She learned that there were birth complications and Mr. Thomas suffered a severe head injury at age 15. (RR: Vol. 66 p. 19) She said that the school continued to promote Mr. Thomas even though he failed every course in the eighth grade. (RR: Vol. 66 p. 19) She said when Mr. Thomas was hit in the head while working with his mother at Fair Park, he was hospitalized for six days and continued to complain of headaches and dizziness. (RR: Vol. 66 p. 20) She said his mother drank alcohol and smoked cigarettes while pregnant with Kenneth and he was born with the umbilical cord wrapped around his neck. (RR: Vol. 66 p. 21)

She said his full-scale IQ was 71 which is in the "mildly mentally retarded" range. (RR: Vol. 66 p. 23) She said that his primary difficulties were in the frontal part of the brain and involved abstract reasoning, problem solving, thinking skills, planning and organization. (RR: Vol. 66 p. 23) She stated that Mr. Thomas qualified for intellectual disability disorder or what used to be called "mental retardation." (RR: Vol. 66 p. 24) She said he didn't learn to drive and had problems making change at stores where others took advantage of him. (RR: Vol. 66 p. 25) She said Mr. Thomas had significant problems in his social functioning. (RR: Vol. 66 p. 25) Mr. Thomas didn't have any friends and was known as a "loner." (RR: Vol. 66 p. 25)

She said that the IQ component has moved away from the score to more about how the person functions in the community. (RR: Vol. 66 p. 31) She said Mr. Thomas would have been harder to parent because he wasn't like the other children and may have acted out behaviorally. (RR: Vol. 66 p. 31-32) She said that the reasoning, logical thinking, planning and problem solving that were impaired when Mr. Thomas was tested by Dr. Hom were still the primary areas impaired on her testing 27 years later. (RR: Vol. 66 p. 33) She said it would have been very difficult for Mr. Thomas to fake the same results 27 years apart. (RR: Vol. 66 p. 34)

**28) *Testimony of Carolyn Henrietta Roy:*** Carolyn Henrietta Roy testified on behalf of that Kenneth Thomas who was her nephew.

**29) *Testimony of Bobby Charles Roy:*** Bobby Charles Roy, cousin of the Defendant, testified that the neighborhood Kenneth lived in was very bad with a lot of violent crime. (RR: Vol. 66 p. 72) He said you had to be tough to survive in the neighborhood. (RR: Vol. 66 p. 72) He said Kenneth's older brother, Billy, took care of the children in the family while their mothers worked.(RR: Vol. 66 p. 74) He said bullying was a big problem in the neighborhood and if you were different you would be "jumped on." (RR: Vol. 66 p. 76)

The witness testified that he never saw Kenneth ask his mother for something and get it as did his brothers and sister. (RR: Vol. 66 p. 80) He testified that Kenneth never

started fights. (RR: Vol. 66 p. 84) He stated that after Kenneth's head injury, Kenneth was more withdrawn. (RR: Vol. 66 p. 85) When he learned of the Finch murders, he was very surprised to find that Kenneth was charged with the offense. (RR: Vol. 66 p. 85)

He testified that Aunt Shirley brought property to his house and he helped her bring it from her car into his house. (RR: Vol. 66 p. 86) He thought at the time that the property belonged to Lonnie because Lonnie was moving into an apartment. (RR: Vol. 66 p. 86) He said when he saw the black trench coat with the monogram "FF", he told his cousin Kathy to get it out of his house. (RR: Vol. 66 p. 88) He wrote in his statement that Lonnie and Kathy came over and got the property. (RR: Vol. 66 p. 88)

**30) Testimony of Rodney Turner:** Rodney Turner testified on behalf of Kenneth Thomas his half brother.

**31) Testimony of Cynthia Ann Rice:** Cynthia Ann Rice, cousin of the Defendant, testified that they grew up in the same horrible neighborhood. (RR: Vol. 66 p. 127) She had a good relationship with Kenneth and knew that he did not start fights with people. (RR: Vol. 66 p. 128) She said that Kenneth's mother didn't act like she cared about him. (RR: Vol. 66 p. 128) She said Kenneth's brother, Billy, would get drunk and try to fight with Kenneth. (RR: Vol. 66 p. 130) She said the entire family knew Kenneth had a brain injury and after the injury she noticed Kenneth was slower. (RR: Vol. 66 p. 131-132)

21

The witness testified that she couldn't believe Kenneth had committed the murders by because he was not a violent type. (RR: Vol. 66 p. 135) She said he never bothered anyone and couldn't have committed the offense on his own. (RR: Vol. 66 p. 135)

**32) Testimony of Jaye W. Crowder, M.D.:** Dr. Crowder, a psychiatrist, testified that he has been involved with the Kenneth Thomas' case since 1987. (RR: Vol. 66 p. 141) In 1987 he examined the Defendant, spoke to his mother and reviewed his medical records. (RR: Vol. 66 p. 142) He said Dr. Hom's results were consistent with his hypothesis that there was damage to the central nervous system. (RR: Vol. 66 p. 144) He said the tests indicated that there was an altered physiology of Kenneth Thomas' brain as a result of the injury. (RR: Vol. 66 p. 144-145) He said this injury affected the Defendant's ability to think at a higher level or cause and effect. (RR: Vol. 66 p. 145) He said it would be difficult for Kenneth to assess the likely consequences of his actions. (RR: Vol. 66 p. 145) People with this brain damage typically have some impulsiveness and irritability and tend to overreact in an aggressive way. (RR: Vol. 66 p. 145) The witness stated that the probability of Mr. Thomas being a future danger in prison was low. (RR: Vol. 66 p. 149)

**33) Testimony of Marilyn Calhoun:** Marilyn Calhoun testified that on February 18th, 1979 she was present when Kenneth Thomas and Marvin Lindwood got into an

argument. (RR: Vol. 66 p. 174) When the men began to argue, she told them that they had to leave so they went outside. (RR: Vol. 66 p. 175)

**34) *Testimony of Curfey Henderson:*** Curfey Henderson, a detention supervisor with the Dallas County Sheriff's Department, identified the Defendant and stated that he was automatically classified as administrative custody because of the charges against him, not because of any misbehavior. (RR: Vol. 67 p. 21-22) He said that he started supervising Kenneth in October, 2010 and has not had a single problem with him. (RR: Vol. 67 p. 23) He described Mr. Thomas as "institutionalized." (RR: Vol. 67 p. 24)

**35) *Testimony of Van Similine:*** Mr. Similine testified he works at the Dallas County Jail, supervising over 200 inmates. (RR: Vol. 67 p. 39) He has supervised Kenneth Thomas for almost four years. (RR: Vol. 67 p. 40) He said younger inmates make more trouble than older inmates who tend to just want to do their time. (RR: Vol. 67 p. 41) He said Kenneth Thomas stays to himself and has never been disruptive. (RR: Vol. 67 p. 41)

**36) *Testimony of George Abraham:*** George Abraham testified he works at the Dallas County Jail as part of the Special Response Team, caring for all the high-profile inmates. (RR: Vol. 67 p. 46) He said it has been his job for four years to transport Kenneth Thomas to court or to visitations. (RR: Vol. 67 p. 48) He said he has never had a problem with Kenneth who has always been cooperative. (RR: Vol. 67 p. 50) He said

Kenneth is quite and does what he's asked to do when he is taken to court. (RR: Vol. 67 p. 57)

*37) Testimony of James Evans Aiken:* James Evans Aiken of James E. Aiken and Associates, Inc. Testified that he conducts evaluations of defendants for classification. (RR: Vol. 67 p. 67-68) He stated that he has classified thousand of inmates. (RR: Vol. 67 p. 73) He was asked to review the prison history of Kenneth Thomas and received information of Mr. Thomas' psychological status as well as an overview of the criminal offenses. (RR: Vol. 67 p. 74) The witness described the classification system. (RR: Vol. 67 p. 81-82)

The witness testified that his review of Mr. Thomas' records show that he followed a "predictable scale." (RR: Vol. 67 p. 83) He said Mr. Thomas went from disruptive behavior down to compliant behavior. (RR: Vol. 67 p. 83) He said that he has seen this pattern thousands of times in his 42 years in the business. (RR: Vol. 67 p. 83) He said he saw Mr. Thomas' dysfunctional behavior when he was in the Dallas County Jail from 1979 to 1983. (RR: Vol. 67 p. 83) He said county jails are different because there is a "revolving population" as opposed to a high-security prison where inmates are serving long sentences. (RR: Vol. 67 p. 84)

He said he looked at 15 write ups of the Defendant during his 27 years of incarceration in the Department of Corrections. (RR: Vol. 67 p. 85) The witness stated

24

that 15 write ups in 27 years put Mr. Thomas in the minuscule range of being a disruptive predator inmate. (RR: Vol. 67 p. 89) He reviewed the write ups and stated that there was no evidence of systemic or random violence. (RR: Vol. 67 p. 93)

The witness stated that it was his opinion that Mr. Thomas could be adequately managed for an extended period of tie without causing unusual risk to staff, inmates or the general public. (RR: Vol. 67 p. 97) He said at the present time Mr. Thomas was over the hill and in prison terms "he has no juice." (RR: Vol. 67 p. 97) Mr. Thomas has no gang affiliations and has to be taken care of by the staff to ensure that he's not a victim of random or systemic violence. (RR: Vol. 67 p. 98)

**38) Testimony of Stephen Phillips:** Steven Phillips testified that he was in the Dallas County Jail from 1982 to 1984, roughly the same time Kenneth Thomas as incarcerated in the jail. (RR: Vol. 68 p. 8) He said his case was eventually overturned and he was exonerated. (RR: Vol. 68 p. 9) He said the jail was very different in those years. (RR: Vol. 68 p. 10) He described a tank as housing 25 to 35 inmates who were free to walk around and interact. (RR: Vol. 68 p. 10) There were a lot of fights every day and there was not very much supervision by the guards who were out of sight down the hall. (RR: Vol. 68 p. 11)

The witness testified that his time in the Dallas County Jail was chaotic and horrible. (RR: Vol. 68 p. 13) He said today that guards watch the inmates more closely

25

and have monitors set up to see what is happening in the tanks. (RR: Vol. 68 p. 13-14) He stated that a lot of the problems in the Dallas County Jail back then were due to a lack of supervision compared to TDC. (RR: Vol. 68)

*39) Testimony of Raymond Moore:* Raymond Moore, a Sergeant for the Dallas County Jail and as part of his job he supervised Kenneth Thomas who was in administrative custody. (RR: Vol. 68 p. 25) He said that most of the inmates in this type of housing cause more problems than Mr. Thomas. (RR: Vol. 68 p. 26) He stated that he didn't have any problems with Mr. Thomas entire time he had been under his supervision. (RR: Vol. 68 p. 26) He said Mr. Thomas was never written up and never lost any privileges. (RR: Vol. 68 p. 28) He described Mr. Thomas as a model prisoner who was respectful, well-mannered, polite and quite. (RR: Vol. 68 p. 29-30)

*40) Testimony of David Weeks:* David Weeks testified that he was a licensed detention officer and was part of the Special Response Team at the Dallas County Jail. (RR: Vol. 68 p. 39) He said Mr. Thomas requested he be moved to a quieter area because of disruptions by other inmates. (RR: Vol. 68 p. 46)

The witness stated that as long as he has worked at the jail, he had never experienced someone as quiet as Mr. Thomas. (RR: Vol. 68 p. 47) He testified that Mr. Thomas kept his cell immaculate, never cursed and was always respectful. (RR: Vol. 68 p. 47) It appeared to him that Mr. Thomas had been trained in the jail routines. (RR:

Vol. 68 p. 49) He said Mr. Thomas had no write ups for infractions. (RR: Vol. 68 p. 50) He thought if Mr. Thomas was in the general population, he would stay to himself and others wouldn't bother him because a lot of the younger inmates respected him. (RR: Vol. 68 p. 56)

*41) Testimony of Anthony Graves:* Anthony Graves testified that he was better known as "death row exoneree 138" and was now an activist speaking at Continuing Legal Education seminars, trying to educate people about the criminal justice system. (RR: Vol. 68 p. 67-68) He has also testified in front of Congress and has been on panel discussions. (RR: Vol. 68 p. 68) He spent 18 and one half years incarcerated on death row before he was exonerated in 2010 and knew Kenneth Wayne Thomas while he was incarcerated at the Polunsky Unit. (RR: Vol. 68 p. 68-70) The witness described the prison, the routine and treatment by the guards.(RR: Vol. 68 p. 72-83)

He said Mr. Thomas was very quiet, laid back and didn't bother anyone else. (RR: Vol. 68 p. 90) He said in the twelve years he knew Mr. Thomas, he never did anything to cause trouble. (RR: Vol. 68 p. 91)

*The State on Rebuttal*

*42) Testimony of Melodye Nelson:* Melodye Nelson, a senior warden with the Texas Department of Criminal Justice, Institutional Division, testified that there are approximately 150,000 people incarcerated in Texas. (RR: Vol. 68 p. 145) She said

there was a high turnover for guards who need to have a high school diploma or a GED. (RR: Vol. 68 p. 148) The witness described the classification system for the jury and the freedom given to inmates in the different levels.  (RR: Vol. 68 p. 151-164)

*43) Testimony of Richard Hughes, Ph.D.:*   Dr. Hughes, a licensed specialist in school psychology, testified he had worked for the Dallas Independent School District from 1974 through 1981.  (RR: Vol. 68 p. 189) He said Kenneth Thomas was given the Iowa Test of Education Development in May, 1973 and scored on the various sections of the exam a 91,78,97-98,89-90, 93 and 88-89.  (RR: Vol. 68 p. 197-198) Mr. Thomas was also given the California Test of Mental Maturity in which he scored an 82 in total IQ, 78 in language IQ and 92 in non-language IQ.  (RR: Vol. 68 p. 198) This test was administered in grade two.  (RR: Vol. 68 p. 200)

The witness testified that grades were not a good reflection of intellectual capacity. (RR: Vol. 68 p. 201) He said Mr. Thomas received D's and F's until he was transferred to Metro North, an alternative school in 1977. (RR: Vol. 68 p. 204-205) He said there were no records that indicate Mr. Thomas was part of a special education program.  (RR: Vol. 68 p. 207) He stated that the school records were not consistent with a student that is mentally retarded.  (RR: Vol. 68 p. 208)

**44) Testimony of James C. Belt, Jr.:** James Belt testified that he practiced law with his father-in-law, Fred Finch. (RR: Vol. 68 p. 220-221) He described Fred and Mildred Finch to the jury. (RR: Vol. 221-232)

**45) Testimony of Randy Price, Ph.D.:** Dr. Price, a forensic psychologist and neuropsychologist, testified that he reviewed the reports, court transcripts and test results and conducted interviews concerning the Defendant in this case, going back to 1979. (RR: Vol. 69 p. 18-21) At the request of the trial court, he was supposed to interview Kenneth Thomas on July 13th, but Mr. Thomas refused to be evaluated. (RR: Vol. 69 p.22-23) He stated he has reviewed Mr. Thomas' hospital records going back to his birth and his school records. (RR: Vol. 69 p. 23)

The witness testified that borderline intellectual functioning does not mean mental retardation. (RR: Vol. 69 p. 33) He opined that Mr. Thomas was not incapable of successfully going through school and graduating had he chosen to do so. (RR: Vol. 69 p. 40) He stated that being a loner was not necessarily adaptive behavior deficit. (RR: Vol. 69 p. 42) He stated he saw a pattern of lying or speaking in his own interest in order to avoid criminal responsibility. (RR: Vol. 69 p. 46) It was his opinion that Mr. Thomas has traits and features consistent with an anti-social personality. (RR: Vol. 69 p. 68)

On cross examination the witness stated that he was employed by the State and interviewed people who might have a bias against Mr. Thomas. (RR: Vol. 69 p. 77) He

stated that in his opinion, Mr. Thomas met the first prong of mental retardation. (RR: Vol. 69 p. 78-79) He said that Dr. Hom had no reason to lie about his diagnosis of a brain injury. (RR: Vol. 69 p. 79) He agreed that someone who was mentally retarded could break into a house and kill someone. (RR: Vol. 69 p. 83) He stated that in a highly-structured environment such as a prison many adaptive behavior can improve. (RR: Vol. 69 p. 85)

***Defense on Rebuttal***

***46) Testimony of Antoinette McGarrahan, Ph.D.:*** Dr. McGarrahan was recalled and testified that she was of the opinion that Mr. Thomas has significant deficits in adaptive behavior. (RR: Vol. 69 p. 103) She said he can read some books and his ability to read as improved over 27 years. (RR: Vol. 69 p. 103) She said he could not sustain a job for very long and made very little money over the years. (RR: Vol. 69 p. 103-104) She said her subsequent neuropsychological testing of Mr. Thomas confirmed Dr. Hom's 1987 diagnosis. (RR: Vol. 69 p. 107) She said she and Dr. Price disagree on the Defendant's adaptive behavior deficits. (RR: Vol. 69 p. 109) She found that Mr. Thomas has had significant problems with academic skills, abstract thinking and executive functioning, social skills, poor social judgement and regulating his emotions and behavior. (RR: Vol. 69 p. 110-111) She stated that Mr. Thomas fully fits the criteria of "intellectual disability disorder." (RR: Vol. 69 p. 113)

*Verdict*

The jury answered Special Issue No. 1 "Do you find by a preponderance of the evidence that the Defendant, Kenneth Wayne Thomas, is a person with mental retardation?" as "no." The jury answered Special Issue No.2 "Do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant, Kenneth Wayne Thomas, that caused the death of the deceased was committed deliberately and with a reasonable expectation that the death of the deceased or another would result?" as "yes." The jury answered Special Issue No. 3, "Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, Kenneth Wayne Thomas, would commit criminal acts of violence that would constitute a continuing threat to society?" as "yes." The jury answered Special Issue No. 4. "Do you find, taking into consideration all the evidence, including the circumstances of the offense, the Defendant's character and background and the personal moral culpability of the Defendant, that there is a sufficient mitigating circumstance or circumstances that warrants that a life sentence of imprisonment rather than a death sentence be imposed?" as "no." The jury's answers to these special issues resulted in a sentence of death. (RR: Vol. 70 p. 82-85)

## SUMMARY OF ISSUES

Appellant raises issues in this brief that are categorized into the following groups: I. Voir Dire Issues Nos. 1-36 : Eight issues (Nos. 1-8) on voir dire involving Appellant's *Batson* challenge; fifteen issues (Nos. 9-23) on voir dire involving error in the trial court denying challenges for cause against prospective jurors; seven issues (Nos. 24-30) on voir dire involving error in the trial court excusing jurors over the objection of Appellant; Six issues (Nos. 31-36) on intellectual disability and why the jury as constituted denied Appellant due process. II. Trial Issues: One pretrial issue (No. 37) on the trial court's error in denying Appellant's motion to disqualify the Dallas County District Attorney's Office in prosecution of the case. Four issues (Nos. 38-42) on the competency trial in which (1) trial court erred when it denied Appellant's motion for mistrial due to the prosecutor's remark about Defendant's case involving "murder"; (2) the trial court erred in overruling Appellant's objection to the prosecutor's question to the witness that Appellant's first trial in 1987 was reversed on appeal as not relevant; (3) the evidence is legally insufficient to support the jury's verdict that Appellant was competent to stand trial; (4) the evidence was factually sufficient to find Appellant incompetent making the jury's verdict so against the great weight and preponderance of the evidence as to be manifestly unjust. III. Punishment trial issues: Thirteen issues (Nos. 42-54) on the punishment trial in which (1) the trial court erred in overruling Appellant's

objection to the testimony of Dr. Randy Price concerning Appellant having an anti-social personality when he could not make that diagnosis; (2) the trial court erred in overruling Appellant's objection to the witness Price's testimony about Appellant lacking remorse which was an impermissible comment on Appellant not testifying; (3) the trial court erred in overruling Appellant's objection that a knife presented in the photographs was speculative as no knife was placed into evidence; (4) the trial court erred in admitting numerous autopsy photographs; (5) the trial court erred in overruling Appellant's objection to victim impact evidence presented by James Belt; (6) the jury's answer to Special Issue No. 1 (intellectual disability) is against the great weight and preponderance of the evidence as to make it unjust; (7) the evidence was sufficient to show that Appellant was intellectually disabled; (8) the evidence is legally insufficient to support the jury's answer to Special Issue No. 3, future dangerousness; (9) the trial court erred in denying Appellant's requested jury instruction that defines "significantly sub-average general intellectual functioning"; (10) the trial court erred in denying Appellant's request that the defense did not have to prove mental retardation by unanimous jury verdict of ten members concurring as opposed to twelve; (11) the trial court erred in denying Appellant's requested 'accomplice' witness charge in this punishment retrial where the original guilt-innocence charge contained such a charge; (12) the trial court erred in denying Appellant's requested 'anti-parties' charge in the jury charge and; (13) the trial

33

court erred in denying Appellant's motion filed under seal after verdict. Appellant's counsel was requested to include an issue (No. 55) on appeal arguing that the evidence is legally insufficient to support the conviction for capital murder. IV. Issues (Nos. 56-67) involving constitutional challenges that have been previously raised and denied by this Court in order to preserve these issues for possible future review in federal court.

## VOIR DIRE ISSUES

## 'BATSON' ISSUES NOS. 1-8

## APPELLANT'S ISSUE NO. 1

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 64, NEENA BISWAS IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY**

**(Appellant's Issues Nos. 1-8 are grouped as each involves the same or similar issue of law. In each issue Nos. 1-8 Appellant argues that Appellant established a 'prima facie' case for a 'Batson' objection. The Defendant is an African-American. An objection by Appellant was made concerning the racially discriminatory manner in which the State exercised its peremptory challenges.)**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 59 page 66 at which the trial court conducted a 'Batson' Hearing. Appellant objected to the State's strike against Juror No. 64, Neena Biswas, a minority (RR: Vol. 59 p. 66) . The trial court denied Appellant's Batson Challenge.  (RR: Vol. 59 p. 77 )

34

The State argued that Dr. Biswas, a physician, was struck because she was uncomfortable dealing with the death penalty and or aggravated assaults because she was in the business of healing. (RR: Vol. 59 p. 74) The State also thought she would require the State to once again prove the guilt of the Defendant and had a problem with this because she wasn't a part of the original guilt/innocence process. (RR: Vol. 59 p. 74) The juror said she could follow the law RR: Vol. 14 p. 98,106

Dr. Biswas testified that she would not hold the State to the impossible standard of beyond all doubt. (RR: Vol. 14 p. 102) She stated she would not hold it against the Defendant if he did not testify. (RR: Vol. 14 p. 106) She said she understood that she could not give a police officer more credibility than any other witness. (RR: Vol. 14 p. 108)

## APPELLANT'S ISSUE NO. 2

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 126, LEON R. TILLEY IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 59 page 66 at which the trial court conducted a 'Batson' Hearing. Appellant objected to the State's strike against Juror No. 126, Leon R. Tilley, a minority (RR: Vol. 59 p. 66) .

35

The trial court denied Appellant's Batson Challenge. (RR: Vol. 59 p. 77 ) The State challenged the juror, the challenge was denied and the State exercised a strike. (RR: Vol.14 p. 240) The State argued that they struck Mr. Tilley because he circled No. 4 in the questionnaire in regards to his belief in the death penalty. (RR: Vol. 59 p. 73)

Mr. Tilley testified that he thought the death penalty was necessary in some cases, but not all cases. (RR: Vol. 14 p. 192) His questionnaire shows that he was in favor of the death penalty, he had checked "yes" and wrote " A person who takes another life should be ready to give his or her life. I stand on the ground as to what the bible says regarding this issue." (RR: Vol. 14 p. 192-196) Appellant submits that Mr. Tilley was a juror who was guided by the Bible and would have had no problem returning a verdict of death if the State presented the evidence necessary and if the Defense failed to show mitigating circumstances.

**APPELLANT'S ISSUE NO. 3**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 225, DEBORAH A. MOORE IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 59 page 66 at which the trial court conducted a 'Batson' Hearing. Appellant objected to

the State's strike against Juror No. 225, Deborah A. Moore, a minority (RR: Vol. 59 p. 66) . The trial court denied Appellant's Batson Challenge. (RR: Vol. 59 p. 77 ) The State argued that they struck Ms. Moore because she circled No. 4 in the questionnaire in regards to their belief in the death penalty. (RR: Vol. 59 p. 73)

Ms. Moore stated that she did believe in the death penalty but that it would be a hard decision to make. (RR: Vol. 17 p. 28-29) She further stated that she would answer the Special Issues truthfully and it would "weigh heavy on my heart." (RR: Vol. 17 p. 30)

She wrote in the questionnaire that there were cases that do deserve the death penalty. (RR: Vol. 17 p. 67) She agreed that there should be a law to protect society. (RR: Vol. 17 p. 67)

## APPELLANT'S ISSUE NO. 4

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 497, PRONSAK NOHE IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 59 page 66 at which the trial court conducted a 'Batson' Hearing. Appellant objected to the State's strike against Juror No. 497, Pronsak Nohe, a minority (RR: Vol. 59 p. 66) .

The trial court denied Appellant's Batson Challenge. (RR: Vol. 59 p. 77 ) The State

argued that Pronsak Nohe because he circled No. 4 on the questionnaire with regards to

their belief in the death penalty.

Mr. Nohe testified that he would rather not make the decision to sentence someone

to death. (RR: Vol. 28 p. 162) He stated that he was "wrestling with" what he believes in

and his civic duty. (RR: Vol. 28 p. 164) However, he testified that "But if I have to do it,

then I would do the best of my ability in dealing with what the law requires me to do."

(RR: Vol. 28 p. 165) At the end of the State's voir dire, Mr. Nohe said he could promise

that he could take the oath to render a verdict if it results in the execution of a fellow

human being. (RR: Vol. 28 p. 180)

## APPELLANT'S ISSUE NO. 5

## THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 755, CASSIE R. FIGURES, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

Appellant directs this Honorable Court's attention to Reporter's Record Volume

59 page 66 at which the trial court conducted a 'Batson' Hearing. Appellant objected to

the State's strike against Juror No. 755, Cassie R. Figures, a minority. (RR: Vol. 59 p.

66) The trial court denied Appellant's Batson Challenge. (RR: Vol. 59 p. 77 ) The State

argued that they struck Ms. Figures because she circled no. 3 on the juror questionnaire with regard to her belief in the death penalty. (RR: Vol. 59 p. 72)

When the State described how a person would be put to death, Ms. Figures stated yes, she could be a part of that process. (RR: Vol. 36 p. 21-22) Ms. Figures stated that she supported the death penalty many times throughout the questioning by the State.

## APPELLANT'S ISSUE NO. 6

## THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 955, MARY A. MCGOWAN, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY

Appellant directs this Honorable Court's attention to Reporter's Record Volume 59 page 66 at which the trial court conducted a 'Batson' Hearing. Appellant objected to the State's strike against Juror No. 955, Mary A. McGowan, a minority (RR: Vol. 59 p. 66) . The trial court denied Appellant's Batson Challenge. (RR: Vol. 59 p. 77 ) The State argued that Ms. McGowan was struck because she thought people on drugs should be put into rehab. (RR: Vol. 59 p. 75) The State further argued that with regards to Special Issue No. 4, she said "hard upcoming of a person matters so they can go out and make bad choices to get attention. Childhood had a huge impact on people in prison and

those on death row.  If they were on drugs when they committed a murder, then they should be put in rehab."

## APPELLANT'S ISSUE NO. 7

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 1055, ARTHERINE PRIESTON, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN <u>BATSON V. KENTUCKY</u>**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 59 page 66 at which the trial court conducted a 'Batson' Hearing. Appellant objected to the State's strike against Juror No. 1005, Catherine Prieston, a minority (RR: Vol. 59 p. 66) . The trial court denied Appellant's Batson Challenge.  (RR: Vol. 59 p. 77 ) The State argued that they struck Ms. Prieston because she circled no. 3 on the juror questionnaire with regard to her belief in the death penalty.  (RR: Vol. 59 p. 72) The State challenge for cause on Ms. Prieston was denied by the trial court.  (RR: Vol. 45 p. 28)

Ms. Prieston was open to assessing a sentence of death based on the evidence.  At RR: Vol.45 p. 10 she explained why she circled number 3 on the questionnaire. Ms. Prieston went on to testify that she thought the death penalty was an important thing to have because there were cases that should be death penalty.  (RR: Vol. 45 p. 11) Ms. Prieston had worked in the Dallas County District Clerk's Office and the Attorney

40

General's Office for the State of Texas and thought her experience would help her be a juror. (RR: Vol. 45 p. 24; 25)

## APPELLANT'S ISSUE NO. 8

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE JURY PANEL BASED ON THE STATE'S MISUSE OF ITS PEREMPTORY CHALLENGE IN REGARD TO JUROR NO. 1095, MARTHA E. BARBOSA, IN VIOLATION OF THE DOCTRINE ESTABLISHED IN BATSON V. KENTUCKY**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 59 page 66 at which the trial court conducted a 'Batson' Hearing. Appellant objected to the State's strike against Juror No. 1095, Martha E. Barbosa, a minority (RR: Vol. 59 p. 66) . The trial court denied Appellant's Batson Challenge. (RR: Vol. 59 p. 77 ) The State argued that they struck Ms. Barbosa because she circled no. 3 on the juror questionnaire with regard to her belief in the death penalty. (RR: Vol. 59 p. 72)

Ms. Barbosa testified that she wrote on her juror questionnaire that she considered herself "law and order, fair and impartial, logical." (RR: Vol. 47 p. 21) Defense counsel did not question Ms. Barbosa. (RR: Vol. 47 p. 36)

## ARGUMENT

Appellant submits that the record supports the claim that the State violated the equal protection clause of the United States Constitution when it used its peremptory strikes against potential jurors Neena Biswas, Leon R. Tilley, Deborah A. Moore,

41

Pronsak Nohe, Cassie R. Figures, Mary A McGowan, Atherine Prieston and Martha E. Barbosa in a racially discriminatory manner contrary to the holding of *Batson v. Kentucky*, 476 U. S. 79, 106 S. C. 1712, 90 L. Ed. 2d 69 (1988). The State argued that they in no way did they use a disproportionate number of strikes on any class.(RR: Vol. 59 p. 71)  Defense Counsel argued (RR: Vol. 59 p. 71):

MR. SANCHEZ: . .  I don't believe that the number of minorities that make the jury is what Batson is talking about.  It's the use of the strikes.  The use of the strikes are - - more than half of the strikes that were used were used on minorities.  That's why we believe we have shown at least a prima facie case that those strikes were used in violation of *Batson v. Kentucky.*

The State's proffered reasons for being neutral were in fact a pretext. *See Lopez v. State*, 940 S. W. 2d 388 (Tex. App.-Austin, 1997); *Musick v. State*, 862 S.W. 2d 794 (Tex. App. – El Paso 1999); *Ramirez v. State*, 862 S. W. 2d 648 (Tex. App. – Dallas 1993); *Esteves v. State*, 859 S. W. 2d 613 (Tex. App. – Houston [1st Dist.] 1993, pet. ref'd) and *Everson v. State*, 851 S. W. 2d 269 (Tex. Crim. App. 1993)

The answers given by these eight prospective jurors were similar to answers given by the non minority jurors as described in the eight previous issues.  Two of the minority struck jurors, Neena Biswas- No. 64 and Mary A. McGowan - No. 955 circled the number 2 which states " I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty." The State accepted 17 non-minority jurors, No. 46-Sands, No. 36-Fenster, No. 208-

42

Dunn-Jelen, No.259-Blomber, No. 316- Kvalheim, No. 323-Withers, No. 353-Clark, No. 440-Tschewik, No. 469-Dawson, No. 588-Agnes, No. 612-Weinzapelfel, No. 685-Keifer, No. 1052 Kirby, No. 857-Mcelyea, No. 968-Rapp, No. 125-Dewell and No. 1135-Sims who also chose number 2 answer as did the 2 struck minority jurors as to which statement best represented their feeling on the death penalty.

Minority jurors Leon R. Tilly- No. 126, Pronsak Nohe- No. 497, Cassie R. Figures-No. 755, Mary A. McGowan - 955, Catherine Prieston- No. 955, and Martha E. Barbosa- No. 1095, all struck minority jurors, answered "no" to question number 3, "Do you have any moral, religious or personal beliefs that would prevent you from sitting in judgement of another human being?" Non minority jurors accepted by the State, No. 46-Sands, No. 36-Fenster, No.259-Blomber, No. 316- Kvalheim, No. 323-Withers, No. 353-Clark, No. 440-Tschewik, No. 469-Dawson, No. 588-Agnes, No. 612-Weinzapelfel, No. 685-Keifer, No. 1052 Kirby, No. 857-Mcelyea, No. 968-Rapp, No. 125-Dewell and No. 1135-Sims also answered this question as "no", they did not have any moral, religious or personal beliefs that would prevent you from sitting in judgement of another human being as did six of the State struck minority jurors. Furthermore, in answer to this same question, two of the minority State struck jurors, Neena Biswas- No. 64 and Deborah A. Moore - No. 225, answered "yes" they did "have moral, religious or personal beliefs that would prevent you from sitting in judgement of another human being."

43

Appellant argues that the State accepted non-minority juror Dunn-Jelen- No. 208 who also answered "yes" to this question.

Appellant argues that five of the State struck minority jurors, Figures - No.755, McGowan - No. 955, Prieston - No. 1055 and Barbosa - No. 1095 answered juror questionnaire question number 4 asked "Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being?" as "No."  Of the non-minority jurors accepted by the State, No. 46-Sands, No. 36-Fenster,  No.259-Blomber, No. 316- Kvalheim, No. 323-Withers, No. 353-Clark, No. 440-Tschewik, No. 469-Dawson, No. 588-Agnes, No. 612-Weinzapelfel, No. 685-Keifer, No. 1052, Kirby, No. 857-Mcelyea, No. 968-Rapp, No. 125-Dewell and No. 1135-Sims all answered this question as "no" as did the State struck minority jurors.

All eight minority struck jurors, the subject of this 'Batson' issue,  answered "yes" to question number 12 concerning the punishment range, life imprisonment or the death penalty, for intentional murder of an individual during the course of committing, or attempting to commit the offense of burglary. Appellant submits that 17 non-minority jurors accepted by the State, No. 46-Sands, No. 36-Fenster, No. 208-Dunn Jelen, No.259-Blomber, No. 316- Kvalheim, No. 323-Withers, No. 353-Clark, No. 440-Tschewik, No. 469-Dawson, No. 588-Agnes, No. 612-Weinzapelfel, No. 685-Keifer, No.

44

1052, Kirby, No. 857-Mcelyea, No. 968-Rapp, No. 125-Dewell and No. 1135-Sims gave the same answer, "yes", as the State struck minority jurors.

In question number 13, "Do you think there are some crimes which call for the death penalty solely because of their severe facts and circumstances, regardless of whether or not the guilty person has committed prior violent acts?" seven of the eight State struck minority jurors answered "yes". Of the State accepted non-minority jurors, 17 answered "yes" No. 46-Sands, No. 36-Fenster, No. 208-Dunn Jelen, No.259-Blomber, No. 316- Kvalheim, No. 323-Withers, No. 353-Clark, No. 440-Tschewik, No. 469-Dawson, No. 588-Agnes, No. 612-Weinzapelfel, No. 685-Keifer, No. 1052, Kirby, No. 857-Mcelyea, No. 968-Rapp, No. 125-Dewell and No. 1135-Sims . Appellant argues that these answers show the similarity between the minority struck jurors and those non-minority that were accepted in some very crucial questions which indicate how strongly the jurors supported the death penalty and for what reason, in this case, murder in the course of a burglary.

Question fifteen was a very important question in that it asked the juror to rank how strongly they held the belief in <u>using</u> the death penalty. Two of the struck minority jurors, Preiston - No. 1055 and Martha Barbosa - No. 1095 ranked themselves a "5" while non-minority juror Sands - No. 46 accepted by the State ranked herself a "5." Two of the State struck minority jurors, Moore - No. 225 and McGowan - No. 955 and two of

45

the non-minority State accepted jurors, Blomber - No. 259, Agnes - No. 588  ranked themselves a "7."  Two of the State struck minority jurors, Tilley - No. 126 and Nohe - No. 497  and four of the non-minority accepted jurors, Clark - No. 353, Keifer - No. 685, Mcelyea - No. 857, Rapp - No. 968 ranked themselves a "8." One of the State struck minority jurors, Biswas - No. 64  ranked themselves a "9." Appellant has shown that the struck jurors gave similar rankings as the jurors accepted by the State.

The State struck minority jurors showed similar answers to question number 34, their belief in the testimony of the police, which indicates the juror's trust in law enforcement.  One minority State struck juror, Moore - No. 225 thought the testimony of the police was always believable while three of the non-minority accepted jurors Kirby - No. 1052 ,Micelyea - No. 857 and Dewell - No. 1125 thought the same. Four minority struck jurors, Biswas - No. 64, Nohe - No. 497, Prieston - No. 1055, Barbosa - No. 1095 thought the testimony of the police was more believable than most witnesses while nine of the non-minority State accepted jurors No. 36-Fenster, No. 316- Kvalheim, No. 353-Clark, No. 440-Tschewik, No. 469-Dawson,  No. 612-Weinzapelfel, No. 685-Keifer, No. 968-Rapp, and No. 1135-Sims thought the same.  Three minority State struck jurors, Tilley - No. 126, Figures - No. 755, and McGowan - No. 955 thought the testimony of the police was the same as any other witness as did seven of the non-minority accepted

jurors No. 46-Sands, No. 208-Dunn Jelen, No.259-Blomber, No. 323-Withers and No. 588-Agnes.

Another question that showed a juror's strongly held beliefs in punishment question number 38 which asked "Do you believe in "an eye for an eye?" Of the eight minority State struck jurors, 2 believed in "an eye for an eye" ( Biswas - no. 64 and McGowan - No. 955. Of the State accepted jurors, 10 believed in "an eye for an eye" No.259-Blomber, No. 316- Kvalheim, No. 440-Tschewik, No. 469-Dawson, No. 588-Agnes, No. 612-Weinzapelfel, No. 1052, Kirby, No. 968-Rapp, No. 125-Dewell and No. 1135-Sims while 10 did not. Appellant has shown that the State struck minority jurors gave answers to significant questions that were similar to the answers given by non-minority jurors accepted by the State.

The Defendant has shown purposeful discrimination pursuant to *Miller-El v. Cockrell*, 537 U.S. 322 (2003) The exercise of even <u>one</u> peremptory challenge for racial reasons invalidates the entire jury selection and mandates a new trial. See. *Linscomb v. State*, 829 S. W. 2d 164, 166 (Tex. Crim. App. 1992); *Keeton v. State*, 724 S. W. 2d 58, 65 n. 5 (Tex. Crim. App. 1987) The aggrieved party need not show multiple instances of racial prejudice in jury selection to prove a constitutional violation. *Linscomb* at 166. Either of the eight strikes by the State, or all together, invalidate the jury selection process and mandate a new trial based on Appellant's 'Batson' objections.

Under *Batson*, one should be concerned with the question of whether the State was racially motivated in the exercise of its peremptory challenges against even one juror of discernable race. *Linscomb*, at 167. Each of the prosecutor's explanations should be examined to determine whether the evidence supports the so-called "neutral" reasons for the strike or whether they are merely a pretext for a racially motivated peremptory challenge. *Whitsey v. State*, 796 S. W. 2d 707, 713 (Tex. Crim. App. 1989)

COMPARATIVE ANALYSIS—DISPARATE TREATMENT

The trial judge's decision on whether the Appellant proves a <u>Batson</u> claim turns, in part, on the trial court's observations during voir dire examination. As the voir dire supervisor, the trial judge can readily perceive discrepancies during jury selection process. These discrepancies may include:

(1) the prosecutor failing to question any of the minority jurors yet striking them anyway;
(2) the prosecutor striking minority jurors who gave answers similar to those of majority jurors whom the prosecutor did not strike; and
(3) the prosecutor striking minority jurors who had the same characteristics professionally, socially, religiously, etc. as majority jurors whom the prosecutor did not strike.

These factors may show disparate treatment of prospective jurors. These factors should enter into the trial judge's assessment of the prosecutor's credibility and eventually the trial judge's determination of the racial neutrality of the prosecutor's

peremptory challenges. See *Young v. State*, 826 S. W. 2d 141, 145 (Tex. Crim. App. 1999).

The evidence in this case indicates that the trial judge erred in allowing the prosecution to strike eight jurors on the basis of race, despite the rationale offered by the State to cover its true motivation. See *Ramirez v. State*, 862 S. W. 2d 648 (Tex. App. – Dallas 1993). The State used 8 of its 14 peremptory strikes to eliminate 57% of the minorities on the qualified prospective jury panel. (RR: Vol. 43 p. 19)

The Court in *Greer v. State,* No. 05-08-00146 (Tex. App.-Dallas June 9, 2009) found it significant that the State in that case struck 100% of the African-American jurors. That Court referenced *Miller-El* in stating, "This remarkable disproportionate use of peremptory strikes weighs heavily in our analysis." The Supreme Court in *Miller-El* stated that striking 10 of 11 available African-Americans were "remarkable" and not likely caused by "[h]appenstance." The fact that the State's reasons for striking these minority veniremembers were, in large part, applied to other panel members who were not struck is evidence of pretext. *See Miller-El, supra* and *Snyder v. Louisiana*, 128 S.Ct. 1203 (2008). The disparate-treatment evidence in this case is strongly reinforced by the State's disproportionate use of peremptory strikes against minorities, just as it was in *Greer*.

In this case the trial court unreasonably failed to apply clearly established law to the facts by failing to examine not just the validity of the reason but the credibility of the prosecutor. See *Hayes v. Thaler*, 361, Fed App. 563 (C.A.5 (Tex.)) 2010 WL 183395 citing *Miller-El v. Drekte*, 545 U.S. 231 (2005) and *Reed v. Quaterman*, 555 F3d 304 (45th Cir.2009).

For these reasons Appellant submits reversible error is present based on a constitutional violation that requires reversal.

## VOIR DIRE ISSUES

**(In each of the following issues involving jury selection Appellant's challenge for cause was denied by the trial court. Appellant exhausted all peremptory challenges, requested additional peremptory challenges which were denied and identified objectionable jurors that were on the jury thereby preserving Appellant's issues raised herein for appellate review.)**

### ISSUES ON TRIAL COURT'S DENIAL OF APPELLANT'S CHALLENGES FOR CAUSE

### APPELLANT'S ISSUE NO. 9

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON REBECCA MARIE SANDS

### SUMMARY OF VOIR DIRE OF VENIRE PERSON

Defense counsel argued that Ms. Sands would automatically answer Special Issue No. 2 "yes". For further argument, see Reporter's Record Volume 13 p. 118-119,133.

50

The trial court denied defense counsel's challenge for cause. (RR: Vol. 13 p. 134)

Ms. Sands wrote on her questionnaire, question 9, "N/A" in answer to what crimes she thought a sentence of life imprisonment is the proper punishment. She further answered question 11 "The death penalty is reserved for those defendants that are such a threat to society that even incarceration does not remove the probability of future violent acts" "Agree. Incarceration is subject to parole/escape possibly creating a threat to society."

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 13 p. 206) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002).

It is fundamental that in all criminal prosecutions, an accused is entitled to an impartial jury composed of people who are unprejudiced, disinterested, equitable, and just who have not prejudged the merits of the case. *Shaver v. State*, 280 S.W.2d 740, 742 (Tex. Crim.App. 1955); Tex. Const. Art. I, § 10. The voir dire process is designed to

insure to the fullest extent possible, that such an impartial jury will perform the duty assigned to it. *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978).

Article 35.16(c)(2) of the Texas Code of Criminal Procedure, allows the defense to challenge for cause any prospective juror who has a bias or prejudice against any law applicable to the case upon which the defense is entitled to rely, either as a defense to the offense being prosecuted or as mitigation of the punishment therefor. *Clark v. State*, 717 S.W.2d 910, 916-17 (Tex. Crim. App. 1986); Tex. Code Crim. P. Ann. Art. 35.16(c)(2) (Vernon Supp. 1992). When a prospective juror is biased against the law, or shown to be biased as a matter of law, he must be excused when challenged, even if he states that he can set his bias aside and be a fair and impartial juror. *Clark*, 717 S.W.2d at 917; *Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Crim.App. 1982).

Based on the record, Appellant preserved error to complain of the propriety of the Trial Court's ruling on his challenges for cause. *Harris*, 790 S.W. 2d 581 (Tex. Crim. App. 1989). See *Hernandez v. State*, 757 S.W.2d 744 (Tex. Crim. App. 1988). These errors in the voir dire process denied Appellant his right to due process and a fair trial. *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). See *Cumbo v. State*, 760 S.W.2d 251 (Tex. Crim. App. 1988)

The trial court erred in overruling the challenge for cause. *Cuevas,* supra; *Smith,* supra. The appellant was forced to unnecessarily use a peremptory challenge, and having exhausted his allotment of such challenges was required to accept an "objectionable" juror on the jury. Appellant preserved his error.

Appellant submits that he is entitled to rely on the following federal law as it applies to jury selection in capital cases and that the complained of juror was biased against the law as a matter of law based on the prospective jurors voir dire examination.

Appellant argues that the Court's ruling in regard to this juror violates the holdings of *Morgan v. Illinois*, 504 U.S. 719 (1992) because general questions do not comply with the duty to ensure that the juror is unbiased. The Supreme Court has explicitly held that these questions are insufficient to ferret out bias:

"Can you follow the law?" "You can be fair, can't you?" " You can follow the Court's instructions, can't you?" A capital juror must be willing and able to accept and apply the statutory presumption of life. A death sentence cannot be automatic. *Woodson v. North Carolina*, 428 U.S. 280 (1976). Additionally, the law requires that a capital juror be able to consider and give effect to mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104 (1982). That juror must be able to consider an individual defendant's mitigation. *Tennard v. Dreke*, 124 S.Ct. 2562 (2004) Thereby, a capital juror must be able to consider any relevant mitigating evidence from the defense. *Payne v. Tennessee*,

53

501 U.S. 808 (1991). Any potential juror who would automatically vote for the death penalty is challengeable for cause. *Morgan v. Illinois, supra*. See also *Wainwright v. Witt*, 469 U.S. 412 (1985). See also *Ross v. Oklahoma*, 4897 U.S. 81 (1988)

Since mitigation can be anything under *Lockett v. Ohio*, 438 U.S. 586 (1978) a prospective capital juror must be able to consider any mitigation evidence the defense seeks to rely upon. Additionally, Appellant submits that the overall voir dire responses from this prospective juror showed an implied bias as to a general prejudice against the defense.

## APPELLANT'S ISSUE NO. 10

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON DORCE L. MOORE

### SUMMARY OF VOIR DIRE OF VENIRE PERSON

Defense counsel argued that Ms. Moore was unqualified because she thought a sentence of life was appropriate for only people who acted in self defense or was mentally ill. Ms. Moore would also require more than a preponderance of the evidence to answer the special issue on mental retardation. She also would require the defense to offer evidence and convince her in Special Issue No. 4. For further argument, see Reporter's Record Volume 15 p. 111. The trial court denied defense counsel's challenge for cause. (RR: Vol. 15 p. 113)

Ms. Moore stated that she would want to be sure, "clear enough to say I feel good about it" in deciding Special Issue No. 1, the issue concerning mental retardation. (RR: Vol. 15 p. 92, 97) Appellant submits that she showed a bias concerning this issue and would require more than the preponderance of the evidence. Appellant further argues that Ms. Moore would place a burden of proof on the defense to present mitigation evidence before she could assess a life sentence. (RR: Vol. 15 p. 110)

Ms. Moore circled 10 when asked how strongly she believed in the death penalty. (Questionnaire p. 4) She thought serving a life sentence was less severe than a death penalty. (Questionnaire p. 4) She had been married to a police officer for several years. (Questionnaire p. 6) She also thought a defendant should testify in violation of the fifth amendment to U.S. Constitution. (Questionnaire p. 7) Appellant submits these answers show the juror was not qualified.

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 15 p. 114) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and

incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by reference as if set out verbatim.

## APPELLANT'S ISSUE NO. 11

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON DAVID L. DARDEN

### SUMMARY OF VOIR DIRE OF VENIRE PERSON

Defense counsel argued that Mr. Darden already thought that the proper punishment was death and had a bias against the Defendant. For further argument, see Reporter's Record Volume 16 p.72 The trial court denied defense counsel's challenge for cause. (RR: Vol. 16 p. 76)

Appellant submits that Mr. Darden would automatically answer the Special Issues so that they would result in a sentence of death if the defendant was found guilty of committing a murder in the course of a burglary.  Mr. Darden repeatedly stated that if a murder was committed during the course of another crime, he thought the person should be sentenced to death. (RR: Vol. 16 p. 65-66) He also would automatically find the Defendant to be a future danger is he was convicted of capital murder. (RR: Vol. 16 p. 71)

Mr. Darden wrote in the questionnaire that the best argument for the death penalty is "murder of innocent humans." (Questionnaire p. 3) He answered "none" as the best argument against the death penalty. (Questionnaire p. 3) He thought the death penalty

56

was the proper penalty for murder.(Questionnaire p. 3) He wrote "If these acts are committed, the death penalty should be imposed" when asked if he agreed with the punishment range of an intentional murder during the course of a burglary. (Questionnaire p. 4) He circled 10 as how strongly he supported the death penalty. (Questionnaire p. 4) He believes in an "eye for an eye". (Questionnaire p. 8)

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 16 p. 76) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by reference as if set out verbatim.

## APPELLANT'S ISSUE NO. 12

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON DELORES SAWYER

## SUMMARY OF VOIR DIRE OF VENIRE PERSON

Defense counsel argued that Mrs. Sawyer testified on two occasions that she would take into account the facial expressions of the defendant during the trial in order to determine his character and whether she should answer the mitigation question yes or no, which was not evidence and was improper. For further argument, see Reporter's Record Volume 19 p. 224. The trial court denied defense counsel's challenge for cause. (RR: Vol. 19 p. 225)

During the State's voir dire, Ms. Sawyer stated that she was very good at "reading" someone because of her law enforcement training and her answers would depend on how she felt about the person. (RR: Vol. 19 p. 180) When the defense questioned Ms. Sawyer, she again reiterated how she can "read" a person and how his demeanor would play a part in her answer in the mitigation issue. (RR: Vol. 19 p. 218-220)

The juror was asked if the demeanor would have some affect on her ultimate decision and she stated that the facts would take precedence but the Defendant's

demeanor would play a part in it and would factor into her answer to Special Issue No. 4. (RR: Vol. 19 p. 220)

Ms. Sawyer ranked herself a "9" has to how strongly she believed in using the death penalty. (Questionnaire p. 4) She thought the death penalty was used too seldom. (Questionnaire p. 5) She agreed with the statement "Regardless of what the Judge says the law is, Jurors should do what they believe is the right thing to do, even if it goes against the law." (Questionnaire p. 9)

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 19 p. 225) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by reference as if set out verbatim.

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S
CHALLENGE FOR CAUSE AGAINST
VENIREPERSON JONATHAN L. HENDERSON**

**SUMMARY OF VOIR DIRE OF VENIRE PERSON**

Defense counsel objected to Mr. Henderson as being mitigation impaired, that

Special Issue No. 4 would not mean much to him. Defense counsel pointed out that Mr.

Henderson said "...if you want me to tell you the truth, it's always going to be the death

penalty." Defense counsel stated that Mr. Henderson would never give them a straight

answer and always talked around the question. For further argument, see Reporter's

Record Volume 20 page 201. The trial court denied defense counsel's challenge for

cause. (RR: Vol. 20 p. 203-204 ) Appellant argues that Mr. Henderson would

automatically answer the Special Issues in such a way as to always result in a sentence of

death. (RR: Vol. 20 p. 174-175):

Mr. Henderson reiterated this viewpoint and clearly stated that he would always

find death as the appropriate sentence if he was convinced it was "the right guy,

deliberate, not retarded and a future danger." (RR: Vol. 20 p. 192-193) .

Mr. Henderson wrote on the questionnaire that he was in favor of the death

penalty and explained his answer as "I feel that justice needs to be served. And maybe

sooner or later the generations will think before committing the crime." (Questionnaire p.

2) He thought murder and aggravated robbery were crimes deserving of the death penalty. (Questionnaire p. 3) He thought the death penalty would give families closure and thought the country spent too much money on people "who continue to use and abuse our funds, that supports them daily." (Questionnaire p. 3) He circled 8 as to how strongly he supported the death penalty. (Questionnaire p. 4) He believes in "an eye for an eye." (Questionnaire p. 8) These answers and statements he made on the questionnaire show Mr. Henderson's only punishment for killing is the death penalty. Appellant argues that he has shown he would automatically answer the special issues so that a death sentence would result and therefore was an unqualified juror.

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 20 p. 226) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by reference as if set out verbatim.

# APPELLANT'S ISSUE NO. 14

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON ISAAC TSCHEWIK

### SUMMARY OF VOIR DIRE OF VENIRE PERSON

Defense counsel challenged this juror because he would place a burden on Appellant in determining his answer to the mitigation issue. For further argument, see Reporter's Record Volume 26 p. 340. The trial court denied defense counsel's challenge for cause. (RR: Vol. 26 p. 340 )

Statements made by Mr. Tschewik that show why Defense counsel challenged him are found at RR: Vol. 26 p. 330 (life sentence is not the proper punishment); p. 335-336 (defense has to prove mitigation in order to have a life sentence); p. 339 (juror didn't think that anything in Defendant's childhood or past would cause him to impose a sentence of life instead of death).

Appellant submits that the testimony of Mr. Tschewik shows that he was clearly unqualified to be a juror in this case because he would place the burden on the defense to bring him mitigation and that while he would listen to mitigation evidence, he would automatically assess a death sentence.

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's

62

challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective

juror's bias against the Defendant, or as a matter of law against the law as relied upon the

by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 26 p. 341)

*See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v.*

*State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and

incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by

reference as if set out verbatim.

**APPELLANT'S ISSUE NO. 15**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S
CHALLENGE FOR CAUSE AGAINST
VENIREPERSON MICHAEL D. DAWSON**

**SUMMARY OF VOIR DIRE OF VENIRE PERSON**

Appellant directs this Honorable Court's attention to Reporter's Record Volume

27 page 152 at which Defense counsel challenged this juror because he continually wrote

in the juror questionnaire that he believed in the principle of an "eye for an eye." For

further argument, see Reporter's Record Volume 27 p. 152. The trial court denied

defense counsel's challenge for cause. (RR: Vol. 27 p. 153)

Mr. Dawson believed that the death penalty was a measure of prevention and that

if you take someone's life intentionally, then you should give your life. (RR: Vol. 27 p.

127) He did not think a mentally retarded person should be exempt from the death

63

penalty if they weren't so mentally retarded that they knew right from wrong. (RR: Vol. 27 p. 133-136) Mr. Dawson considered background and other mitigation issues as a "crutch" and didn't think people should get a lesser penalty because they had a hard time. (RR: Vol. 27 p. 147)

Mr. Dawson believed so strongly in the death penalty that on the questionnaire he circled number 1, "I believe that the death penalty is appropriate in all murder cases." (Questionnaire p. 2) He thought the death penalty was appropriate for murder, aggravated sexual assault and child molestation. (Questionnaire p. 3) He states again in question number 12 that "intentional murder warrants the death penalty." (Questionnaire p. 4) Mr. Dawson circled 10 in how strongly he believes in the death penalty in question number 15. (Questionnaire p. 4) He thought a life sentence was less severe because "I do not think it is fair for the guilty to live on, the victim didn't get to." (Questionnaire p. 4) Mr. Dawson also had a bias of giving credibility to law enforcement personnel, question number 34. (Questionnaire p. 6) He checked the statement "Even though the law says a Defendant has the right to remain silent, a person accused of capital murder should testify" in question number 36 a fifth amendment violation. (Questionnaire p. 7)

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective

juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol.27 p. 153) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by reference as if set out verbatim.

<u>**APPELLANT'S ISSUE NO. 16**</u>

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON ANGELA K. THORPE-HARRIS**

<u>**SUMMARY OF VOIR DIRE OF VENIRE PERSON**</u>

Defense counsel challenged this juror because she continually said that she would place a burden on the Defense in Special Issue No. 2 to prove he did not act deliberately. For further argument, see Reporter's Record Volume 28 p. 129. The trial court denied defense counsel's challenge for cause. (RR: Vol. 28 p. 133 )

Appellant argues that the answers in the questionnaire and her explanation of them during voir dire show that a person would have to be severely retarded to be assessed a life sentence. (RR: Vol. 28 p. 115) She did not trust expert testimony. (RR: Vol. 28 p. 121) Ms. Thorpe-Harris strongly believed in the death penalty, circling number 10 in how strongly she believed in using the death penalty. (Questionnaire p. 4) In answering

the question "It is better to that ten guilty people go free than one innocent man suffer" she disagreed, stating "Ten guilty going free may create 10 times the problem. We make attempts to compensate an innocent person's suffering." (Questionnaire p. 8) She also believed in "an eye for an eye" and stated "I think that if we actually lived by this verse, criminal activity would decline." (Questionnaire p. 8 ) She did not believe inmates could be rehabilitated. (Questionnaire p. 8) Ms. Thorpe-Harris had a family member who had been murdered and no one charged with her death. (Questionnaire p. 9)

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol.28 p. 133) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by reference as if set out verbatim.

# APPELLANT'S ISSUE NO. 17

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON CHRISTOPHER F. WEINZAPFEL

## SUMMARY OF VOIR DIRE OF VENIRE PERSON

Mr. Weinzapfel was challenged on the fact that he recalled the case, after he filled out the questionnaire. He was also evasive in his answers and invoked the Fifth Amendment. For further argument, see Reporter's Record Volume 32 p. 89.

Defense counsel argued that Mr. Weinzapfel asked to "take the Fifth" when asked about whether his work would be a distraction and when asked about his involvement in another death case, the Darlie Routier case. (RR: Vol. 32 p. 62-63; 65) He refused to participate in voir dire.

His answers in the juror questionnaire show that he was a strong proponent of the death penalty. He thought that if a person murdered once, he would repeat the act and therefore it was a risk to let him live. He also had a bias of credibility toward law enforcement personnel. He believes in an "eye for an eye",and thought this principle was part of the founding fathers original plan for dealing with criminals. He did not believe in mitigating circumstances. (See juror questionnaire.)

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's

67

challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective

juror's bias against the Defendant, or as a matter of law against the law as relied upon the

by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 32 p. 90)

*See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v.*

*State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and

incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by

reference as if set out verbatim.

## APPELLANT'S ISSUE NO. 18

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON PHILLIP D. RAPP

### SUMMARY OF VOIR DIRE OF VENIRE PERSON

Defense counsel challenged Mr. Rapp because of his answers in the juror

questionnaire and that his voir dire answers showed that he didn't understand how the

legal process works. For further argument, see Reporter's Record Volume 42 p. 70. The

trial court denied defense counsel's challenge for cause. (RR: Vol. 42 p. 70 )  Mr. Rapp

repeatedly answered "Just depends on the evidence" when asked about the special issues.

(RR: Vol. 42 p. 69) Mr. Rapp stated that he had strong feelings supporting the death

penalty and has had these feelings for a long time. (RR: Vol. 42 p. 69)

Mr. Rapp had extremely strong feelings in favor of the death penalty and had circled number 1"I believe that the death penalty is appropriate in all murder cases in his questionnaire. (Questionnaire p. 2) He wrote that the best argument for the death penalty was "If it is proven beyond a reasonable doubt that the defendant committed murder, I find it appropriate to sentence death penalty rather than taking that space up in prison." (Questionnaire p. 3) When asked if he agreed with the punishment range of a capital offense, he wrote "Murder is murder.  Whether it's through burglary, drive-by, middle of the day."  (Questionnaire p. 4) He ranked himself an eight on how strongly he believed in using the death penalty.  (Questionnaire p. 4) He believed that the death penalty was used too seldom and wrote " Too many convicted murderers getting a chance at life." (Questionnaire p. 5) When answering the question "It is better that ten guilty people go free than one innocent man suffer" Mr. Rapp wrote "Just because that person is found not guilty, doesn't make them innocent."  (Questionnaire p. 8) Mr. Rapp also believes in "an eye for an eye." (Questionnaire p. 8) He thought that the police were more believable than most witnesses. (Questionnaire p. 6) When asked if there was any reason why he would not want to serve as a juror in this case, Mr. Rapp wrote "My conservative political stance would make it hard for me to be open-minded or impartial."  In the next question "How would you feel about being chosen as a juror in this case" he reiterated

that he didn't think he could be impartial.  (Questionnaire p. 20) Appellant submits that this juror could not have made it clearer that he was biased against the defendant.

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause.  Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol.42 p. 71) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002).  Additionally, Appellant adopts and incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by reference as if set out verbatim.

## APPELLANT'S ISSUE NO. 19

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON NANCY RAMOS

### SUMMARY OF VOIR DIRE OF VENIRE PERSON

Defense counsel challenged Ms. Ramos because of her answers in the juror questionnaire and because she believes that the death penalty is appropriate in all murder cases. (RR: Vol. 44 p. 19)  The trial court denied defense counsel's challenge for cause. (RR: Vol. 44 p. 19)

Ms. Ramos circled the number one " I believe that the death penalty is appropriate in all murder cases." (Questionnaire p. 2) Ms. Ramos thought that police officers were more believable than most witnesses. (Questionnaire p. 6) She disagreed with the statement "It is better that then guilty people go free than one innocent man suffer." (Questionnaire p. 8) There were numerous questions that Ms. Ramos refused to answer, including if she believed in "an eye for an eye." She did not think a person convicted of a violent crime could be rehabilitated. (Question p. 8) She thought that psychiatrists, psychologists were a "waste of money." (Questionnaire p. 13) She answered "no" that she could not listen to the testimony of an expert witness and give any opnion offered the weight you felt it deserved. She wrote in response to this question "I would be nervous and would get cold feet." (Questionnaire p. 13) Ms. Ramos did not want to sit as a juror and wrote "I'm missing days from work and paying by babysitter, have low income and I don't get paid for jury duty date." (Questionnaire p. 19) She thought it would be difficult to be a juror and would not feel comfortable about being chosen. (Questionnaire p. 19) Ms. Ramos, aside from being an automatic death penalty juror, did not want to serve because it would create a hardship for her financially and otherwise.

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective

juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 44 p. 19) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by reference as if set out verbatim.

## APPELLANT'S ISSUE NO. 20

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JAY F. KIRBY

## SUMMARY OF VOIR DIRE OF VENIRE PERSON

Defense counsel challenged Mr. Kirby because of the answers he gave in the juror questionnaire and that he believed the death penalty was appropriate in all murder cases. (RR: Vol. 45 p. 68) The trial court denied defense counsel's challenge for cause. (RR: Vol. 45 p. 68)

Appellant argues that Mr. Kirby was automatically disposed to find for the death penalty and circled number 1 "I believe that the death penalty is appropriate in all murder cases." (Questionnaire p. 2) He wrote he believed in "an eye for an eye" when asked if he was in favor of the death penalty. (Questionnaire p. 2) He did not think a life sentence would be appropriate and wrote "If found guilty of murder with intent the death penalty

72

should be used." (Questionnaire p. 3) He went on to write "If all evidence and DNA find guilty that person should be put to death." (Questionnaire p. 3) He wrote that there was "not one" argument against the death penalty. (Questionnaire p. 3) He further wrote " I do not think life should be considered in a murder case." (Questionnaire p. 3) He ranked himself a "10" as to how strongly he believed in the death penalty. (Questionnaire p. 4) Throughout the juror questionnaire Mr. Kirby wrote that he thought the guilty should be put to death. (Questionnaire p. 3,4) He thought the death penalty was used too seldom and then wrote "over crowded prisons." (Questionnaire p. 5) Mr. Kirby also thought that the testimony of law enforcement were always believable. (Questionnaire p. 6) He disagreed with the statement "It is better that ten guilty people go free than one innocent man suffer" and stated "If 10 guilty people go free, then they will commit more crimes." (Questionnaire p. 8) Mr. Kirby believes in "an eye for an eye" and wrote "If someone kills someone I know I want that person put to death." (Questionnaire p. 8) He did not believe a person could be rehabilitated. (Questionnaire p. 8) He answered the question on the considering genetics, circumstances of birth, upbringing and environment as "I think that people should be held accountable." (Questionnaire p.8)

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective

juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol.45 p. 68) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by reference as if set out verbatim.

<u>**APPELLANT'S ISSUE NO. 21**</u>

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON NATHAN H. SOSA**

<u>**SUMMARY OF VOIR DIRE OF VENIRE PERSON**</u>

The Defense challenged Mr. Sosa based on his answers on the juror questionnaire and because he would require the Defendant to give information to the family for closure before he could assess a life sentence. (RR: Vol. 46 p. 32) The trial court denied defense counsel's challenge for cause. (RR: Vol. 46 p. 33) Mr. Sosa could not follow the law to returned a life sentence verdict. See Reporter's Record Volume 46 pp. 27-28 and Juror questionnaire.

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective

74

juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 46 p. 34) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by reference as if set out verbatim.

## APPELLANT'S ISSUE NO. 22

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S CHALLENGE FOR CAUSE AGAINST VENIREPERSON JAMES E. MARTIN

### SUMMARY OF VOIR DIRE OF VENIRE PERSON

Defense counsel challenged Mr. Martin based on his answers on the juror questionnaire and because how the tragic death of his grandson would affect him. (RR: Vol. 50 p. 45) The trial court denied defense counsel's challenge for cause. (RR: Vol. 50 p. 45)

Mr. Martin stated that his grandson's death occurred in 2005 and that it was the anniversary of his death. (RR: Vol. 50 p. 43) He said that it was "a little tough" today. (RR: Vol. 50 p. 43) He told that State that Ms. Hanley of the District Attorney's Office prosecuted the case. (RR: Vol. 50 p. 38) The juror stated that he didn't think his grandson's death and prosecution of his death would not affect his service in any way. (RR: Vol. 50 p. 43)

75

Mr. Martin wrote in his questionnaire in answer to why he was in favor of the death penalty "If you're found guilty of murder charge and will be a threat to society in the future, you should be put to death." (Questionnaire p. 2) He thought the death penalty was the proper automatic punishment for murder.(Questionnaire p. 3) He ranked himself a "10" as to how strongly he supported the death penalty. (Questionnaire p. 4) He thought the death penalty was used too seldom in Texas. (Questionnaire p. 5)

For these reasons, Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Because the Trial Court erred in denying Appellant's challenge for cause (Art. 35.16(a)(9) ; Art.35.16 (c)(2) C.C.P.) based on the prospective juror's bias against the Defendant, or as a matter of law against the law as relied upon the by the Defendant, Appellant was forced to use a peremptory strike. (RR: Vol. 50 p. 47) *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) & (c)(2) (West 2006); *Barajas v. State*, 93 S.W.3d 36,39 (Tex Crim. App. 2002). Additionally, Appellant adopts and incorporates herein the argument and authorities cited in Issue No. 9 and incorporated by reference as if set out verbatim.

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S
CHALLENGE FOR CAUSE AGAINST
VENIREPERSON JENNIFER L. WILDER**

**SUMMARY OF VOIR DIRE OF VENIRE PERSON**

The Defense challenged Ms. Wilder because she showed in her testimony that she could not follow the law and would hold the defense to a burden of beyond a reasonable doubt instead of preponderance of the evidence on Special Issue No.1, the intellectual disability issue. He stated that Ms. Wilder would also place a burden on the Defense in Special Issue No. 4, mitigation and would lower the burden on the State to prove just a mere possibility that the Defendant would commit further acts of criminal violence. For further argument, see Reporter's Record Volume 52 p. 85.

After the trial court denied Defense Counsel's challenge for cause the following occurred (RR: Vol. 52 p. 87)

MR. SANCHEZ: Your Honor, we would ask for an extra strike, based on the fact that - - -other than the jurors we've already brought up to the Court, where we believe the Court denied us a challenge for cause, that we believe should have been granted, we would ask for another strike, based on the fact that Juror Number 612, Christopher Weinzapfel, that we had submitted for cause, on the basis we believe he was being evasive in answering his question. That challenge for cause was denied. Because of that, we would ask for one more strike from the Court, that we would use on this juror.
THE COURT: Okay. I'm going to deny the strike.

Appellant further argues that Ms. Wilder would lower the burden on the State to prove just a mere chance or a possibility that the Defendant would commit criminal acts

of violence. (RR: Vol. 52 p. 74) Ms. Wilder would require Appellant to bring her evidence of mitigation, even though there is no burden on either side, to her, in order to get her to answer "yes" to Special Issue Number 4. (RR: Vol. 52 p. 76)

Ms. Wilder circled "10" as how strongly she believed in the death penalty. (Questionnaire p. 4) She also expressed concern at giving a life sentence when she wrote "They're just locked up - what if they escape!" (Questionnaire p. 4) She thought that law enforcement witnesses were more believable. (Questionnaire p. 6) She disagreed with the statement "It is better that ten guilty people go free than one innocent man suffer." (Questionnaire p. 8)

Appellant submits that the Trial Court erred in denying Appellant's challenge for cause. Appellant objected to seating of venire person, Jennifer L. Wilder, stating that Mr. Bureau was an objectionable juror. (RR: 52 p. 87) Appellant submits that he has asserted a clear and specific challenges for cause clearly articulating grounds therefore; that he used a peremptory challenge on those jurors; that all his peremptory challenges were exhausted; that his request for additional strikes was denied; and, that an objectionable juror sat on the case.

Appellant suffered a detriment from the loss of the additional strike, in that an objectionable juror was seated on the jury. Appellant has demonstrated harm, and thereby reversible error, in that Appellant has shown that the Trial Court erroneously

denied challenges for cause on all fifteen venire members.  Therefore, this Court should

reverse and remand this cause for a new trial based on Appellant's Issue Nos. 9 through

23 on improper jury selection; which as a whole denied Appellant his right to due

process in the selection of a capital murder – death penalty jury.  Additionally, Appellant

adopts and incorporates herein the argument and authorities cited in Issue No. 9 and

incorporated by reference as if set out verbatim.

**ISSUES CONCERNING JURORS EXCUSED FOR CAUSE
OVER OBJECTION OF DEFENSE**

**APPELLANT'S ISSUE NO. 24**

**THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON
VENIREPERSON SHERYL R. KINGERY OVER THE
OBJECTIONS OF THE DEFENSE**

The State challenged juror Sheryl R. Kingery and the trial court granted the State's

challenge over defense objection. (RR: Vol. 13 p. 4,10) The State argued (RR: Vol. 13 p.

58-60) that Ms. Kingery has a bias against the law and would abolish the death penalty if

she was given the opportunity.  The State argued that Ms. Kingery said on numerous

occasions that she didn't believe in the death penalty.  The State further argued that Ms.

Kingery stated that she couldn't say she would follow the law.

Defense Counsel argued (RR: Vol. 13 p. 60-61):

MR. SANCHEZ: Your Honor, under the *Witt* case and under *Russeau v. State* , a
juror can have beliefs against capital punishment. But as long as they indicate to the
Court that they can answer the questions honestly, take the oath and base it on the

79

evidence, they're not excludable, under *Russeau v. State and Lockhart.* Just because people are against the death penalty doesn't automatically make 'em not be eligible to be on this jury.

. . .

And she said she would take the oath. I asked her if she would refuse to participate She said she wouldn't; that she would participate and she would do everything honestly and follow the law.

So she's not excludable, just because of her beliefs of the death penalty, based on *Russeau v. State*. She can express those beliefs. But still, as long as they can set aside those views and answer the questions and follow the instructions of the Court, that makes her eligible to serve on this jury. She's not challengeable for cause, based on those set out by the State.

Ms. Kingery testified that she could answer all four questions honestly. (RR: Vol. 13 p. 57) The trial court erred in granting the challenge for cause in contradiction of the case of *Wainwright v. Witt*, 469 U.S. 412 (1985).

## APPELLANT'S ISSUE NO. 25

## THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON KIMBERLY KAY MORRIS OVER THE OBJECTIONS OF THE DEFENSE

The State challenged juror Kimberly Kay Morris and the trial court granted the State's challenge over defense objection. (RR: Vol. 13 p. 264-265) The State argued that Ms. Morris could not take the oath to follow the law in this case. (RR: Vol. 13 p. 264)

The Defense argued (RR: Vol. 13 p. 264-265):

MR. SANCHEZ: Yes, Your Honor we would object. She did say more than once that she could take the oath and that she could follow the law and base her decision on the evidence. She said that more than once.

80

Ms. Morris testified that she thought it should be difficult for a jury to decide whether somebody lives or dies. (RR: Vol. 13 p. 244) She agreed that her questionnaire shows that she is concerned about the fairness of the process. (RR: Vol. 13 p. 245) She thought she was the kind of person that could look at the evidence and give an honest opinion. (RR: Vol. 13 p. 246) She said she would not hold the State to beyond all doubt, an impossible standard. (RR: Vol. 13 p. 252) She stated that she would not make up mitigation in order to give a life sentence but would answer the question truthfully. (RR: Vol. 13 p. 259) Ms. Morris stated in the questionnaire "I do believe the death penalty is appropriate depending on the cases. In cases where the person shows no regard for life. (Questionnaire p. 2) She circled number 2 "I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty. (Questionnaire p. 2) She had no moral, religious or personal beliefs that would prevent her from sitting in judgement of another human being or returning a verdict which would result in the execution of another human being. (Questionnaire p. 3) She wrote as the best argument for the death penalty " If someone took someone's life with intent or meant to harm someone with no care for another's life, then that person does not deserve to live." (Questionnaire p. 3) The trial court erred in granting the State's challenge for cause.

# APPELLANT'S ISSUE NO. 26

## THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON CONSUELO DAVILA OVER THE OBJECTIONS OF THE DEFENSE

The State challenged juror Consuelo Davila and the trial court granted the State's challenge over defense objection. (RR: Vol. 14 p. 188-189) The State argued that Ms. Davila was unable to take the oath because of her moral or religious opposition to the death penalty.

The Defense argued (RR: Vol. 14 p. 189):

MR. SANCHEZ: Yes, Your Honor.
As part of our voir dire, we inform the juror that on Special issue Number Four, each juror must make their own reasonable, moral assessment or judgement as to whether or not the death penalty should be imposed. And the Court sustained the DA's objection to this.
So our questioning after that was tainted by that - - by the Court sustaining that objection. And so the Court was of the opinion that jurors are not required or allowed to make their own reasonable, moral judgement, as to whether or not the death penalty should be imposed.
There's case law from - - Supreme Court has already indicated in many rulings that, at the punishment stage, a juror can make an individual, reasonable moral judgement. And that is precisely what's called for in Special Issue Number Four.
So we would object to the juror being challenged for cause, when we weren't allowed to explain that to the juror.

The trial court erred in granting the challenge for cause.

# APPELLANT'S ISSUE NO. 27

## THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON GLORIA J. HAWKINS OVER THE OBJECTIONS OF THE DEFENSE

The State challenged juror Gloria J. Hawkins and the trial court granted the State's challenge over defense objection. (RR: Vol. 15 p. 240-243) The State argued that Ms. Hawkins had moral or religious beliefs that would prevent her from sitting in judgement in a case where a person could receive the death penalty. The State further argued that Ms. Hawkins didn't think she could judge anyone, was evasive in her answers and would hold it against the Defendant if he did not testify on his own behalf.

Defense counsel argued that Ms. Hawkins made it clear to the court that she could take the oath and follow the law once the scheme was explained to her. For further argument, see Reporter's Record Volume 15 p. 244.

The record shows that at the end of the State's voir dire, she believed that if she took the oath, she would have to assess the death penalty. (RR: Vol.15p. 222) At the end of the Defense voir dire, she stated that she could take the oath to consider the law and the evidence in making her decision. (RR: Vol. 15 p. 239) The trial court erred in granting the challenge for cause.

**THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON JENNA A. KINZIE OVER THE OBJECTIONS OF THE DEFENSE**

The State challenged juror Jenna A. Kinzie and the trial court granted the State's challenge over defense objection. (RR: Vol. 17 p. 160) The State argued Ms. Kinzie would not be able to take the oath and after questioning by the Defense, changed her position and therefore was a vacillating juror. The State further argued that Ms. Kinzie would start police officers off with higher credibility.

Defense counsel argued that the State never asked her if she could her feelings aside and base her verdict on the evidence. Counsel argued that Ms. Kinzie stated that she could follow the law and understood the law. For further argument see RR: Vol. 17 p. 161.

The Trial Court conferred with the State and defense counsel and agreed to state the oath, ask the juror if she can take the oath and not have any extrapolations. (RR: Vol. 17 p. 167-171) However, the Trial Court proceeded to speak to the juror about the oath violating her conscience. (RR: Vol. 17 p. 170) The juror then proceeded to state that she couldn't take the oath because it would violate her conscience. (RR: Vol. 17 p. 171) Defense counsel made the following objection (RR: Vol. 17 p. 171) :

MR. SANCHEZ: Your Honor, I would object, based on the fact there was some additional facts - - questioning of the juror about their violating their conscience.

84

Extrapolated further than we had thought you were going to ask.  We would object, your Honor.  We still think she's qualified.

THE COURT: Okay.   I will grant the State's challenge for cause.

The trial court erred in granting the State's challenge for cause.

## APPELLANT'S ISSUE NO.  29

### THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON RAUL FLORES OVER THE OBJECTIONS OF THE DEFENSE

The State challenged juror Raul Flores and the trial court granted the State's

challenge over defense objection. (RR: Vol. 18 p. 68-69) The State argued that Mr.

Flores was predisposed to not giving the death penalty, had a bias against the State,

would require a higher burden of proof and that he could never answer "no" to Special

Issue Number Four.

Defense Counsel argued (RR: Vol. 18 p. 69):
MR. SANCHEZ: Your Honor, just briefly.  He never said he couldn't follow the law when I talked to him.  He never said that he wouldn't take the oath. So I would object to him being challenged for cause.

Appellant submits that after speaking with the State, Mr. Flores was of the mind

that he would not have any choice in whether or not to assess the death penalty. After

defense counsel explained Special Issue No. 4 to him he stated " I was actually seeing no

wiggle room, leeway.  Like I said, we are being funneled into what, and have no real

freedom?"

He did not have any moral, religious or personal beliefs that would prevent him from sitting in judgement of another human being. (Questionnaire p. 3) The trial court erred in granting the State's challenge for cause.

**APPELLANT'S ISSUE NO. 30**

**THE TRIAL COURT ERRED IN GRANTING STATE'S CHALLENGE ON VENIREPERSON KELLYE C. HOGAN OVER THE OBJECTIONS OF THE DEFENSE**

The State challenged juror Kellye C. Hogan and the trial court granted the State's challenge over defense objection. (RR: Vol. 47 p. 117) The State argued that Ms. Hogan would hold the State to a higher burden of proof and was a vacillating juror.

The State argued that Ms. Hogan would hold the State to a higher burden of proof. The following which disputes this belief is found at RR: Vol. 47 p. 114):

MR. SANCHEZ: . . .What I'm hearing from you - - tell me if I'm right - - is that you would say, "I want to be sure, by my definition of beyond a reasonable doubt. I want you to do away with any reasonable doubt I may have, But I'm not going to hold you to that impossible burden of beyond all doubt or beyond a shadow of a doubt."
VENIREPERSON: Yes.
MR. SANCHEZ: Is that what you're saying now?
VENIREPERSON: That's what I'm saying.

The trial court questioned Ms. Hogan who stated that she would hold the State to a higher burden. (RR: Vol. 47 p. 115) Appellant submits that Ms. Hogan felt pressure to give an answer when questioned by the trial court. However, Appellant submits that the

86

juror had the right to define beyond a reasonable doubt in her own terms. The trial court erred in granting the State's challenge for cause.

## ARGUMENT ON ISSUES 24-30

Appellant submits that the trial court erred in granting these State challenges. Where a prospective juror states his belief that he can set aside any influences and personal bias he may have, and the court overrules the challenge for cause, the court's decision will be reviewed in light of *all* the answers given. *Faulder v. State*, 745 S.W.2d 327 (Tex. Cr. App.. 1987); *Cordova v. State*, 733 S.W.2d 175, 182 (Tex. Cr. App. 1987); *Mays v. State*, 726 S.W.2d 937, 950 (Tex. Cr. App. 1986); *Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Cr. App. 1982). Appellant submits that these jurors did not exhibit any bias toward the Defendant or the State and were all people who could follow the law as instructed by the trial court. These jurors were qualified and should not have been excused by granting the State's challenge under Sec. 35.16 C.C.P.

## APPELLANT'S ISSUE NO. 31

**THE APPLICATION OF THE JUDICIAL OPINION IN EX PARTE BRISENO DEFINING INTELLECTUAL DISABILITY (MENTAL RETARDATION) AS A PERSON HAVING AN I.Q. SCORE OF 70 OR BELOW IS UNCONSTITUTIONAL PURSUANT TO THE OPINION RENDERED IN THE CASE OF HALL V. FLORIDA, 134 S.CT. 1986 (2014)**

Appellant recognizes that this Honorable Court has reaffirmed its holding in *Ex Parte Briseno*, 35 S.W.3d 1 (2004) in the cases of *Ex Parte Cathey*, 451 S.W.3d 1 (Tex.

Crim.App. 2014), *Ex Parte Ladd*, 2013 wl 593927 ___ S.W. 3d___(Tex. Crim. App.

2015), *Ex Parte Lizcano*, WR-68,348-03 (Tex. Crim.App. April 15, 2015) since the

decision of the U.S. Supreme Court in *Hall v. Florida* 134 S.Ct.1986 (2014). Appellant

submits that this Court should use this case to reevaluate its suggested criteria enunciated

in the *Briseno* case in light of the holding in *Hall v. Florida*, ibid and in light of the

concurring opinion in *Ex Parte Ladd*, supra. Honorable Judge Alcala pointed out, . .

"Perhaps it may be appropriate in the near future for this Court to reexamine the

parameters of the standard for intellectual disability set forth in *Briseno* to ensure that it

fully complies with the dictates of *Hall* and *Atkins*." . . .

Appellant further argues that pursuant to the majority and concurring opinion in

the case of *In RE: Tyrone Allen*, realtor, WR-82,265-01 and WR-82,265-02 handed

down May 13, 2015, the need for legislative action on the issue of providing a

legislatively defined definition of 'intellectual disability' and procedure for determining

the same is submitted in support of Appellant's claims.  The trial bar apparently has

misinterpreted 'Briseno' to require an "IQ of about 70 or below as represented by the

questions as used in jury selection by the prosecutors in the case at bar to be a ceiling of

70 over which intellectual disability could not be found contrary to '*Hall*.' See *Ex Parte*

*Hearn*, 310 S.W. 3d 424 (Tex. Crim. App. 2010) in which it is stated that "... this Court

interprets the "about 70" language of the AAMR's definition of mental retardation to

represent a rough ceiling above which a finding of mental retardation in the capital context is precluded"

As suggested in Judge Price's concurring opinion in *Ex Parte Cathey,* supra, and Judge Newell's dissenting opinion in *Ex Parte Lizcano*, WR-68,348-03 decided April 15, 2015, which includes references to cases and articles that had been critical of the Briseno standard as unscientific, Appellant moves this Honorable Court to reexamine the criteria in 'Briseno', in light of the Hall case.

**Texas' procedures implementing the United States' Supreme Court's decision in *Atkins v. Virginia* violates the Eighth Amendment.**

As the United States Supreme Court recently reaffirmed, "the Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability." *Hall v. Florida*, 134 S. Ct. at 1990  (quoting *Atkins v. Virginia*, 536 U.S. at 321).  But despite the powerful evidence of intellectual disability presented in this case, Kenneth Thomas faces the death penalty because Texas clings to a rigid, judge-made, non-scientific approach, under *Ex parte Briseño*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004).

In *Hall v. Florida*, this Court held that the State of Florida's failure to recognize the standard error of measurement in IQ scores "creates an unacceptable risk that persons with intellectual disability will be executed . . ." 134 S. Ct. at 1990. As shown below, the *Briseño* approach entails precisely the same risk, including seeking the death penalty

against Kenneth Thomas despite his obvious disability. As Justice Price previously

recognized, "after the recent opinion of the United States Supreme Court in *Hall v.*

*Florida*, I should think that the writing is on the wall for the future viability of *Ex parte*

*Briseno*." *Ex parte Cathey,* No. WR-55,161-02, 2014 WL 5639162, at *20 (Tex. Crim.

App. Nov. 5, 2014) (Price, J., concurring).

A. **Texas's non-scientific *Briseño* approach violates *Atkins* and *Hall* by creating an unacceptable risk of executing those with intellectual disabilities.**

Following the United States Supreme Court's decision in *Atkins v. Virginia*, the

Texas Court of Criminal Appeals announced a novel approach to determining

intellectual disability:  in addition to satisfying the traditional definition of intellectual

disability by showing significant sub-average functioning and adaptive deficits before

the age of 18, Texas petitioners must prove that their adaptive deficits are the result of

intellectual disability alone, and not a personality disorder. The court explained that, in

its view, "adaptive behavior criteria are *exceedingly subjective*," and therefore proposed

additional evidentiary factors courts should weigh "in the criminal trial context" as

indicative of *mental retardation or of a personality disorder*." *Id.* (emphasis added).[1] As

---

[1] The factors this Court identified are as follows: 1) Did those who knew the person best during the developmental stage - his family, friends, teachers, employers, authorities - think he was mentally retarded at that time, and, if so, act in accordance with that determination? 2) Has the person formulated plans and carried them through or is his conduct impulsive?  3) Does his conduct show leadership or does it show that he is led around by others? 4) Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable? 5) Does he respond coherently, rationally, and on point to oral or written questions, or do his responses wander from subject to subject? 6) Can the person hide facts or lie effectively

the court later clarified, this approach aims to identify which *Atkins* claimants possess the

"level and degree of [intellectual disability] at which a *consensus of Texas citizens*"

would prefer the death penalty still be imposed. *Ex parte Sosa*, 364 S.W.3d 889, 891

(Tex. Crim. App. 2012); *see also Chester v. Thaler*, 666 F.3d 340, 346 (5th Cir. 2011)

(stating the Fifth Circuit position that the *Briseño* factors permissibly exclude certain

offenders with intellectual disability from the *Atkins* exemption).

The core of this approach asks non-scientific questions about what an *Atkins*

claimant *can do* to sort what the lower court deems as deserving intellectually-disabled

from those whose personality disorder is the true cause of their deficits. *See Ex parte*

*Weathers*, No. WR-64,302-02, 2014 WL 1758977, at *6 (Tex. Crim. App. Apr. 30, 2014)

(requiring proof "that the first and second prongs are linked—the adaptive limitations

must be related to a deficit in intellectual functioning and not a personality disorder")

(internal citation and quotation marks omitted); *Ex parte Hearn*, 310 S.W.3d 424,

428–29 (Tex.Crim.App.2010) (citing factors set out in *Briseño* as "evidentiary factors"

to "help distinguish" mental retardation from personality disorders); *Chester*, 666 F.3d at

346; *Moore v. Quarterman*, 342 F. App'x 65, 72 (5th Cir. 2009) ("We first address the

State's contention that the district court abused its discretion in not considering "other

---

in his own interests? 7) Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose? *Ex parte Briseño*, 135 S.W.3d at 8-9.

factors" suggested in *Briseño* to help the factfinder distinguish mental retardation from antisocial personality disorder."); *Ladd*, 2013 WL 593927, at *8 ("In *Briseño*, the Texas Court of Criminal Appeals instructed fact-finders to consider whether the evidence of adaptive skill deficits was indicative of mental retardation or of a personality disorder. *Briseño*, 135 S.W.3d at 8. The court therefore construes the term "related" [from the medical definition] as meaning indicative of sub-average intellectual function, as *opposed to indicative of a personality disorder*.") (emphasis added).

The first problem with *Briseño* is that it lacks any basis in professional, medical, or scientific standards concerning intellectual disability. This Court has stated that evaluation of adaptive functioning is "exceedingly subjective." *Ex parte Briseño*, 135 S.W.3d at 8. The court therefore created its own standards, not based on science. In the opinion John Steinbeck's character Lennie was used as an example of someone whom the citizens of Texas "*might*" deem qualified for the exemption. *Ex parte Briseño*, 135 S.W.3d at 6 (citing John Steinbeck, *Of Mice and Men* (1937) (emphasis added)).

*Atkins* determinations, however must be "informed by the *medical* community's diagnostic framework. . . . And the professional community's teachings are of particular help in this case, where . . . this Court and the States have placed substantial reliance on the expertise of the medical profession." *Hall*, 134 S. Ct. at 2000.

The *second* problem is that the *Briseño* approach not only is *not* based in science or medicine, but "gross[ly] deviat[es] from clinical definitions of adaptive functioning." John Blume et al., *A Tale of Two (and possible three) Atkins: Intellectual Disability and Capital Punishment Twelve Years After the Supreme Court's Creation of a Categorical Bar*, 23 WM. & MARY BILL RTS. J. 393, 414 (2015).

The science challenges *Briseño*'s central premise – the sorting of those with intellectual disability from those with personality disorders. While there may be some overlap in the behaviors associated with Antisocial Personality Disorder and the adaptive deficits observed in people with intellectual disability, it is clinically inappropriate to conclude that the presence of diagnostic criteria for anti-social personality disorder rule out a diagnosis of intellectual disability. Under the heading "differential diagnosis," the DSM-V states the "diagnosis of intellectual disability should be made *whenever* Criteria A, B, and C are met." DSM-V, at 39 (emphasis added). Moreover, [c]o-occurring mental . . . conditions are frequent in intellectual disability, with rates of some conditions . . . three to four times higher than the general population." *Id.*

As the previous edition of the DSM explained, the "diagnostic criteria for mental retardation do not include an exclusion criterion; therefore, the diagnosis should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder." American Psychiatric Association, *Diagnostic and Statistical Manual*

*of Mental Disorders*, 39 (4th ed. Text Revision 2007) (here after DSM-IV-TR). In other words, characteristics of anti-social personality disorder and intellectual disability are not mutually exclusive: if a person meets the criteria for intellectual disability, he has intellectual disability even if he also has features of other disorders, including Anti-Social Personality Disorder. *See also* App. E at 467-68 (testimony of Dr. Garnett reviewing these authorities).

With respect to anti-social personality disorder and intellectual disability in particular, "the characteristics of the two disorders overlap, and the presence of one does not rule out the other." J. Gregory Olley, *Knowledge and Experience Required for Experts in Atkins Cases*, 16 J. Applied Psych. 135, 137 (2009) (critiquing *Briseño* for its attempt to distinguish personality disorders from intellectual disability). Some inappropriate behaviors, such as "asocial behavior, specifically aggression, assaultive behavior, conduct problems, and misunderstanding of social context and social understanding" can arise "out of the functional impairment of a person with" intellectual disability. George W. Woods et al, *Intellectual Disability and Comorbid Disorders*, in DEATH PENALTY AND INTELLECTUAL DISABILITY 279, 286. When that is the case, it is

inappropriate to attribute these behaviors to personality disorders, to the exclusion of

intellectual disability. *Id.*[2]

The American Association of Intellectual Disability (AAIDD) recently published

the DEATH PENALTY AND INTELLECTUAL DISABILITY.[3] The book devotes an entire

chapter to problems with *Briseño*, concluding that "[f]ew if any intellectual disability

(ID) scholars, representative bodies or specialists consider that the *Briseño* factors

provide a valid diagnostic framework." Stephen Greenspan, *The Briseño Factors* in

DEATH PENALTY AND INTELLECTUAL DISABILITY 219.

Because of its unscientific nature, the *Briseño* approach has garnered many critics,

including judges, academics, and clinicians involved in the identification and treatment

of this population. *See Ex parte Cathey*, No. WR-55,161-02, 2014 WL 5639162, at *20

(Tex. Crim. App. Nov. 5, 2014) (Price, J., concurring in part) (noting continued

disagreement with the court's "decidedly non-diagnostic approach to evaluating the

adaptive-deficits prong of the standard for determining intellectual disability" and

predicting that after *Hall*, the writing is on the wall for the future viability of *Ex parte*

---

[2] *In light of this science, Thomas in no way concedes that he is properly diagnosed as having features of anti-social personality disorder.*

[3] Coming from the AAIDD, the book is authoritative: the organization, formerly the American Association of Mental Retardation, was founded in 1876 and is the Nation's oldest and largest interdisciplinary organization in the field of intellectual and developmental activities; its definition of mental retardation was cited in *Atkins*, 536 U.S. at 308 n.3.

*Briseño*); *Lizcano v. State*, No. AP-75879, 2010 WL 181772, *35 (Tex. Crim. App. May 5, 2010) (Price, J., concurring and dissenting, joined by Johnson and Holcomb, JJ.) ("[W]e seem to have granted a certain amorphous latitude to judges and juries in Texas to supply the normative judgment to say, in essence, what mental retardation *means* in Texas (and, indeed, in the individual case) for Eighth Amendment purposes.") (emphasis in original);*Chester*, 666 F.3d at 371 (DENNIS, J., dissenting) ("The prohibition becomes meaningless unless it is moored to a generally agreed upon definition of 'mental retardation.' . . . The [Texas courts] should not be permitted to circumvent *Atkins*'s constitutional prohibition by totally supplanting the definition of adaptive functioning that [generally conformed] both with the AAMR clinical definition and with the national consensus that had developed around the AA[IDD] and APA definitions."); John Blume et al., *Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases,* 18 CORNELL J. LAW & PUB. POLICY 689, 710-17 (2009); Blume et al., *A Tale of Two (and possible three) Atkins*, 23 WM. & MARY BILL RTS. J. at 399-400; Peggy M. Tobolowsky, *A Different Path Taken: Texas Capital Offenders' Post-Atkins Claims of Mental Retardation*, 39 HASTINGS CONST. L.Q. 1, 149-66, 173-74 (2011); Stephen Greenspan & Harvey N. Switzky, *Lessons from the Atkins Decision for the Next AAMR Manual*, in AAMR, WHAT IS MENTAL RETARDATION?

IDEAS FOR AN EVOLVING DISABILITY IN THE 21ST CENTURY 291 (2006); Greenspan, *The Briseño Factors* in DEATH PENALTY AND INTELLECTUAL DISABILITY 219.

Application of the unscientific *Briseño* factors results in the execution of intellectually-disabled people entitled to the *Atkins* protection. Several scholars have noted the extraordinarily low proportion of *Atkins* claimants who prevail in Texas. Blume et al., *A Tale of Two (and possible three) Atkins*, 23 WM. & MARY BILL RTS. J. at 414 (comparing *Atkins*-claim success rates among the states and finding the Texas rate (8 of 45 claims) "strikingly low"); Peggy M. Toblowsky, *Excluding Intellectually Disabled Offenders from Execution: The Continuing Journey to Implement Atkins*, 211 (Carolina Academic Press 2014) (documenting "various comparative measures suggest[ing] that Texas state offenders are less likely to succeed in their *Atkins* claims than estimates of intellectually disabled capital offenders would indicate or than offenders elsewhere"); Lee Kovarsky, *Death Ineligibility and Habeas Corpus*, 95 CORNELL L. REV. 329, 352-53 (2010) (noting Texas state courts have rejected almost every contested *Atkins* case in post-conviction review); Tobolowsky, *A Different Path Taken*, 39 HASTINGS CONST. L.Q. at 37-38 & nn. 203-04, 71 & nn. 373-74 (noting fewer than half of Atkins claimants in Texas prevail, as compared to national average).

By purposeful design, *Sosa*, 364 S.W.3d at 891, *Briseño* weeds from *Atkins* protection many persons with mild intellectually disability. This is the subgroup most

likely to retain identifiable strengths and to be engaged in criminal conduct, and it makes up the overwhelming majority (85%) of those who are intellectually disabled, DSM-IV-TR, at 43, and "virtually all" of the intellectually-disabled who face possible execution. Greenspan, *The Briseño Factors* in DEATH PENALTY AND INTELLECTUAL DISABILITY 221. This exclusion runs contrary to *Atkins* and *Hall*'s mandates to exempt from execution *all* people with this disability.

"The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects." *Hall*, 134 S. Ct. at 2001. While proper *Atkins* determinations are supposed to be "informed by the medical community's diagnostic framework[,]" *Hall*, 134 S. Ct. at 2000, *Briseño* dictates a purely subjective analysis in Texas. Instead of science and medicine, it is this subjective view that ostensibly reflects the consensus of the State's citizenry that controls in Texas. As did Florida with its refusal to acknowledge the standard error of measurement, Texas "goes against the unanimous professional consensus." *Hall*, 134 S. Ct. at 2000 (internal quotation marks omitted).

## B. Texas is the only state to follow the non-scientific *Briseño* approach.

Texas is the *only* state that uses subjective "supplemental evidentiary factors" to limit the *Atkins* exemption to a subset of people with intellectual disability, highlighting the degree to which Texas has departed from "[o]bjective indicia of society's standards

98

in the context of the Eighth Amendment". *Hall*, 134 S.Ct. at 1996 (internal quotation marks and citation omitted). Every state to adopt a legislative definition of intellectual disability has used an unsupplemented variant of the three-pronged clinical definitions from *Atkins*.[4] Even those states lacking statutory guidance have judicially adopted unsupplemented clinical criteria for intellectual disability.[5] No state has varied its intellectual disability definition in any way other than by either specifying a controlling

---

[4] *See* ALA. CODE § 15-24-2(3) (2012); ARIZ. REV. STAT. ANN. § 13-753(K)(1)-(K)(3) (2012); ARK. CODE ANN. § 5-4-618(a)(1) (2011); CAL. PENAL CODE § 1376(a) (2011); COLO. REV. STAT. § 18-1.3-1101(2) (2012); DEL. CODE ANN. tit. 11 § 4209(d)(3)d (2012); FLA. STAT. ANN. § 921.137(1) (2012); GA. CODE ANN. § 17-7-131(a)(3) (2011); IDAHO CODE ANN. § 19-2515A(1)(a) (2012); IND. CODE ANN. 35-36-9-2 (2012); KAN. STAT. ANN. §§ 21-6622(h), 76-12b01 (2011); KY. REV. STAT. ANN. § 532.130(2) (2011); LA. CODE CRIM. PROC. ANN. art. 905.5.1(H)(1) (2011); MO. ANN. STAT. § 565.030(6) (2012); NEB. REV. STAT. § 28-105.01(3) (2011); NEV. REV. STAT. ANN. § 174.098(7) (2011); N.C. GEN. STAT. ANN. § 15A-2005(a)(1)(a) (2011); S.C. CODE ANN. § 16-3-20(C)(b)(10) (2011); TENN. CODE ANN. § 39-13-203(a) (2012); UTAH CODE ANN. § 77-15a-102 (2011); VA. CODE ANN. § 19.2-264.3:1.1(A) (2012); WASH. REV. CODE ANN. § 10.95.030(2)(a) (2012). Two states do not include the developmental onset criterion. See OKLA. STAT. ANN. tit. 21 § 701.10bA(1) (2012); S.D. CODIFIED LAWS § 23A-27A-26.2 (2011). Connecticut, Illinois, Maryland, and New Mexico have abolished the death penalty, but had pre-abolition statutes defining intellectual disability by reference to the clinical criteria. See CONN. GEN. STAT. § 1-1g(a) (2011) (superseded); 725 ILL. COMP. STAT. 5/114-15(d) (2011) (superseded); MD. CODE ANN., CRIM. LAW § 2-202(b)(1) (2012) (superseded);N.M. STAT. ANN. § 31-20A-2.1(A) (2007) (superseded). The New York Court of Appeals struck down the death penalty, *People v. Lavalle*, 783 N.Y.S.2d 485 (N.Y. 2004), but New York had previously defined intellectual disability by reference to the clinical criteria. See N.Y. CRIM. PROC. LAW § 400.27(e) (2007).

[5] *See Hughes v. State*, 892 So.2d 203, 216 (Miss. 2004); *State v. Lott*, 779 N.E.2d 1011 (Ohio 2002); Commonwealth v. Miller, 888 A.2d 624 (Pa. 2005). New Jersey abolished the death penalty in 2007, but before then relied on decisional law incorporating the APA definition. See State v. Jimenez, 880 A.2d 468 (N.J. Super. Ct. App. Div. 2005), *overruled on other grounds by State v. Jimenez*, 908 A.2d 181 (N.J. 2005)).

version of the normal adaptive-deficit criterion or increasing the age-of-onset threshold.[6]

And no state statute or decisional law rules out, like *Briseño*, a finding of significant

adaptive deficits (and therefore intellectual disability) if a personality disorder is present.

Added to this already-unbalanced side "of the ledger stand the 18 States that have

abolished the death penalty, either in full or for new offenses[.]" *Hall*, 134 S. Ct. at 1997.

Thus in 49 States an "individual in [Thomas's] position" – one excluded from *Atkins*'s

protection based on judge-made standards – would not face execution. *Id.* This is far

greater than the consensus number of 41 identified in *Hall*. Nothing could provide

stronger "evidence of consensus that our society" rejects exclusion from the *Atkins*

exemption based on subjective, judge-made criteria. *Id.* at 1998.

---

[6] Nine states incorporate the "skill areas" from either the 1992 AAMR Manual or the DSMIV.DEL. CODE tit. 11g § 4209(d)(3)d.1 (2012); IDAHO CODE ANN. § 19-2515A(1)(a) (2012);725 ILL. COMP. STAT. 5/114-15(d) (2012); MO. ANN. STAT. § 565.030(6) (2012); N.C. GEN.STAT. ANN. § 15A-2005(a)(1)(b) (2012); *Hughes*, 892 So. 2d at 216; *Wiley v. State*, 890 So. 2d 892, 895 (Miss. 2004); *Lott*, 779 N.E.2d at 1014; *Blonner v. State*, 127 P.3d 1135, 1139 (Okla.Crim.App. 2006); Miller, 888 A.2d at 630-31. One state formally uses the domain classification system from the 2002 AAMR MANUAL. SEE VA. CODE ANN. § 19.2-264.3:1.1(A) (2102). Four others have held that the AAMR and APA schemes provide useful guidance. *See In re Hawthorne*, 105 P.3d 552, 556-57 (Cal. 2005); *Pruitt v. State*, 834 N.E.2d 90, 108 (Ind. 2005); *State v. Jimenez*, 908 A.2d 181, 184 n.4 (N.J. 2006) (death penalty subsequently repealed); *Howell v. State*, 151 S.W.3d 450, 458 (Tenn. 2004) (quoting TENN. CODE ANN. § 33-1-101(17) (2003)). Seven states have adopted more general adaptive deficits language that fits into the AAMR and APA framework, although the clinical sources are not identified directly. See ARIZ. REV. STAT. ANN. § 13-753(K) (2012); CONN. GEN. STAT. § 1-1g(b) (2007) (superseded); FLA. STAT. ANN. § 921.137(1) (2012); KAN. STAT. ANN. § 76-12b01(a) (2012); LA. CODE CRIM. PROC. Ann. art. 905.5.1(H)(1) (2011); UTAH CODE ANN. §77-15a-102 (2012); WASH. REV. CODE ANN. § 10.95.030(2)(d) (2012).

In sum, only under the questioned *Briseño* premise of sorting the deserving intellectual disabled from those with personality disorders does Thomas's *Atkins* claim arguably falter. As shown above, like Florida's non-scientific approach to the standard error of measure in IQ scores, the Texas *Briseño* approach clashes with science and denies "the basic dignity the Constitution protects." *Hall*, 134 S. Ct. at 2001. Under any fair application of *Hall* and *Atkins*, Kenneth Thomas should not face the death penalty. His death sentence thus stands in violation of the Eighth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Texas Constitution.

**APPELLANT'S ISSUE NO. 32**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO QUASH THE PROSPECTIVE JURY PANEL AFTER RECEIVING THE CASE OF *HALL V. FLORIDA*, Supra. BECAUSE THE STATE HAD VOIR DIRED THE JURY THAT TEXAS USED AN I.Q. OF 70 OR BELOW AS A CEILING TO ESTABLISH INTELLECTUAL DISABILITY**

**APPELLANT'S ISSUE NO. 33**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S COUNSEL'S REQUEST TO REQUESTION THE JURY THAT HAD BEEN ALREADY QUALIFIED AS TO THE ISSUE OF INTELLECTUAL DISABILITY TO PROPERLY EDUCATE THEM AND DETERMINE IF THEY WERE QUALIFIED JURORS AFTER RECEIVING THE CASE OF *HALL V. FLORIDA*,Supra. HANDED DOWN DURING THE VOIR DIRE PROCESS IN THE CASE AT BAR**

# APPELLANT'S ISSUE NO. 34

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION THAT THE STATE SHOULD NOT BE ALLOWED TO CONTINUE TO VOIR DIRE THE PROSPECTIVE JURORS THAT INTELLECTUAL DISABILITY IS MEASURED BY AN I.Q. SCORE OF 70 OR LESS PURSUANT TO THE CASE OF EX PARTE BRISENO, Supra. CONTRARY TO THE CASE OF HALL V. FLORIDA, Supra.**

**(These three issues are presented together as each involves similar issues of law.)**

During the jury selection process the United State Supreme Court handed down the case of *Hall v. Florida,* supra. A review of the voir dire by the State up to this time (RR: Vol.47 pp.5-12, vol.53 pp. 4-21,vol.56 pp.  4-6 ) shows that prospective jurors were informed that the law in Texas *(Ex Parte Briseno* 135 S.W.3d 1 (Tex. Crim. App. 2004) was that the first prong of the test for intellectual disability is an I. Q. score of 70 or below. Appellant brought to the attention of the visiting judge that the case of *Hall v. Florida* had been decided. ( RR. Vol.47pp. 5-12) Appellant objected to any further voir dire by the State that informed prospective jurors that to consider the factual issue of mental retardation that the defense had to show an IQ score of 70 or below. The implication was that the score could not be over 70. Appellant's objection was overruled and he was given a running objection to this manner of voir dire at least until the elected presiding judge could consider the ramification of the *Hall* case and Appellant's motion

102

to dismiss the prospective jury panel or allow the jurors that had been qualified up to that point in time to be questioned again on the issue of the elements of mental retardation. Jury selection continued until June 13, 2014 at which time a hearing was held on Appellant's motion to: (1) dismiss the jury panel (C.R. vol.1 pp. 23-24)(Appellant's memorandum in support of its motion and written objection to the trial court's ruling is found at clerk's record pp. 34-37,60-62) or (2) allow trial counsel the opportunity to requestion the jurors on this particular mental retardation i.e. intellectual disability issue. RR: Vol.53 pp.4-30.

The trial court overruled Appellant's request and decided to propose a single explanation and question of whether the juror could 'follow the law or not'. The court overruled Appellant's motion to dismiss and request to revisit the jurors and requested proposed instructions for the court to give to the jurors already qualified. (RR. Vol. 59 pp. 12-20) Appellant objected to this procedure as an inadequate method of having a real voir dire with jurors to illicit their feelings and understanding of how a standard error of measurement is part of an I.Q. test score. (RR: Vol. 53 P. 16) Appellant's counsel further objected that to continue with the trial judge's method denied Appellant due process rights under the U.S. Constitution to obtain a fair and impartial jury.  (RR: Vol. 53 pp.18-20) Appellant further objected that the trial judge was not adequately instructing

the jurors according to the *Hall* case as the Court's instructions "still told them 70, (RR: Vol.59 pp.23-27) and not that the I.Q. test score could be in a range as high as 75."

Defense Counsel made a bill in the record so show what counsel would have asked the jurors. (RR: Vol.59 pp.61-66) The prospective jurors were not properly instructed on the 'Flynn effect' nor the effect of the standard error measurement on IQ scores. In *Ex Parte Cathey*, supra it was noted that in *Ex Parte Briseno*, "significantly subaverage intellectual functioning is defined as an IQ of about 70 or below..." .

Appellant submits that this definition runs afoul of the *Hall* case in practice in the case at bar by the way the State interpreted and used the standard as if 70 was the maximum IQ score in which intellectual disability could be found by the jury. Appellant was denied a constitutional jury in part because he was denied an opportunity to fully explore the prospective jurors understanding of the elements that make up the first prong of intellectual disability in Texas. This refusal to dismiss the jury panel and start voir dire over or allow the defense an opportunity to requestion the prospective jurors denied Appellant due process and a fair trial before a properly voir dired jury. The trial court's method of instructing the qualified prospective jurors denied Appellant due process of law in jury selection in a capital murder case, because the prospective jurors were not given an opportunity to express their views on the issue and denied Appellant an

opportunity to fully explore the juror's views in order to either challenge the juror for cause or exercise his peremptory challenges in an informed manner.

## APPELLANT'S ISSUE NO. 35

## THE JURY AS CONSTITUTED WAS BIASED OR PREJUDICED WHICH DEPRIVED APPELLANT OF A FAIR TRIAL (STATE CONSTITUTION ISSUE)

Appellant submits that the trial court's actions in relation to overruling Appellant's objections to the trial court's actions in reference to each juror complained about previously deprived Appellant of a lawfully constituted unbiased and non prejudicial group of jurors, all of which should have been qualified according to the law. Art. 35.16 C.C. P. Appellant submits that one or all or any combination of errors as previously complained about concerning jury selection constitute a violation of Constitution of the State of Texas Article One, Section 10.

Appellant has suffered injury by denying him due process guaranteed by Art. 35.16 C.C. P. in applying law of jury selection to the case at bar.

**APPELLANT'S ISSUE NO. 36**

**THE JURY AS CONSTITUTED HAS DENIED APPELLANT DUE PROCESS OF LAW BECAUSE JURORS CHALLENGEABLE FOR CAUSE WERE ALLOWED ON THE JURY WHICH DEPRIVED APPELLANT OF A FAIR TRIAL (FEDERAL CONSTITUTIONAL ISSUE)**

Appellant submits that the trial court's actions in relation to overruling Appellant's objections to the trial court's actions in reference to each juror complained about previously deprived Appellant of a lawfully constituted unbiased and non prejudicial group of jurors, all of which was a violation of his right to due process under the Fifth and Fourteen Amendment to the U.S. Constitution and or interpreting Federal Court opinions. Appellant submits that one or all or any combination of errors as previously complained about concerning jury selection constitute a violation of due process under the United States Constitution. A defendant has a right to <u>not</u> have a particular venire member on the jury if the venire member is challengeable for cause or the defendant exercises one of his peremptory challenges and further preserves the error for appellate review as in the case at bar.

Appellant has suffered injury by denying him due process guaranteed by the 'constitution' in applying law of jury selection to the case at bar. It is a violation of due process to provide for a <u>wrong</u> with no remedy (i.e. *Jones v. State*, 982 S.W.2d 386 (Tex.

106

Crim. App. 1998) and its holding concerning reversible error is constitutionally illusory erroneous and barbaric in its application. It's misuse on appeal by application to other than trivial trial error is itself a violation of constitutional due process.

To grant Appellant rights of voir dire, but hold that a violation of the same is not a denial of due process of the highest order usurps each citizen's right to fair and impartial jury as in the case at bar, where the State and trial court take advantage of the defendant having to use its peremptory challenges in a matter in an attempt to have a fair trial by correcting the trial court's errors. See all dissents in *Jones* that fights for basic ideals of fairness for all citizens and non citizens of this State as to criminal litigation jurisprudence in jury trial.

## PRETRIAL ISSUES

## APPELLANT'S ISSUE NO. 37

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO DISQUALIFY THE DALLAS COUNTY DISTRICT ATTORNEY'S OFFICE IN THE PROSECUTION OF THIS CASE

In Volume 3 pages 4-30 and Volume 4 p. 4-5 the Defense Motion to Disqualify the Dallas County District Attorney's Office from the prosecution of this case (Clerk's Record shows docket sheet entry that motion was presented on October 3,& 10, 2014) was presented to the Court.

Appellant submits that he was denied due process in the prosecution of this case as his former court appointed #2 defense attorney, after doing considerable work on behalf of the Defendant, was hired by the elected district attorney who was seeking the death penalty as the ultimate punishment option to prosecuting the Defendant for the offense of capital murder.

Appellant moves this Honorable Court to find that the facts of this case constitute an exception to the *Eidson v. Edwards,* 793 S.W.2d 1 (Tex. Crim. App. 1990) case holding due to the fact that (1) it is a death case, (2) the Defendant's former defense counsel was hired by the prosecuting attorney's office after doing extensive work including trial strategy (RR: Vol,. 3 p. 13) for the Defendant's case as shown in the testimony (3) appellate attorneys who would be under former defense counsel as head of appellate section participated in the death penalty case, (5) the selection of death as one of the punishment options was made before the hiring of Mr. Wilson and; (6) the appearance of impropriety in the due process of this case.

# COMPETENCY TRIAL ISSUES

## APPELLANT'S ISSUE NO. 38

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR MISTRIAL IN THE COMPETENCY JURY TRIAL DUE TO THE PROSECUTOR'S REMARK THAT THE DEFENDANT'S CASE INVOLVED 'MURDER'

Appellant directs this Honorable Court's attention to Reporter's Record Volume 58 pp. 29-37 at which the following occurred:

A. The fact that there was no weapon; and there must be, by law, a weapon. Yes.

Q. (By Mr. Birmingham): All right. Now, it is a fact - - it is not fiction, but it is a fact that there was no <u>murder</u> weapon - - I'm sorry.

MR. SANCHEZ: Objection, Your Honor. At this point, Your Honor, I'm going to ask the jury to disregard the last statement made by the prosecutor.

May we approach, Your Honor?

THE COURT: You may.

> (The following is a bench conference being held outside the hearing of the Members of the Jury.)

MR. SANCHEZ: Your Honor, we're going to ask for a mistrial. That's in violation of the - - I don't think an instruction is enough to get that out of the jury's head. A Motion in Limine was filed with the Court, before this trial started. They agreed that they would follow it. You ruled it would be enforced. It's just been violated in front of the jury. He mentioned "murder."

MR. BIRMINGHAM: I think, if you did an instruction, that will cure any error caused by me. I'll withdraw the statement. It was a total accident.

THE COURT: We need to do this outside the presence of the jury, to show harm.

At this point, a hearing outside the jury was conducted by the trial court. (RR: Vol. 58 pp. 31-36) at which defense counsel argued:

MR. SANCHEZ: Your Honor, before this proceeding started, we had filed a Motion in Limine that the Court granted, and the State said they understood it. I think it's pretty clear, by case law and by the rules, that the jury is not to know or have any knowledge of the underlying - - I think the Court is aware that the jury is not to know or have any evidence before them of the underlying offense, because that will taint the jury and mislead them in their decision as to whether to find the Defendant is competent or not competent. They're not to have any knowledge of that.

The Court ruled that way. And, as we have seen, they have violated that rule. They have presented evidence in front of the jury that he's being charged with murder. Some type of murder. The word "murder" came out of the State's mouth, and the jury heard it. I don't think there's any reason to believe they didn't hear that.

We don't believe an instruction will unring that bell. They've heard it. Once you instruct them, again, you will be reinforcing them that the word "murder" was said, and it will not allow him to get a proper and fundamentally-fair hearing on competency. Because now the jury has that in their mind.

I think, really, the only proper relief that he is to be given at this point is to declare a mistrial, impanel a whole new jury and start all over again. Because now they have it in their mind. There's no way to get out of it. If you tell them not to consider it, again, you're reinforcing in their mind that was said and they'll have full knowledge of it.

THE COURT: Mr. Tatum.

MR. TATUM: Additionally, Your Honor, just prior to the questioning of this witness, the informal conference was held between Brandon, I guess, the Defense team as - -a caution as to what words will be used in questioning this witness so that any reference to an offense or a killing, which was used in the sub rosa hearing, would not be mentioned. And he even said he wrote the word "weapon" down a number of times so he wouldn't use the word "murder weapon". Unfortunately, it's been used.

We would refer the Court to the Motion in Limine, which cites *Perry versus State* in which the Court of Criminal Appeals has said, "Actual competency hearing itself should be conducted uncluttered by evidence of the offense itself. Such separate, uncluttered hearing before a jury makes it easier to determine fairly the issue of competency without

110

introducing facts which might tend to cloud the issue at hand and stir the minds of the jury to make the difficult exercise of calm judgment."

Interjecting this undermines the whole issue of competency to be determined, without knowing what the offense is, so we get a fair determination. If we go forward with this jury, it's going to deny this man due process and the right to a fair hearing. And that's why we have these rules. Unfortunately, it's been violated.

So, as far as relief - - I think the State said they would just want an instruction. We say that instruction cannot remove this harm from this jury's mind, because it undermines the whole proceedings. So, therefore, if we go forward, we've made the objection, assuming the Court is going to sustain it. If the Court does, we will also ask the jury to be instructed to disregard; but we also say, in asking for that, it's not good enough.

So, eventually, we're going to ask for a mistrial and to start this process over, because of these reasons. There's so much harm that's been introduced before this jury.

MR. SANCHEZ: Your Honor, also, either done intentionally or unintentionally is really not the issue. The fact that it's done is the issue. Again, Your Honor, we would move for a mistrial at this point.

...

The trial court denied Defense' Motion for a Mistrial and instructed the jury. (RR: Vol. 58 pp. 36)

Informing the competency jury of the underlying charges against the Defendant violated the Defendant's rights to due process and due course of law and prejudiced the jury's determination of Defendant's competence to stand trial, thereby denying him a fair determination of competency. There can be no dispute that a competency jury is not to be informed of the underlying charges or facts of the underlying charges. *Ex parte Hagens*, 558 S.W.2d 457, 461 (Tex. Crim. App. 1977).

111

## ARGUMENT

It has long been the law in Texas that the jury in a competency haring must be "given the opportunity to pass on competency to stand trial uncluttered by evidence of the offense itself." *Townsend v. State*, 427 S.W.2d 55, 63 (Tex. Crim. App. 1968). In *Ex parte Hagens*, 558 S.W.2d 457, 461 (Tex. Crim. App. 1977). To do so violates a defendant's rights to due process and due course of law. U.S. Const. amend. V, XIV; Tex. Const. Art. I, §§ 13 & 19.

A mistrial is the proper remedy when an impartial verdict cannot be reached, or if a verdict could be reached but would have to be reversed on appeal due to an obvious error. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). Although, generally an instruction to disregard any error will cure the harm, this is not the case if the improper reference was "of such damning character as to suggest it would be impossible to remove the harmful impression from the jurors' minds. *Rojas v. State*, 986 S.W.2d 241, 250 (Tex. Crim. App. 1998). A mistrial is required when an improper question or reference is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors. *See Ladd* at 567.

In this case, a mistrial was the only proper remedy to the highly prejudicial and egregious error that occurred. `

112

# APPELLANT'S ISSUE NO. 39

## THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE PROSECUTOR'S QUESTION TO THE WITNESS THAT APPELLANT'S FIRST TRIAL IN '87 WAS REVERSED ON APPEAL AS NOT RELEVANT

Appellant directs this Honorable Court's attention to Reporter's Record Volume 58 at which the prosecutor asked:

Q. Okay. That first trial that happened in '87 in February, that case was reversed on appeal, correct?
MR. SANCHEZ: Your Honor, I'd have to object at this point to relevancy.
MR. BIRMINGHAM: Just understanding - -
THE COURT: Overruled.
MR. BIRMINGHAM: Thank you, Judge.
(This sequence was repeated)

Relevant evidence "May be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." TEX.R.EVID. 403. The opponent of the evidence must demonstrate that its negative attributes substantially outweigh any probative value. *Montgomery*, 810 S.W. 2d at 377. A Rule 403 analysis must balance (1) the inherent probative force of the proffered item of evidence, along with (2) the proponent's need for that evidence, against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of

113

time or merely repeat evidence already admitted. *Gigliobianco v. State*, 2310 S.W.3d

637, 641-42 (Tex. Crim.App. 2006). Appellant submits that the trial court committed

reversible error in the competency hearing by allowing the jury to know about prior legal

proceedings in which the case was reversed on appeal. This allowed the jury to confuse

the issue of competency with the underlying offense of murder. This prejudiced

Appellant's right to a fair competency trial.

## APPELLANT'S ISSUE NO. 40

## THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S VERDICT THAT APPELLANT WAS COMPETENT TO STAND TRIAL

## APPELLANT'S ISSUE NO. 41

## THE EVIDENCE WAS FACTUALLY SUFFICIENT TO FIND APPELLANT INCOMPETENT MAKING THE JURY'S VERDICT SO AGAINST THE GREAT WEIGHT AND PREPONDERANCE OF THE EVIDENCE AS TO BE MANIFESTLY UNJUST

**(These two issues are combined for presentation as they involve the same facts and similar issues of law.)**

Appellant submits that the evidence presented at trial was not sufficient to support

the jury's verdict that Appellant was competent to stand trial.

"A criminal defendant who is incompetent may not be put to trial without violating

due process." *Turner v. State*, 422 S.W.3d 676, 688 (Tex. Crim. App. 2013). "'[A]

person whose mental condition is such that he lacks the capacity to understand the nature

and object of the proceedings against him, to consult with counsel, and to assist in

114

preparing his defense, may not be subjected to trial.'" *Id* at 688-89 (Quoting *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975)).  Thus, a defendant is incompetent to stand trial if he does not have a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or a rational, as well as factual, understanding of the proceedings against him. TEX.CODE.CRIM.PROC.ANN, art. 46B.003(a) (Vernon 2006).

Standard of Review

Appellant submits that the standard of review is stated in the case of *Seghelmeble v. State*, 390 S.W.3d 576 (Tex. Ct. App.-Dallas, 2012) in which the Dallas Court stated that the standard of review as to competency is factual sufficiency. "When a jury has rejected a defendant's claim that he is incompetent to stand trial, our standard of review is to determine whether the jury's finding is so against the great weight and preponderance of the evidence as to be manifestly unjust."  *See Mertz v. State*, 785 S.W.2d 146 (Tex. Crim. App. 1990)

Testimony at Competency Hearing

Dr. Antoinette McGarrahan, a psychologist specializing in forensic psychology and neuropsychology, testified that she has given Mr. Thomas extensive neuropsychological tests to look at his intellectual functioning as well as his cognitive functioning to see if there were any brain impairments. (RR: Vol. 57 p. 168) She also

115

performed tests to look at emotional functioning as well as his ability to work with his attorneys. (RR: Vol. 57 p. 168) She reviewed close to 60 documents that related to prior mental health evaluations and transcripts of prior proceedings, including birth and medical records that spanned 28 years. (RR: Vol. 57 p.170)

Dr. McGarrahan stated that it was her professional opinion that Mr. Thomas was not presently competent to stand trial based on the neuropsychological testing that he performed which showed the Defendant's intellectual capacity to be that of "mild mental retardation" and his full scale IQ was 71. (RR: Vol. 57 p. 172) She found that the Defendant had some brain impairment stemming from his birth and a head injury sustained at age 15. (RR: Vol. 57 p. 173) She stated that he was not able to rationally assist his attorneys. (RR: Vol. 57 p. 172) She stated that she did not see any evidence that Mr. Thomas was trying in any way to fake mental illness or mental retardation. (RR: Vol. 57 p. 174) In her examinations of Mr. Thomas she found he had a fixed idea that the State could not secure a conviction without a weapon and could not move beyond this idea. (RR: Vol. 57 p. 177) Mr. Thomas thought someone was working against him and his perceptions were not based in reality. (RR: Vol. 57 p. 177) These beliefs were documented as having been present 30 years ago. (RR: Vol. 57 p. 177) She found Mr. Thomas could not rationally consult with his attorneys because his perceptions and his beliefs were not based in reality. (RR: Vol. 57 p. 179)

Cynthia Short, an attorney who works with other attorneys in certain types of cases, testified that she investigated the life of Kenneth Thomas, spent in excess of 60 hours with him and read all his evaluations since 1986. (RR: Vol. 58 p. 56) She stated that the Defendant closely resembles those people that have been deemed incompetent. (RR: Vol. 58 p. 58) She also found in the Defendant the presence of a "fixed-false belief" about an important matter related to his case and no amount of education, this fixed-false belief could not be undone. (RR: Vol. 58 p. 59) The Defendant believed that he could not be convicted if there wasn't a weapon introduced into evidence and had this belief as far back as 1980's. (RR: Vol. 58 p. 59) He also had a fixed false belief about the role of the Judge in the case and that the Judge could dismiss his case. (RR: Vol. 58 p. 60-61) She did not believe Mr. Thomas could make rational choices about his legal options or legal strategies. (RR: Vol. 58 p. 63) She was aware that Mr. Thomas did not want to cooperate with the State's expert after the Court ruled that he must do so. (RR: Vol. 58 p. 63) She thought that the Defendant thought he didn't have to participate in the State's evaluation when the lack of a murder weapon would lead to his acquittal. (RR: Vol. 58 p. 64) Ms. Short concluded that the Defendant was unable to testify in his own defense, because he couldn't recall events accurately and had distorted views or misperceptions about how the criminal system works. (RR: Vol. 58 p. 68)

Dr. Kristi Compton, a clinical and forensic psychologist, testified that she was appointed by the trial court to give an opinion about the competency of Mr. Thomas. (RR: Vol. 58 p. 93) She interviewed and tested Mr. Thomas for <u>three hours,</u> giving him a malingering test and a competency test. (RR: Vol. 58 p. 97) It was her opinion, Mr. Thomas was competent to stand trial. (RR: Vol. 58 p. 98) She thought that he had a rational and factual understanding of the proceedings against him. (RR: Vol. 58 p. 98) She gave him the Test of Memory Malingering and found that he was not putting forth full effort during the evaluation. (RR: Vol. 58 p. 102) Appellant submits that Mr. Thomas did not want to participate in the testing ordered by the trial court in part because he did not want to be found disabled and thought the evaluation was meant to belittle and shame him. (RR: Vol. 58 p. 64) Appellant argues that this was the reason that Dr. Compton found that the results were not consistent with his prior tests. (RR: Vol. 58 p. 104) She stated that Mr. Thomas was able to articulate and understand the purpose of his upcoming trial and understood that he had been convicted of a crime. (RR: Vol. 58 p. 107) She said there was no identifiable nexus between mental illness and his ability to consistently engage with counsel. (RR: Vol. 58 p. 109)

Dr. Compton stated that Mr. Thomas functions in the borderline to mental/mild mental retardation. (RR: Vol. 58 p. 114) Dr. Compton, Dr. McGarrahan and Ms. Short

118

all found he has beliefs that are firmly fixed with one being that he can't be convicted because there wasn't a weapon. (RR: Vol. 57 p. 177; Vol. 58 p. 59,115)

Dr. Compton testified that she respected the opinion of Antoinette McGarrahan. (RR: Vol. 58 p. 119) Appellant submits that Dr. Compton, who was called to make the evaluation and met with Appellant three or four days later (RR: Vol. 58 p. 121) did not have the time to fully research his childhood, his brain injury, or his prison history. She agreed that Mr. Thomas has some subclinical delusions and that he had a mental defect, an intellectual disability. (RR: Vol. 58 p. 127) She indicated in her report that the Appellant's ability to disclose to counsel pertinent facts and events and state of mind was below average. (RR: Vol. 58 p. 128) She found that his also below average in his ability to engage in a reasoned choice of legal strategies, testify and cross examine witnesses. (RR: Vol. 58 p. 128) She also testified that talking to his attorneys and how they dealt with him could have helped her in her determination. (RR: Vol. 58 p. 134) The statute sets out the factors experts use to evaluate whether a defendant is incompetent to stand trial. TEX CODE CRIM. PRO. ANN. Art 46B.024 (West 2006). The Court of Criminal Appeals has stated that some of those factors are also helpful to the fact-finder in determining the broader question of competency. *Ex parte LaHood*, 401 S.W. 3d 45,53 (Tex. Crim. App. 2013); *see Morris*, 301 S.W.3d (Tex. Crim. App. 2009). These factors include whether a defendant can (1) understand the charges against

119

him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify.

Appellant argues that the jury's verdict so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Nunez v. State*, 942 S.W.2d 57 (Tex. Ct. App.-Corpus Christi 1997, no pet.)

## PUNISHMENT TRIAL ISSUES

## APPELLANT'S ISSUE NO. 42

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION THAT DR. RANDY PRICE, STATE'S PSYCHOLOGIST, BE ALLOWED TO TESTIFY AS AN EXPERT ON APPELLANT HAVING TRAITS OF SOMEONE WITH ANTI-SOCIAL PERSONALITY DISORDER WHEN HE COULD NOT PURSUANT TO HIS OWN PROFESSIONAL STANDARDS MAKE THAT DIAGNOSIS**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 69 p. 11, 68, at which defense counsel made his objection that the expert witness could not properly testify that Appellant had some traits of antisocial disorder but could not make the diagnosis. The witnesses' assessment of Appellant did not allow him to give an opinion that Appellant had an anti-social disorder. This testimony was misleading and designed to give the jury the impression that Appellant had a diagnosed anti-social

120

personality disorder in order to defeat the defense's intellectual disability issue when in truth no such proper diagnosis could be made as all of the elements that underlie the definition of anti-social personality disorder were not present. The trial court abused its discretion in overruling Appellant's objection as the testimony was beyond the expert's discipline to opine on the subject contrary to the dictates of *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim.App. 1992) or *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998) and Rule 702 Tex. R. Evidence. Additionally, any probative value was outweighed by the prejudicial effect as objected to by Appellant. See RR: Vol. 69 p. 11-13.

## APPELLANT'S ISSUE NO. 43

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE WITNESS PRICE'S TESTIMONY ABOUT APPELLANT LACKING REMORSE**

Counsel objected to any testimony about lack of remorse as being a violation of Appellant's Fifth Amendment right to remain silent. (RR: Vol. 69 p. 13) The trial court reversibly erred in overruling Appellant's objection. The statement by Dr. Price about lack of remorse violated Appellant's right to remain silent and is of constitutional error dimension. This denied Appellant a fair punishment hearing. See *Renteria v. State*, 206 S.W.3d 689 (Tex. Crim. App. 2006)

121

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION THAT A KNIFE IS PRESENTED IN THE PHOTOGRAPHS (STATE'S EXHIBIT NO. 205) AS SPECULATIVE WHERE NO KNIFE WAS PLACED INTO EVIDENCE**

The following objection was made by defense counsel at Reporter's Record Volume 61 pp. 11-12:

MR. SANCHEZ: One thing further, Your Honor: I think the State, as part of their presentation with the medical examiner, will have a PowerPoint which shows a silhouette of a knife next to the pictures. I would object to that, as speculative. Especially since there is no knife that's ever been introduced into evidence. For example, this (indicating). I think it would be misleading to the jury that that's the way the knife looked, when there's no evidence in any way that there's - - a knife like that was ever used.

...

THE COURT: And the Court will overrule that request.

Defense counsel reurged his objection Reporter's Record Volume 61 p. 48 when the State introduced State's Exhibit No. 206, a PowerPoint presentation.

The presentation of the knife in the photograph was calculated to mislead the jury into believing that a knife (the knife shown in the picture) was actually recovered and was part of the evidence for the jury to consider. The manner and means of its depiction was highly prejudicial and provocative. The depiction's prejudicial effect for outweighed any probative value.

One of those exceptions appears in Rule 403 of the Texas Rules of Evidence: "Although relevant, evidence may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex.R.Evid.403. When an appellant challenges the propriety of the trial court's admission of evidence over a Rule 403 objection, an appellate court should consider a number of factors, including:

> (1) how probative the evidence is;
> (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way;
> (3) the time the proponent needs to develop the evidence ;and
> (4) the proponent's need for the evidence.

*Ledbetter v. State,* 208 S.W.3d 723 (Tx. App. - Texarkana, 2006)

Appellant submits that the picture was not relevant evidence as there was no knife recovered and was proffered to mislead the jury into thinking that was the knife, all of which denied Appellant a fair trial based on actual evidence.

**APPELLANT'S ISSUE NO. 45**

**THE TRIAL COURT ERRED IN ADMITTING NUMEROUS AUTOPSY PHOTOGRAPHS BY THE MEDICAL EXAMINER'S OFFICE IN VIOLATION OF RULE 403, TEX. R. EVID. WHERE THE PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED ANY PROBATIVE VALUE**

Appellant directs this Honorable Court's attention to Reporter's Record Volume 61 page 8 at which Appellant's counsel made the following objection:

MR. SANCHEZ: Your Honor, I believe that the State - - after this witness comes, the State intends to bring up the medical examiner, which will lead them to show the jury photos of the autopsy. For the record, we have to object to those photos being shown to the jury.

123

We believe the prejudicial effect of those pictures outweigh the probative value, and that the medical examiner has a way to explain the injuries to the jury by using diagrams that are provided already in the autopsy.

The trial court overruled Appellant's objection. (RR: Vol. 61 p. 11) See *Salazar v. State*, 385 S.W.3rd 141 (Tex. Crim. App. 2001) The State asked the medical examiner, Dr. Edward T. McDonough, "These are pretty gruesome pictures, are they not, Doctor?" The witness answered "Yes. I would agree with that, yes." (RR: Vol. 61 p. 61)

The objectionable color photographs contained the following images (State's Exhibits Nos. 58-83):

#58- photograph of Fred Finch laying on autopsy table wearing an extremely bloody shirt with the lower half of his body unclothed. The body is showing rigor with the arms raised.
#59-close up photograph showing numerous small stab wounds to the back
#60- close up photograph showing numerous small stab wounds
#61-close up photograph showing stab wound
#62-photograph of the abdomen of Fred Finch showing stab wounds
#63-extreme close up photograph showing single edge blade characteristics
#64-photograph of stab wounds to upper body and left arm of Fred Finch
#65-close up photograph of stab wound to the right side of the face of Fred Finch
#66-overhead photograph of frontal view of nude body of Fred Finch showing location of stab wounds
#67-overhead photograph of back view of nude body of Fred Finch showing location of stab wounds
#68-extreme close up photograph of bloody palm and fingers of Fred Finch
#69-extreme close up photograph of knife wound
#71-photograph of bloody abdomen, breasts and side showing stab wounds of Mildred Finch
#72-overhead photograph of back view of nude body of Mildred Finch showing numerous stab wounds
#73-extreme close up view of bloody fingers showing cuts
#74-photograph of large bloody knife wound on arm with wristwatch

#75-photograph of Mildred Finch's bloody upper body showing stab wounds to the face and defects in the shirt
#76-close up photograph of the bloody face of Mildred Finch with eyes closed and mouth open showing stab wounds
#77- photograph of the lower half of the body of Mildred Finch showing stab wounds and bloody pajama bottoms
#78-overhead photograph of the upper two-thirds of the bloody body of Mildred Finch showing rigor with the arms raised and bent
#79-extreme close up photograph of stab wound to the head
#80-extreme close up photograph of stab wounds to the head
#81-extreme close up photograph of stab wounds to the left back arm
#82-overhead view of the nude body of Mildred Finch showing location of stab wounds
#83-photograph of the right side upper body of Mildred Finch showing numerous stab wounds

## ARGUMENT AND AUTHORITIES

Rule 403 of the Texas Rules of Evidence states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by consideration of undue delay, or needless presentation of cumulative evidence.

Many factors should be used in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include:

- the number of exhibits offered,
- the gruesomeness of the exhibits,
- the detail in the exhibits,
- size of the photographs,
- whether the photographs are in color or black and white,
- whether the photos are close-up, and
- whether the body depicted is clothed or naked.

See *Wyatt v. State,* 23 S.W.3d 18, 29 (Tex. Crim. App.2000). The availability of other means of proof and the circumstances unique to each individual case should also be noted. *Id.* Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Rojas v. State,* 986 S.W.2d 241, 249 (Tex. Crim. App.1998). See also *Santellan v. State*, 939 S.W.2d 155 (Tex. Crim. App. 1997)

Appellant asserts that the trial court erred in allowing the State to introduce these 25 color photographs in what appears to be an attempt by the prosecution to introduce evidence meant to appeal to emotion rather than the fact finding process. Specifically, the number of exhibits offered - 25 - was excessive, especially in light of the other evidence used, crime scene photographs. Taken together, the prejudicial effect of the State's photographs far outweighed any possible probative value. *Wyatt v. State*, 23 S.W.3d at 29.

The unfairly prejudicial effect of the above listed photographs influenced the jury in a prejudicial manner and denied Appellant a fair trial especially in light of the fact that there was no controverted issue as to cause of death. The trial court judgement and sentence should be reversed and the case remanded. Appellant submits that the error raised in this issue affected the substantial right of Appellant to a fair trial absent prejudicial evidence (Rule. 44.2.(b) C.C.P.).

## THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE PROFFERED VICTIM IMPACT EVIDENCE TO BE PRESENTED BY STATE'S WITNESS, MR. JAMES BELT

In Reporter's Record Volume 68 pp. 214-219 Appellant objected to the proffered testimony of James Belt. The testimony was inflammatory and unduly prejudicial in that it would likely promote a decision based on passion and emotion instead of fact. It would amount to victim worth evidence as promoting consideration of comparative worth of the victim to the defendant. Additionally, the witness was too remote to be an anticipated effected party. Mr. Belt was the victim's son-in-law. Also, he was permitted to testify about the effect on his wife and children, denying Appellant his right of confrontation.

Generally, victim impact testimony regarding extraneous crimes is inadmissible. See *Cantu v. State*, 939 S.W. 2d 627, 637 (Tex. Crim. App. 1997). Victim impact testimony can run a risk of extreme prejudice and can lead to an unfair punishment hearing. See *Boston v. State*, 965 S.W.2d 546, 550 (Tex. App.-Houston [14th Dist.] 1997, no pet.). Trial courts limit victim impact testimony to the victim named in the indictment. See *Barletta v. State*, 994 S.W.2d 708, 713 (Tex. App.- Texarkana 1999, pet. ref'd)(referring to Cantu analysis, but finding no preservation of claim); *Cantu*, 939 S.W.2d at 637-38 (admission of victim impact testimony was error, but harmless).

This Honorable Court has stated: The danger of unfair prejudice to a defendant inherent in the introduction of "victim impact" evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high. The admission of such evidence would open the door to admission of victim impact evidence arising from any extraneous offense committed by a defendant. Extraneous victim impact evidence, if anything, is more prejudicial than the non-extraneous victim impact evidence found by this Court to be inadmissible in *Smith v. State*, 919 S.W.2d 96 (Tex. Crim. App. 1996). We hold that such evidence is irrelevant under TEX.R.CRIM.EVID. 401 and therefore irrelevant in the context of the special issues under Art. 37.071. *Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997); *Lindsay v. State*, 102 S.W.3d 223, 228 n. 1 (Tex. App.-Houston [14th Dist.], 2003, pet. filed).

Appellant submits to the trial court erred in overruling Appellant's objections and that his substantial rights were violated to such an extent it affected Defendant's right to receive a fair trial on the issue of guilt/innocence in this case. Appellant submits that each witness' testimony, singularly or cumulatively compares or makes a comparative worth analysis of the value of the victim to their families and the community compared to the defendant or other members of society contrary to *Mosely v. State*, 983 S.W.2d (Tex. Crim. App. 1998); which effectively denies Appellant a fair trial in the punishment stage.

**APPELLANT'S ISSUE NO. 47**

**THE JURY'S ANSWER TO SPECIAL ISSUE NO. 1 (INTELLECTUAL DISABILITY ISSUE) IS AGAINST THE GREAT WEIGHT AND PREPONDERANCE OF THE EVIDENCE AS TO MAKE IT UNJUST**

**APPELLANT'S ISSUE NO. 48**

**THE EVIDENCE WAS SUFFICIENT TO SHOW THAT APPELLANT WAS INTELLECTUALLY DISABLED**

**(These two issues are combined for presentation as they involve the same facts and similar issues of law.)**

Appellant met his burden of establishing his 'Atkins' claim of intellectual disability by a preponderance of the evidence. He proved that (1) he suffers from significant sub-average general intellectual functioning, usually evidence by an IQ score below 70, that is accompanied by a (2) related limitations in adaptive functioning and (3) the onset of which occurred prior to the age of eighteen. *Ex Parte Cathey ,supra*

In summary, Appellant presented the following evidence:

Dr. McGarrahan stated that it was her professional opinion that Mr. Thomas' full-scale IQ was 71and that he was mildly mentally retarded. He has significant deficits in his academic skills. (RR vol. 66p. 23-35). She said that his primary difficulties were in the frontal part of the brain and involved abstract reasoning, problem solving, thinking skills, planning and organization. (RR: Vol. 66 p. 23) She stated that Mr. Thomas qualified for intellectual disability disorder or what used to be called "mental

129

retardation." (RR: Vol. 66 p. 24) She said that the reasoning, logical thinking, planning and problem solving that were impaired when Mr. Thomas were tested by Dr. Hom were still the primary areas impaired on her testing 27 years later. (RR: Vol. 66 p. 33) She said it would have been very difficult for Mr. Thomas to fake the same results 27 years apart. (RR: Vol. 66 p. 34). She said his brain that was impaired 27 years ago is the same now, (RR. Vol69 pp.103-113). She explained that Dr. Price and she agree on Thomas' sub-average intellectual functioning and that he met the first prong of the requirement of intellectual disability but disagree on adaptive behavior deficits. She explained Thomas' adaptive behavior deficits(RR. Vol.69 pp. 109-113). See also Dr. Price's testimony at RR. Vol. 69 pp78-79.

Dr. Jim Hom, a neuropsychologist who examined the Defendant in 1987, concluded that his test results were consistent with someone who had a significant head injury. (RR: Vol. 65 p. 97) He said he has reviewed one set of tests of Mr. Thomas and found that they were consistent with his results in 1987. (RR: Vol. 65 p. 98-99;102) This witness testified that the tests show that Mr. Thomas would have an intelligence range in the low 70's, his academic abilities in the third and fourth grade. (RR: Vol. 65 p. 103)

State's witness Dr. Hughes, a licensed specialist in school psychology, testified that Kenneth Thomas was given the Iowa Test of Education Development in May, 1973

130

and scored on the various sections of the exam a 91,78,97-98,89-90, 93 and 88-89.  (RR: Vol. 68 p. 197-198) Mr. Thomas was also given the California Test of Mental Maturity in which he scored an 82 in total IQ, 78 in language IQ and 92 in non-language IQ.  (RR: Vol. 68 p. 198) This test was administered in grade two.  (RR: Vol. 68 p. 200)  He said that the California test was given in 1973 and the Iowa test was given in 1975.  (RR: Vol. 68 p. 209) He said if the head injury occurred in October 1976, Kenneth was moved to Metro North after the injury where students were taught with self-paced modules as opposed to lecture-format classrooms at Metro North. (RR: Vol. 68 p. 210-211) Appellant submits that a review of all of the evidence submitted shows that the jury's answer to this special issue is so against the great weight of the evidence as to be manifestly unjust. See *Gallo v. State* 239 S.W.3d 757 (Tex. Crim. App. 2007) and *Ex Parte Van Alstine*, 239 S.W. 3d 815(Tex. Crim. App. 2007).

## APPELLANT'S ISSUE NO. 49

**THE EVIDENCE IS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S ANSWER TO SPECIAL ISSUE NO. 3 'FUTURE DANGER' IN THE PUNISHMENT STAGE OF THE TRIAL**

Appellant argues that there was insufficient evidence of future dangerousness because The State's evidence was insufficient to prove this issue beyond a reasonable doubt and the defense evidence showed that Appellant had spent 27  years on death row

131

with not one incident of violence and defense experts testified that he was a low risk for future dangerousness.

In the case of *Huffman v. State*, 746 S.W.2d 212 (Tex. Crim. App. 1988) it was held that:

> In *Roney v. State,* 632 S.W.2d 598,603 (Tex. Cr. App. 1982), this court wrote: "Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a 'calculated and cold-blooded crime,' such as appeared in *O'Bryan v. State*, 591 S.W.2s 464, 480 (Tex. Cr. Ap. 1979), where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a 'yes' answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. *Jurek v. State,*522 S.W.2d 934 (Tex. Cr. App. 1975); *Jurek v. Texas*, 428 U.S. 262, 96 S.ct. 2950, 49 L.Ed.2d 929 (1976)."

> *Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007). This Court should reform

the judgement to life imprisonment. *Holberg v. State* 38 S.W.3d 137, 139 (Tex. Crim. App. 2000) and Art. 44.251 (a).

**TEXAS LAW REQUIRES A FINDING OF FUTURE DANGEROUSNESS FOR DEATH TO BE IMPOSED AS A PUNISHMENT**

Texas Code of Criminal Procedure 37.071 governs the procedures in capital trials. Tex. C.C.P. Art. 37.071 § 3(a)(1)(2001). The statute requires a separate sentencing proceeding to determine whether the defendant is to be sentenced to death or to life imprisonment. *Id.* For the jury to impose death, the State must prove beyond a reasonable doubt that there is a "probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The trial court must instruct the jury that if it answers "yes" to the future dangerousness question, the jury must impose a sentence of death. In short, the jury's finding of future dangerousness is a prerequisite to the death penalty.

In evaluating whether there is sufficient evidence of future dangerousness, Texas courts consider several factors. First, Texas courts evaluate future dangerousness based on the actual circumstances in which the defendant will live. *Berry v. State,* 233 S.W.3d 847, 863 (Tex. Crim. App. 2007). Second, Texas courts consider the defendant's prior bad acts. Tex. C.C.P. Art. 37.07 § 3(a)(1). Third, Texas courts consider whether there is sufficient evidence that the defendant calculatingly caused the death of the victim with deliberate forethought. *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). No

133

one factor controls this Court's decision; Texas courts consider the balance of these factors in their analysis of whether a defendant is a future danger. *Keeton,* 724 S.W.2d at 61.

## Mr. Thomas' Twenty-Seven Years on Death Row Established That He Is Not a Future Danger In Prison.

The issue before this Court is unique because it requires none of the typical speculation required in future dangerousness evaluations. Most often, the jury is required to speculate, based on mitigating and aggravating evidence presented by the opposing parties, whether the defendant will be a continuing threat to society. Here, Mr. Thomas has already served twenty-seven years in prison on the capital case, providing an actual record that he is not a future danger. Although the jury that decided his sentence twenty-seven years ago predicted he would be a future danger based on the evidence available to them at the time, that prediction has been convincingly proven to be false.

This Court is required to consider Mr. Thomas' prison record and whether it contains evidence of violent behavior in its examination of his future dangerousness. See *Harris v. Texas Dep't of Crim. Justice*, 806 F. Supp. 627, 636 (S.D. Tex. 1992). Mr. Thomas' prison record contains no evidence of violence during any period in which Mr. Thomas has been in prison on the capital murder conviction.

134

Mr. Thomas has proved that he is not a danger to inmates and guards in an incarcerated setting. He proved that he can be productive and nonviolent in the highly structured environment of prison, where he will spend the rest of his life.

When deciding whether there was sufficient evidence to support a jury's finding that there is a probability the defendant will commit criminal acts of violence that will constitute a continuing threat of violence to society, this Court must view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Article 37.0711§3(a)(1) C.C.P., beyond a reasonable doubt. See *Beltran v. State,* 728 S.W.2d 382,388(Tex.Cr.App.1987); *Santana v. State*, 714 S.W.2d 1, 8 (Tex. Cr. App. 1986); *Fierro v. State*, 706 S.W.2d 310,319 (Tex. Crim. App. 1986).

"Prior criminal conduct, the age of the defendant and psychiatric evidence are among the various factors relevant in deciding the record punishment issue." *Roney v. State,* supra, at 661. Psychiatric testimony, however, is not essential to support an affirmative finding to the issue of future dangerousness. *Beltran v. State*, supra, at 390; *Carter v. State*, 717 S.W.2d 60 (Tex. Cri. App. 1986); *Williams v. State*, 68 S.W.2d 692 (Tex. CR. App. 1983); *Mitchell v. State*, 650 S.W.2d 801 (Tex. Cr. App. 1983). See also *Brooks v. State*, 599 S.W.2d 312 (Tex. Cr. App. 1979), cert. den. 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981).

Other factors relevant to the issue have been discussed in *Brasfield v. State*, 600 S.W.2d 288 (Tex. Cr. App. 1980); *Hovila v. State*, 562 S.W.2d 243 (Tex. Cr. App. 1978). See *Robinson v. State*, 548 S.W.2d 63, 64 (Tex. Cr. App. 1977).

In order to determine whether the facts present in the instant case were sufficient we may look to other cases where the State failed to present sufficient evidence. The cases of *Roney v. State,* supra; *Garcia v. State*, 626 S.W.2d 46 (Tex. Cr. App. 1982); *Wallace v. State,* 618 S.W.2d 67 (Tex. Cr. App. 1981); *Brasfield v. State,* 600 S.W.2d 288 (Tex.Cr.App.1980)*; Warren v. State*, 562 S.W.2d 474 (Tex. Cr. App. 1978), as well as *Beltran v. State*, supra need to be examined.

Any stimulus to Mr. Thomas' past crimes does not exist in prison. *Cf. Berry*, 233 S.W.3d at 864 (finding "a very low probability that, if sentenced to life in prison, [appellant] will have any more children"). The State failed to show any possibility (much less a probability beyond a reasonable doubt) that Mr. Thomas would commit any crimes if sentenced to life in Texas.

Rather than relying on the type of evidence this Court has found demonstrative of premeditation and future dangerousness, however, the State relied on conduct with little if any probative value of future dangerousness. The State's argument was essentially requesting the jury to compare the worthiness of the Defendant's life to that of the victim.

The State presented evidence of offenses that occurred while Mr. Thomas was young. He was found guilty of capital murder and sentenced to death in 1986. He was incarcerated at the Ellis Unit in Huntsville, Texas until 2001 when death row was moved to the Polunsky Unit. While he was incarcerated in the Ellis Unit, Mr. Thomas was allowed to work, eat and recreate with other inmates.

James Aiken testified that he reviewed the prison history to Kenneth Thomas and stated that Kenneth followed a "predictable scale." (RR: Vol. 67 p. 83) He testified that Kenneth had dysfunctional behavior when he was in the Dallas County Jail from 1979 to 1983, when he was young. (RR: Vol. 67 p. 83) During these years in the county jail, Kenneth was living with a "revolving population" as opposed to a high-security prison where inmates are serving long sentences. (RR: Vol. 67 p. 84)

Steven Phillips testified that his time (1982-1984) in the Dallas County Jail was chaotic and horrible. (RR: Vol. 68 p. 13) He said today that guards watch the inmates more closely and have monitors set up to see what is happening in the tanks. (RR: Vol. 68 p. 13-14) He said when he was incarcerated, the tank boss had more control over the inmates than the guards. (RR: Vol. 68 p. 14) He stated that a lot of the problems in the Dallas County Jail back then were due to a lack of supervision compared to TDC. (RR: Vol. 68)

James Aiken said he looked at 15 write ups of the Defendant during his 27 years of incarceration in the Department of Corrections. (RR: Vol. 67 p. 85) He said finding instructions on how to wire a radio in order to talk to other inmates was a fairly common occurrence. He said that when looking at the write up for having a razor blade, he looks to see if the inmate has stabbed anyone and why the inmate has possession of a razor if he hasn't harmed anyone or threatened anyone. (RR: Vol. 67 p. 86) He saw that Mr. Thomas had problems with two inmates and was written up for fighting even though he was found not guilty and the other inmates punched first. (RR: Vol. 67 p. 96) He said that Mr. Thomas was written up for mouthing off to a guard and throwing water on a guard. (RR: Vol. 67 p. 87) He said he often sees this behavior in younger inmates. (RR: Vol. 67 p. 88) He said Mr. Thomas was written up for possession of a homemade hat, a piece of sand paper and tobacco. (RR: Vol. 67 p. 88-89)

The witness stated that 15 write ups in 27 years put Mr. Thomas in the minuscule range of being a disruptive inmate. (RR: Vol. 67 p. 89) He reviewed the write ups and stated that there was no evidence of systemic or random violence. (RR: Vol. 67 p. 93) Mr. Thomas who was watched 24 hours a day went for years without any write ups and when he was written up for rule infractions, they were spread out over the years, sometimes only one in a year. (RR: Vol. 67 p. 91-96)

Raymond Moore, a Sergeant for the Dallas County Jail and as part of his job he supervised Kenneth Thomas who was in administrative custody. (RR: Vol. 68 p. 25) He said Mr. Thomas was in a single cell and every 30 minutes somebody walked by his cell. (RR: Vol. 68 p. 25) He said that most of the inmates in this type of housing cause more problems than Mr. Thomas. (RR: Vol. 68 p. 26) He stated that he didn't have any problems with Mr. Thomas entire time he had been under his supervision. (RR: Vol. 68 p. 26) He said Mr. Thomas was never written up and never lost any privileges. (RR: Vol. 68 p. 28) The witness recalled that during the weekly shake downs of Mr. Thomas' cell, Mr. Thomas knew the drill and never gave them any problems. (RR: Vol. 68 p. 29) He described Mr. Thomas as a model prisoner who was respectful, well-mannered, polite and quite. (RR: Vol. 68 p. 29-30)

David Weeks a licensed detention officer at the Dallas County Jail, said he has supervised Mr. Thomas and on one occasion moved Mr. Thomas when Mr. Thomas requested he be moved to a quieter area because of disruptions by other inmates. (RR: Vol. 68 p. 46) He said Mr. Thomas was a quiet inmate who knew what was right and what was wrong. (RR: Vol. 68 p. 46) Mr. Thomas wanted to be moved because someone was being loud and he didn't want to get in trouble. (RR: Vol. 68 p. 47)

The witness stated that as long as he has worked at the jail, he had never experienced someone as quiet as Mr. Thomas. (RR: Vol. 68 p. 47) He testified that Mr.

Thomas kept his cell immaculate, never cursed and was always respectful. (RR: Vol. 68 p. 47) It appeared to him that Mr. Thomas had been trained in the jail routines. (RR: Vol. 68 p. 49) He said Mr. Thomas had no write ups for infractions. (RR: Vol. 68 p. 50) Mr. Thomas was respectful to the female staff. (RR: Vol. 49-50) He said he never had any problems with him while he was escorting him and recalled that Mr. Thomas was always cooperative, knew the routine so well that they didn't have to tell him what to do. (RR: Vol. 68 p.55) He thought if Mr. Thomas was in the general population, he would stay to himself and others wouldn't bother him because a lot of the younger inmates respected him. (RR: Vol. 68 p. 56)

Anthony Graves testified that Mr. Thomas was very quiet, laid back and didn't bother anyone else. (RR: Vol. 68 p. 90) He said in the twelve years he knew Mr. Thomas, he never did anything to cause trouble. (RR: Vol. 68 p. 91) He said razors were used to cut food that was bought in the commissary such as summer sausage, peppers, and pickles. (RR: Vol. 68 p. 92) He said if a razor was found with a pencil, the inmate would have been using the razor to sharpen the pencil. (RR: Vol. 68 p. 92) He said that at one point, inmates were given razors. (RR: Vol. 68 p. 93) He said if an officer saw you had broken the razor to use, he would tell the inmate to flush it when they were through so they wouldn't get a case. (RR: Vol. 68 p. 93) He said the guards were always aware that the inmates had razors. (RR: Vol. 68 p. 983)

140

These are facts that are crucial in determining whether or not Mr. Thomas posed a future danger. He showed that from 1986 to 2014 he lived peacefully among other inmates. Mr. Thomas, by his peaceful behavior, proved that he was not a danger to the prison population.

There is nothing in the records of Mr. Thomas nor recent testimony from inmates or prison personnel that show he is a risk for future dangerousness. There were no instances of any misconduct or acts of violence while he was being held in the Dallas County Jail awaiting trial and during trial. Mr. Thomas has shown by his behavior since 1986, the year of the offenses, that he is not a danger to society.

The State of Texas has determined that dangerous people must be executed when they pose such a threat that there is no safe place that the State can put them. The law that allows for a jury to impose the death penalty also requires the evidence for future dangerousness to be substantial and convincing. The State executes people because they will be continually dangerous, not because of the impact the murder has had on the victim's family. Appellant submits that the jury was more influenced by the State's argument that Mr. Thomas did not deserve to live when the family of the victims did not have their loved ones in their lives, than in the evidence that Appellant was peaceful in prison. Appellant could not have provided any proof other than his twenty-seven year peaceful record to the jury. The State did not present any evidence of future

141

dangerousness that would overcome Appellant's peaceful, nonviolent twenty-seven year history in the Texas Department of Criminal Justice. The finding on Special Issue No. 3 by the jury is grossly unjust. It is apparent that the jury voted "yes" to the issue of future dangerousness without any compelling evidence to support their verdict in order to assure the death penalty for the defendant.

This Court should find in viewing the evidence and under the test described in *Beltran v. State, supra*; *Santana v. State*, *supra*; and *Fierro v. State*, *supra,* there is legally insufficient evidence to support the affirmative finding by the jury to the second special issue under Article 37.071§3(a)(1), *supra*.

## APPELLANT'S ISSUE NO. 50

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUESTED JURY INSTRUCTION THAT DEFINES "SIGNIFICANTLY SUB-AVERAGE GENERAL INTELLECTUAL FUNCTIONING"

Appellant respectfully directs this Honorable Court to Reporter's Record Volume 69 p. 120 at which Appellant stated his objection and requested instruction. Appellant requested the charge on defining "significantly sub-average general intellectual functioning to be modified as follows:

. . .
MR. TATUM: . . .Your Honor, in reviewing the Court's Charge, we are requesting an additional two sentences to be placed in the paragraph that's defining significantly sub-average general intellectual functioning. In that definition - - it's on page two, third paragraph from the bottom, end of the last sentence.

142

We are requesting that the Court insert these two sentences, to fully develop and give an accurate definition of this terminology, which we believe is not in the common knowledge of jurors. Or, there is not common-knowledge definition, and that's why the term - - the phrase is defined.  We think it's inadequate.  It needs to talk about the fact that there is a standard error of measurement.

What we propose is that the next sentence should read: "IQ tests has a standard error of measurement which is a reflection of the inherent imprecision of the test itself.:

The next sentence should read: "An IQ score of 70 is considered to represent a band or zone of a score of 65 to 75."

This language is taken from the recent Supreme Court case of Hall versus Florida, 134 Supreme Court, 1986, which was decided this year, March - - -May 27, 2014.

. . . .

In support of this proposition the defense presented the testimony of Dr.

McGarrahan, who previously testified as to Appellant's competency that it is important

for a lay juror to know that an IQ score is an approximation in a range of scores.  (RR:

Vol. 69 p. 123) This information is necessary to adequately incorporate the standard

error of measurement of plus or minus five points.  Appellant argues that to deny a full

definition denied Appellant due process in having the term of art fully described

consistent with the holding in the *Hall* case for the trier of fact to consider. See

discussion in dissenting opinion in *Middleton v. State*, 239 S.W.45 ( Tex. Crim. App.

2003).

**APPELLANT'S ISSUE NO. 51**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUEST THAT THE DEFENSE DID NOT HAVE TO PROVE MENTAL RETARDATION I.E. INTELLECTUAL DISABILITY BY UNANIMOUS JURY VERDICT OF TEN MEMBERS CONCURRING AS OPPOSED TO TWELVE**

Appellant objected that the charge on intellectual disability had to be proved by a unanimous verdict rather than the civil law standard of by 10 of 12 votes of the 12 person jury. The evidence is tested against the civil law burden of proof if "by a preponderance of the evidence." See Rule 292 Texas Rules of Civil Procedure. *Ex Parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004) and *Lallo v. State*, 239 S.W.3d 757 (Tex. Rim. App. 2007). See footnote 30 to case of *Williams v. State,* 270 S.W.3d 112 (Tex. Crim. App. 2008). Appellant submits he was denied a fair trial by having to prove that he was intellectually disabled by a unanimous verdict of the jury.

**APPELLANT'S ISSUE NO. 52**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUESTED 'ACCOMPLICE' WITNESS CHARGE IN THIS PUNISHMENT RETRIAL WHERE THE ORIGINAL GUILT/INNOCENCE CHARGE CONTAINED SUCH A CHARGE**

Appellant requested an 'accomplice witness charge' be submitted to the jury on the basis that Appellant's brother, Lonnie Thomas, was arrested and charged with the same offense and he testified against Appellant. Appellant argues that it was reversible

error for the Court not to charge the jury pursuant to Article 38.14 C.C.P. *Zamosa v. State*, 41 S.W.3d 504 (Tex. Crim. App. 2013).

**APPELLANT'S ISSUE NO. 53**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUESTED 'ANTI-PARTIES' CHARGE IN THE JURY CHARGE**

Appellant requested an 'anti-parties' charge (RR: Vol.69 p.128) which was denied. An anti-parties charge had been given in the guilt/innocence stage of the trial, but to a different jury. Appellant's brother, Lonnie Thomas was arrested as a co-defendant in this case, which raises the issue of whether Appellant was only guilty as a party to the offense.  Appellant submits that it was reversible error to not submit this requested charge pursuant to the discussion of the merits of such a charge in *Belyeu v.State* 791 S.W.2d 66, 73 (Tex. Crim. App. 1989). See also *Green v. State*, 682 S.W.2d 271 (Tex. Crim. App. 1984) and *Marguez v. State*, 725 S.W.2d 217 (Tex.Crim. App. 1987).

**APPELLANT'S ISSUE NO. 54**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FILED UNDER SEAL BEFORE TRIAL COURT RECEIVED THE JURY'S VERDICT FOR A COMPETENCY HEARING**

Appellant made a motion under seal for a second competency hearing based on Appellant's conduct during trial that counsel believed was relevant on the issue of competency that occurred after the competency jury trial was held but prior to taking the

145

verdict. (RR: Vol. 70 p. 81) The motion was presented under seal. The motion has been unsealed by order of the trial court and made available for appellate review.

The motion is entitled Second Notice of Incompetence to Stand Trial. Pursuant to Art. 46B.04 Defendant's counsel requested a second hearing on defendant's competency to stand trial. Counsel attached her sworn affidavit, her interview notes and a sample of defendant's hand written correspondence. Appellant submits that the trial court abused its discretion in not conducting a competency hearing with a jury. In *Rodriguez v. State*, 324 S.W.3d 74 (Tex. Crim. App. -Hou [14ᵗʰ Dist.] 2010) it was written:

A defendant is incompetent when he or she lacks (1) sufficient present ability to consult with counsel with a reasonable degree of rational understanding or (2) a rational and factual understanding of the legal proceedings. Tex.Code Crim. Proc. Ann. art. 46B.003(a) (West 2006). A trial court has an obligation to sua sponte hold an informal inquiry into competency if "evidence suggesting the defendant may be incompetent to stand trial comes to the attention of the court." Tex.Code Crim. Proc. Ann. art. 46B.004(b) (West 2006). After the informal inquiry, if the court determines some evidence exists that would support a finding of incompetence, then the court must appoint an expert to examine the defendant and hold a trial to determine whether the defendant is actually incompetent to stand trial on the merits. Tex.Code Crim. Proc. Ann. art. 46B.004–.005 (West 2006).

The "evidence" required to trigger the mandatory informal inquiry can be any fact brought to the court's attention that raises a bona fide doubt regarding the defendant's competency. *Fuller v. State,* 253 S.W.3d 220, 228 (Tex.Crim.App.2008); *Criswell v. State,* 278 S.W.3d 455, 458 (Tex.App.-Houston [14th Dist.] 2009, no pet.). Evidence sufficient to create a bona fide doubt includes facts regarding the defendant's "recent severe mental illness, at least moderate retardation, or truly bizarre acts by the defendant." *Fuller,* 253 S.W.3d at 228 (quotation omitted). Evidence sufficient to create a bona fide doubt may also include any other fact from a reasonable or credible source that tends to show incompetence. *Alcott v. State,* 51 S.W.3d 596, 599 (Tex.Crim.App.2001); *see also Kostura v. State,* 292 S.W.3d 744, 749 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (Sullivan, J., concurring). This evidence need not be sufficient to find a defendant actually incompetent. *Fuller,* 253 S.W.3d at 228. It must simply create " 'a real doubt in the judge's mind as to the defendant's competency.' " *Kostura,* 292 S.W.3d at 747 (majority opinion) (quoting *Alcott,* 51 S.W.3d at 599 n. 10). We review a trial court's implicit decision to not hold a sua sponte informal inquiry for an abuse of discretion. *Id.* at 746.

A defendant has the right to be competent throughout his or her entire trial, which includes sentencing. *Casey v. State,* 924 S.W.2d 946, 949 (Tex.Crim.App.1996). Thus, the Texas competency statutes "allow competency to be raised, by either party or the

147

judge, at any time before sentence is pronounced." *Morris v. State,* 301 S.W.3d 281, 290 (Tex.Crim.App.2009).

The trial court entered an order unsealing Reporter's Record Volume 11 in which is a record of Defendant's refusal to appear in court during individual voir dire. A review shows trial counsel's concerns that the Defendant would be disruptive and that his demeanor had changed. (RR: Vol. 11 p. 4-5) Reporter's Record was also unsealed for appeal and writ purposes which reveals that during the trial the defendant undressed and covered himself with feces and wanted to enter the courtroom in this condition. This showed a material change in his competency (p. 5). The Defendant agreed to clean up but wanted to see his psych doctor. (pp. 11-12) The photographs of the defendant naked with feces smeared on his face and chest appear at RR: Vol. 12 p. 11-12.

The trial court abused its discretion in failing to hold a competency hearing before sentencing, which can only be remedied by reversing the judgment and ordering a competency hearing be conducted. See also *Burgan v. State,* 259 S.W.3d 219 (Tex. Ct. App.-Beaumont, 2008).

**(Appellant has specially instructed Appellate Counsel to raise the following issue on direct appeal despite the fact that the retrial was for punishment only.)**

**APPELLANT'S ISSUE NO. 55**

**THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE CONVICTION FOR CAPITAL MURDER**

Appellant submits that the evidence presented at trial was not sufficient to support the conviction for capital murder. Appellant maintains that he can not be guilty as charged because the alleged murder weapon, a knife, was not found. This fact has been central to Appellant's mental incompetence and intellectual disability.

Texas law requires that the State establish:(1) the offense was actually committed; and (2) the accused was the person who either committed or participated in the crime. See *Johnson v. State*, 673 S.W.2d 190, 197 (Tex. Crim. App.1984). The State must prove more than just a plausible explanation of the crime. *Reeves v. State*, 806 S.W.2d 540, 543 (Tex. Crim.App.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 641, 113 L.Ed.2d 736 (1991). While the trier of fact is the sole judge of the weight and credibility of the witnesses, *Coe v. State*, 683 S.W.2d 431, 438 (Tex.Crim.App.1984); *Williams v. State*, 692 S.W.2d 671, 676 (Tex.Crim.App.1984), a guilty verdict should not be allowed to stand merely because the defendant was found to be the most likely perpetrator. A defendant, even the most likely defendant, is presumed to be innocent unless his guilty is established beyond reasonable doubt. See TEX.CODE CRIM. PROC. ANN. Art 38.03

(Vernon Supp. 1991); see also *Ardovina v. State*, 143 Tex. Crim. 43, 156 S.W.2d 983, 984(1941); *Perkins v. State*, 32 Tex. 109, 112(1869).

A review of the testimony shows that the record is insufficient to show Appellant participated in the offense of Capital Murder. Appellant argues that the State failed to present sufficient evidence to support the conviction for capital murder.

There was no knife or any other weapon that was found to be linked to this offense and to Appellant. Appellant submits that the evidence shows the items taken during the offense were numerous and could have filled two vehicles. (RR: Vol. 62 p. 102) Appellant argues that he alone could not have removed the items from the house and taken them to their location by himself, even if he had a shopping cart as the State surmised. Appellant does not drive and has never driven a motor vehicle. (RR: Vol. 62 p. 62) Appellant submits that there is no evidence in the record to support his conviction for capital murder. (See discussion of requirement that there be evidence beyond a reasonable doubt of every fact necessary to constitute the crime with which a defendant is charged in *Cruz v. State*, 629 S.W. 2d 852 (Tex. Ct. App. Corpus Christi, 1982) citing *In Re Windship*, 397 U.S. 358 (1970).

**CONSTITUTIONAL ISSUES ATTACKING THE TEXAS DEATH PENALTY STATUE AND SCHEME**

*(The following Constitutional Issues have been previously submitted to this Honorable Court; which previously has overruled the issues raised. See Saldano v. State, 232 S.W.3d 77 (Tex. Crim.App. 2007) Appellant submits these issues in this case not to cause unnecessary litigation but to invite this Court to review any prior stand on any issue and more importantly to preserve each issue for further review in the Federal Court system; which has final constitutional power of review.)*

Appellant urged his constitutional attack on the Texas Death Penalty statute and scheme in pre trial motions denied by the trial court on June 20 2014, (RR. Vol. 56 pp.18-19). At the time of drafting the brief the district clerk did not include these motion in the appellate record filed with this court along with the punishment jury charge. The clerk would not allow appellate counsel access to the actual court file claiming that they are all electronic. Counsel for the State and appellant's counsel have agreed on a course of action to remedy this situation which will require a supplementation of the clerk's record once access is obtained.

**APPELLANT'S ISSUE NO. 56**

**THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT PROHIBITION OF THE EIGHTH AMENDMENT BECAUSE IT ALLOWS THE JURY TOO MUCH DISCRETION TO DETERMINE WHO SHOULD LIVE AND WHO SHOULD DIE AND BECAUSE IT LACKS THE MINIMAL STANDARDS AND GUIDANCE NECESSARY FOR THE JURY TO AVOID THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY**

This Court should declare the statutory scheme under which Appellant was convicted and sentenced to death unconstitutional in violation of the Eighth Amendment and vacate his death sentence. In its current formulation, the Texas scheme does not insure such a reasonably consistent application of the ultimate penalty.

**APPELLANT'S ISSUE NO. 57**

**THE STATUTE UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL IN VIOLATION OF THE DUE PROCESS REQUIREMENTS OF THE FOURTEENTH AMENDMENT BECAUSE IT IMPLICITLY PUTS THE BURDEN OF PROVING THE MITIGATION SPECIAL ISSUE ON APPELLANT RATHER THAN REQUIRING A JURY FINDING AGAINST APPELLANT ON THAT ISSUE UNDER THE BEYOND A REASONABLE DOUBT STANDARD**

Under the Texas statutory scheme, Appellant's jury was not instructed on a burden of proof on the mitigation special issue. *See Lawton*, 913 S.W.2d at 557 ("the Texas legislature has not assigned a burden of proof regarding mitigating evidence"). *See id*.

("the burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case").

The Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), necessitates a finding that the Texas death penalty scheme is unconstitutional because it does not place the burden of proof on the State that would require the jury to find beyond a reasonable doubt that there are no mitigating circumstances sufficient to warrant the imposition of life rather than death. *Apprendi* should be applied to article 37.071, section 2(e)(1).

## APPELLANT'S ISSUE NO. 58

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO HOLD ARTICLE 37.071 Sec. 2(E) AND (F) CONCERNING BURDEN OF PROOF UNCONSTITUTIONAL AS A VIOLATION OF ARTICLE ONE SEC. 10 AND SEC. 13 OF THE TEXAS CONSTITUTION**

The infirmities in the statute discussed in the previous issue are also violative of State Constitutional Law. Under the "due course of law" provision of the Texas Constitution, Article I Sec. 10, the citizens of this state are guaranteed that any punishment for an offense will be in accordance with the law. *McFarlane v. State*, 254 S.W.2d 136 (Tex. Cr. App. 1953). When the burden of proof is shifted to the Defendant, the State's burden has essentially been reduced.

153

**APPELLANT'S ISSUE NO. 59**

**THE TEXAS DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT, CONTRARY TO *APPRENDI* AND ITS PROGENY**

Appellant's Motion on the unconstitionality of the burden of proof on this special issue was denied by the trial court.

**APPELLANT'S ISSUE NO. 60**

**THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT SPECIAL ISSUES.**

Texas' 12/10 Rule generates the danger that confused jurors otherwise predisposed to hold-out on voting for a death sentence will conform to a "majority-rules" mentality. *See Mills v. Maryland*, 486 U.S. 367, 383, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988) Put another way, Texas' 12/10 Rule is a built-in impermissible "dynamite charge", which has been recognized as a possible Eighth Amendment violation in the capital sentencing context. *See Lowenfield v. Phelps*, 484 U.S. at 240-41, 108 S.Ct. at 522, 98 L.Ed.2d.

**APPELLANT'S ISSUE 61**

**THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT, AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF VAGUE, UNDEFINED TERMS IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF THE TRIAL THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND THE IMPOSITION OF THE DEATH PENALTY.**

## ARGUMENT AND AUTHORITIES

At the conclusion of the punishment phase, the trial court submitted to the jury the two statutory special issues (see TEX. CODE CRIM. PROC. ANN. art. 37.071, §3(b)(1), (b)(2), (e) (Vernon Supp. 1999).

The trial court did not define certain critical terms appearing in these questions, namely, "probability", "continuing threat to society",  and "criminal acts of violence", which terms  are so vague and indefinite as to be violative of Appellant's fundamental constitutional rights.  Consequently, the jury was deprived of any instructions concerning the meaning of these crucial terms in the special issues.

155

**APPELLANT'S ISSUE NO. 62**

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO HOLD ART. 37.071 Sec. 2(e) and (f) UNCONSTITUTIONAL BECAUSE SAID STATUTE FAILS TO REQUIRE THE ISSUE OF MITIGATION BE CONSIDERED BY THE JURY**

Article 37.071 Sec. 2 (c)and (f), submitted to a jury upon conviction of capital murder.

This statute is unconstitutional because it fails to require that jurors give meaningful consideration to mitigation evidence. After the juror has considered the mitigation, it is then up to the juror to determine what effect to give the mitigation. Failure to mandate meaningful consideration of mitigating evidence makes this statute unconstitutional in violation of the Eighth Amendment.

**APPELLANT'S ISSUE NO. 63**

**THE STATUTORY "PENRY" SPECIAL ISSUE IN TEX. CODE CRIM. PRO. ARTS. 37.071 & 37.0711 IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE**

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. See, *e.g., Walton v. Arizona*, 100 S.Ct. 3047, 3055 (1990) (state's "method of allocating the burdens of proof" during capital sentencing phase cannot "lessen the State's burden ... to prove the existence of aggravating factors").

**APPELLANT'S ISSUE NO. 64**

**THE STATUTORY "PENRY" SPECIAL ISSUE IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT PERMITS THE VERY TYPE OF OPEN-ENDED DISCRETION CONDEMNED BY THE UNITED STATES SUPREME COURT IN FURMAN V. GEORGIA**

In *Furman v. Georgia*, 408 U.S. 238 (1972), in which the Supreme Court struck down capital punishment as it then was being administered, the chief constitutional infirmity that controlling Members of the Court pointed to in their respective concurring opinions was arbitrariness. In particular, the Court condemned the open-ended, unstructured discretion that was given to capital sentencing juries. *See also*, *Gregg v. Georgia*, 428 U.S. 153 (1976); *Spaziano v. Florida*, 468 U.S. 447-64 (1984).

**APPELLANT'S ISSUE NO. 65**

**TEXAS' STATUTORY CAPITAL SENTENCING SCHEME IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT DOES NOT PERMIT MEANINGFUL APPELLATE REVIEW**

As discussed above, the pivotal sentencing issue in Texas capital cases - the statutory "*Penry*" special issue– does not specify the types of mitigating or aggravating factors relevant to a capital sentencing jury's deliberations during the punishment phase. Rather, the jury is simply asked whether there are "sufficient mitigating circumstance or

circumstances" to warrant a life sentence rather than a death sentence. See TEX. CODE CRIM. PROC. Arts. 37.071 and 37.0711

Appellant contends that Texas' unstructured sentencing scheme is unconstitutional because it does not permit meaningful appellate review, which is not only required by a Texas statute but also is a prerequisite to a constitutionally implemented capital sentencing scheme.

## APPELLANT'S ISSUE NO. 66

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S CONSTITUTIONAL CHALLENGES TO THE TEXAS CAPITAL MURDER DEATH PENALTY LAW

## ARGUMENTS AND AUTHORITIES

Appellant presented these issues in several pre trial motions denied by the trial court. These issues are raised in an effort to avoid any claim of waiver for further review even though this Court has previously resolved the issues adversely to Appellant's position.

The Texas capital punishment scheme does not permit the jury to consider and give effect to all the mitigating circumstances which exist concerning the defendant in violation of the Eighth and Fourteenth Amendment of the United States Constitution and/or Article 1 Sec. 10, 13 and 14 of the Texas Constitution.

The Texas death penalty scheme gives prosecutor's unfettered discretion to elect to proceed with the death penalty in violation of the Eighth and Fourteenth Amendment to the United States Constitution.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because jurors are not informed that a failure to agree on a special issue will result in life imprisonment.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because the jurors are not adequately guided by the three issues to present the jury from acting in an arbitrary and capricious manner.

The Texas Death Penalty Statute, at 37.071 violates the Eighth and Fourteenth Amendment to the United States Constitution because there is no proportionality review on appeal.

## APPELLANT'S ISSUE NO. 67

**THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION**

The Eighth Amendment to the United States Constitution requires a greater degree of accuracy and fact finding than would be true in a noncapital case. *Gilmore v.*

159

*Taylor*, 508 U.S. 333, 113 S.Ct. 2112, 124 L. Ed.2d 306 (1993) and *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

The decision as to which defendant is to be subjected to the death penalty varies from county to county. When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied. *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

The failure of the State to set forth uniform and specific standards to determine against whom a death sentence will be sought, violates the principles set forth in the United States Constitution.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, based on the issues presented and argument and authorities cited herein, there being reversible error appearing in the record of the trial of the case, Appellant prays this Honorable Court reverse the judgment of the trial court and remand for a new trial.

Respectfully submitted,

    /s/ John Tatum
John Tatum
Counsel for Appellant

160

## CERTIFICATE OF SERVICE

I, JOHN TATUM, do hereby certify that a true and correct copy of the foregoing Brief for Appellant was delivered to Hon. Susan Hawk, Criminal District Attorney of Dallas County Texas, Appellate Section, 11th floor, Frank Crowley Criminal Courts Building, Dallas, Texas 75207, on this 19th day of June, 2015.

       /s/  John Tatum
       John Tatum


## CERTIFICATE OF SERVICE

The undersigned attorney for Appellant certifies that a true and correct copy of the foregoing brief was mailed , postage prepaid, to Kenneth Thomas TDCJ #00000869 at the Polunsky Unit 3872 FM 350 South, Livingston, Texas 77351, by U.S. Mail this the 19th day of June, 2015.

       /s/ John Tatum
       JOHN TATUM

**CERTIFICATE OF COMPLIANCE OF WORD COUNT PURSUANT TO APPELLATE RULE OF PROCEDURE 9.4**

I certify that this document has 39,401 words pursuant to the definitions of length and content in Rule 9.4.

    A. Case Name: Kenneth Thomas

    B. The Court of Criminal Appeals Case Number: No. AP-77,047

    C. The Type of Document: Appellate Brief

    D. Party for whom the document is being submitted: Applicant

    E. The Word Processing Software and Version Used to Prepare the Brief: Word Perfect X7

Copies have been sent to all parties associated with this case.

_____/s/ John Tatum_____ 6/19/15

(Signature of filing party and date)

John Tatum
990 South Sherman St.
Richardson, Texas 75081
(972) 705-9200
SBOT# 19672500